Daniel J. Herling (SBN 103711)
Edward H. Davis (SBN 88210)
**DUANE MORRIS LLP**
One Market, Spear Tower, Suite 2000
San Francisco, CA 94105-1104
Telephone: 415.957.3000
Facsimile: 415.957.3001
E-Mail:  djherling@duanemorris.com
        ehdavis@duanemorris.com

Attorneys for Plaintiffs
EDDY DOMINGUEZ, NEWTON BUI, TAN
NGUYEN and LICINO VALINO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EDDY DOMINGUEZ, NEWTON BUI, TAN NGUYEN and LICINO VALINO,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREW CORPORATION,<br><br>Defendant. | Case No.  C 07-04679 CW<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER ON ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Dept:   2, 4th Floor<br>Judge:  Claudia Wilken<br>Complaint Filed:  September 11, 2007 |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Plaintiffs are moving this court for a temporary restraining order that prohibits Andrew Corporation from taking any further action that would interfere with the agreed-upon Operating Agreement (also known as the "operational plan of record") including, but not limited to, terminating the current employment of the Plaintiffs due to Plaintiffs filing a complaint for, among other causes of action, unjust enrichment and imposition of constructive trust and declaratory and injunctive relief.

Plaintiffs Eddy Dominguez, Newton Bui, Tan Nguyen, and Licino Valino ("Plaintiffs") engaged in negotiations with defendant Andrew Corporation ("Andrew") in 2005 for Andrew to purchase all of the outstanding capital stock of Cell Site Industries, Inc. ("CSI"). Plaintiffs are the former shareholders of CSI. On December 13, 2005, the Andrew business development team traveled to San Francisco to conduct face-to-face negotiations with Plaintiffs in order to agree to terms for a letter of intent to acquire all of CSI's common stock.

The San Francisco negotiations focused on three issues: (1) total valuation of the deal; (2) what percentage of the purchase price would be paid upfront; and (3) what percentage of the purchase price would be deferred, subject to a "earn-out" whereby, if CSI met certain revenue and operating income targets on or before certain dates, Andrew would pay a specified portion of the deferred purchase price to Plaintiffs. The negotiations resulted in a total purchase price of $21.5 million: $6.5 million to be paid upfront, a maximum of $5 million earn-out for year one, a maximum $5 earn-out for year two, and a maximum $4 million earn-out for year three. In addition, a $1 million retention bonus was added to the purchase price, which was not subject to the earn-out contingencies, and instead would be paid over three years prorata to the Plaintiffs who continued their employment with CSI.

The negotiated terms were incorporated into an initial Letter of Intent ("LOI") dated January 23, 2006. The LOI contained an exclusivity clause that ran for a 60-day period for the benefit of Andrew. Plaintiffs also signed a joint non-disclosure agreement (NDA") on January 28, 2006. The LOI period of exclusivity and NDA were twice extended at Andrew's request, and based

1

on Andrew's representation that significant resources were being expended to complete a due diligence review. At that time, Andrew knew that Plaintiffs received other unsolicited offers.

Plaintiffs and Andrew continued to negotiate the specific terms of a Stock Purchase Agreement ("SPA"). The final negotiations centered on several issues including: the calculation of the earn-out; defining a criteria in which the earn-out goals would be measured; and Plaintiffs' ability to maintain some control of certain business decisions affecting the goals for the business which, in turn, would affect CSI's ability to meet the criteria necessary for Plaintiffs to achieve the earn-out.

The plan, was for the negotiation points related to meeting the earn-out criteria, to be incorporated it into a so-called "Operating Agreement" (also known as the operational plan of record). Andrew insisted that any Operating Agreement not be developed until after the closing.

The earn-out payments were based on a contingency, of achieving defined revenue and operating income targets for the newly formed business unit comprised of former Cell Site Industries employees. Andrew Corporation named this business unit ACMC. The purpose of this Operating Agreement was to outline the agreed-upon investment Andrew would make in ACMC in the form of headcount and capital equipment to ensure ACMC's ability to continue to grow the business.

In year one, ACMC achieved its revenue and operating income targets, irrespective of the lack of investment from Andrew. During year one, ACMC repeatedly asked for investment of headcount and capital per the operational plan of record, but was denied time and time again with various excuses. Even without the investment, ACMC met the yearly targets, while cautioning all along of impending financial consequences.

Because of the lack of investment in year one, Andrew has inhibited the ability of ACMC to achieve year two and year three earn-outs.

On August 27, 2007, Andrew announced that it had reached an agreement to be acquired by CommScope, Inc. This acquisition has been characterized as an all-cash deal that is highly leveraged, indicating the probability that certain assets will be packaged and sold to help pay for the acquisition. This probability is evidenced from Andrew's consolidation of its business units from five divisions to two in order to facilitate a sale or spin off of unwanted assets.

In light of its pending acquisition, Andrew Management has directed ACMC management, operations and sales to focus all its efforts on maximizing fourth quarter fiscal year 2007 revenues (ended September 2007) (at the expense of future revenues), in an attempt to reverse the worst quarter (FY Q3 2007 ended June 2007) in Andrew's history to ensure that the CommScope, Inc. acquisition is consummated.

Despite Andrew's failure to invest in ACMC, ACMC was able to achieve the first year earn-out targets. However, Andrew's continuing failure to perform under the Operating Agreement, and Andrew Management's directives to sacrifice all future operating income and revenue targets for short term fourth quarter objectives, will make it all but impossible to meet year two and year three earn-out objectives.

Unless immediately enjoined from its continuing breach of the Operating Agreement and the SPA, Plaintiffs will have no opportunity to meet the year two and year three milestones in order to achieve its earn-out. Plaintiffs stand to lose the opportunity, through no fault or inaction of their own, to earn a maximum of $9 million. Further, if Andrew is not enjoined, Plaintiffs stand to incur loss of goodwill, because, amongst other things, many business relationships that they have developed will be disrupted or severed as a result of Andrew's failure to provide ACMC the headcount and capital investment to ensure ACMC's ability to continue to grow its business in spite of any potential sell off by Andrew. As a result, Plaintiffs will sustain irreparable injury.

Permitting Andrew to impede ACMC's ability to meet its targets and therefore resulting in the Plaintiffs not having an opportunity to meet its earn-out milestones, Andrew has been unjustly enriched.

On September 11, 2007, Plaintiffs filed a complaint against Andrew Corporation (*Dominguez, et al. v. Andrew Corporation, et al.*, United States District Court, for the Northern District of California, Case No. C 07-04679 CW. Based upon previous comments made by Andrew Corporation management, Plaintiffs are concerned that the filing of this lawsuit will result in their being terminated from their current employment with the ACMC business unit of Andrew.

In order to preserve the status quo and prevent Plaintiffs from sustaining immediate and irreparable harm, for which there is no adequate legal remedy, this Court should enjoin Andrew from

3

taking any further action that would interfere with the agreed-upon operational plan of record including, but not limited to, the termination or reassignment of the Plaintiffs from their current employment positions with the ACMC division of Andrew.

### A.   ARGUMENT

#### 1.   Plaintiffs Are Entitled To A Temporary Restraining Order.

It is well established that a United States District Court properly vested with diversity jurisdiction may grant injunctive relief to enforce local or state law. *See e.g.*, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-312 (1982) (federal court may issue an injunction on any case within its subject matter jurisdiction that is appropriate for equitable relief; *accord United States v. Holtzman*, 762 F.2d 720, 724 (9th Cir. 1985). The purpose of a temporary restraining order is to preserve the status quo, pending a hearing on an application for a preliminary injunction. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, Local 70*, 415 U.S. 423, 439 (1974). The status quo will not be maintained unless a temporary restraining order is issued enjoining Andrew from prohibiting Plaintiffs from performing their duties pursuant to the operational plan of record as agreed upon by both parties. Absent entry of the requested temporary restraining order, Plaintiffs will be faced with having to achieve their earn-out milestones without the vital assets of headcount capital and equipment to ensure Plaintiffs will be able, through ACMC, to continue to grow the business. Although most TRO's and preliminary injunctions in the Ninth Circuit are prohibitory in effect, prohibitory orders may be ineffective or inadequate. In the instant case, the request is to require Andrew to "abide by the operational plan of record" and not terminate Plaintiffs from their employment. In such cases, federal courts are fully empowered to grant mandatory preliminary injunctions. *See, Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841, fn. 8 (9th Cir. 2001) (The court acknowledges the nature of mandatory injunction may be somewhat unusual, it was in the broad description of the district court to fashion a remedy to preserve the status quo and prevent irreparable harm).

In the Ninth Circuit, the standards for issuing a temporary restraining order are similar to those for issuance of a preliminary injunction, although less exact giving the severe time constraints. *Woodrow F. Morgan, Inc. v. United States*, 670 F.Supp. 289, 291 (E.D.Cal. 1987); see also *LA*

*United Schools District v. U.S. District Court*, 650 F.2d 1004, 1008 (9th Cir. 1981) (dissenting opinion) *cert. denied*, 474 U.S. 919 (1985).

A temporary restraining order or preliminary injunction is justified when: the moving party must show: either (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) serious questions are raised in the balance of hardships which tips sharply in favor of the moving party. *Stuhlbarg* at 840-841; *Dr. Seuss Enters. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1397 n. 1 (9th Cir. 1997). These standards "are not separate tests but the outer reaches of a single continuum." *International Jensen, Inc. v. Metro Sound USA*, 4 F.3d 819, 822 (9th Cir. 1993). Under either analysis, the entry of a temporary restraining order is appropriate for several reasons.

**B.    Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.**

It is undisputed that:

- Plaintiffs and Andrew negotiated that out of the total purchase price of $21.5 million, $14 million was based on earn-outs in years one through three. Complaint, ¶ 13; Dominguez Decl., ¶ 4;

- Andrew representatives knew that the earn-out was a critical element of the SPA and that Plaintiffs needed some assurances to proceed with the SPA. Andrew representatives advised Plaintiffs that Andrew would put significant resources behind development of the Operating Agreement and would fully support Plaintiffs with adequate headcount and capital resources. Andrew refused to officially incorporate Operating Agreement in the SPA, but rather agreed with Plaintiffs to an operational plan of record. Complaint, ¶ 18; Dominguez Decl., ¶ 5;

- Unbeknownst to Plaintiffs at the time that Plaintiffs and Andrew were negotiating the SPA in April 2006, Andrew was involved in active negotiations with ADC Telecommunications, Inc. for the sale of Andrew to ADC Telecommunications, Inc. These negotiations culminated in Andrew and ADC signing an agreement on May 31, 2006 for the acquisition of Andrew, less than a month after the SPA was executed by Plaintiffs and Andrew. Complaint, ¶ 19;

- During the Chicago meeting, Andrew representatives knew or should have known that the earn-out was a substantial and important part of the SPA and the overall purchase price and that Andrew's imminent sale could have serious and detrimental effect on Plaintiffs' ability to fulfill the contingencies necessary for the earn-out. Complaint, ¶ 20; Dominguez Decl., ¶ 5;

- The acquisition of Andrew by ADC Telecom was terminated in August 2006 (as a result of an unsolicited bid by CommScope, Inc. on or about August 9, 2006), lifting the freeze that had been put in place when the SPA was signed. At this time, Andrew assured Plaintiffs that CSI had Andrew's full support and that the promised resources would now be delivered. However, they were not; and negotiations, unbeknownst to Plaintiffs, continued with CommScope, Inc. Complaint, ¶ 23; Dominguez Decl., ¶ 6;

- During the course of employment with ACMC, Andrew management has advised Plaintiff Eddy Dominguez that the criteria for meeting the earn-out is dependent solely upon the Operating Agreement and despite the language in the SPA, the SPA was not relevant (in their opinion) to the Plaintiffs meeting the earn-out criteria. Dominguez Decl., ¶ 5;

- Andrew and Plaintiffs drafted the Operating Agreement for the purpose of outlining operational support (headcount and capital investment) levels adequate to allow Plaintiffs to meet or exceed the earn-outs "threshold criteria," necessary to collect a substantial portion of the total sales price. However, Andrew intentionally failed to fulfill its obligations pursuant to Operating Agreement, making it extremely difficult if not impossible for ACMC to meet the criteria necessary for Plaintiffs to be paid the earn-out. The Plaintiffs, in spite of Andrew's failure to perform, achieved the first year earn-out targets. However, Andrew's continuing failure to perform under the Operating Agreement and Andrew management directives to sacrifice all future operating income and revenue targets for short term fourth quarter objectives would make it all but impossible to meet year two and year three earn-out objectives. Complaint, ¶ 27; Dominguez Decl., ¶ 7.

- ➢ On August 27, 2007 Andrew announced yet again that it had reached an agreement to be acquired, this time by CommScope, Inc.  This acquisition has been characterized as an all-cash deal that is highly leveraged, indicating the possibility that certain assets will be packaged and sold to help pay for the acquisition.  Indications of this are evidenced from Andrew's consolidation of its business units from five divisions to two, to facilitate a sale or spin off of unwanted assets.  Complaint, ¶ 24;
- ➢ In light of its pending acquisition, Andrew Management has directed ACMC management, operations and sales to focus all of its efforts on maximizing fourth quarter fiscal year 2007 revenues (end of September 2007) at the expense of future revenues.  Complaint, ¶ 25, Dominguez Decl., ¶ 8;
- ➢ Andrew has incurred its worst quarter (FY Q3 2007 ending June 2007) in Andrew's history.  Davis Decl., ¶ 4.

Accordingly, the evidence is straightforward.  Andrew was aware that the earn-out payments comprised 65 percent of the total purchase price.  Despite Andrew not complying with the Operating Agreement, Plaintiffs were able to ensure that the business division of Andrew that it ran, ACMC, earned the year one $5 million earn-out.  Now that Andrew is in the process of selling to CommScope, Inc., it is erecting obstacles which would preclude Plaintiffs from even having the opportunity of meeting its earn-outs for years two and three.  Should the Plaintiffs not move for a restraining order, it will be faced with the argument that no damages can be awarded because they would be speculative in nature.  Accordingly, under the current situation, Plaintiffs have no adequate remedy at all.

**C. Plaintiffs Will Suffer Irreparable Harm Unless Andrew Is Temporarily Restrained.**

Plaintiffs will suffer irreparable injury unless this court enters a temporary restraining order against defendant Andrew.  Where an injury is not compensable in damages, even if the plaintiff prevails on the merits, the injury is "irreparable" and warrants injunctive relief.  *Sun Dance Land Corp. v. Community First Fed. Sav. Ass'n*, 840 F.2d 653, 661 (9th Cir. 1988).

Here, because of Andrew's unlawful unilateral decision not to allow Plaintiffs to have adequate operational assets, Plaintiffs have been deprived of a fair chance to reach the milestones for its earn-outs.

In the event that Andrew sells or spins off a business unit including ACMC, Plaintiffs are also at risk, because the Andrew management directives to preclude ACMC from having the necessary headcount and operational capital, the Plaintiffs face the real threat of loss of perspective customers and/or goodwill. See Dominguez Decl., ¶ 10. Evidence of a threatened loss of prospective customers or goodwill certainly supports a finding of a possibility of irreparable harm. See *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2nd Cir. 1995) (in trademark licensing case, deprivation of opportunity to expand business is irreparable harm).

### D.  Any Harm Caused By Entry Of The Requested Order Is Clearly Outweighed By The Risk Of Harm Of Denying Plaintiffs' Request For Relief.

Plaintiffs are aware of no prejudice to Andrew which would result from entry of the requested interim injunctive relief and the brief delay that would ensue before a preliminary injunction hearing. In contrast to Plaintiffs' potential displacement and imminent loss of business opportunity obtained by foregoing of millions of dollars, defendant would suffer little harm, if any, for an issuance of a temporary restraining order.

## II.  CONCLUSION

Andrew's recent management directives to focus all of its efforts on maximizing fourth quarter fiscal year 2007 revenues, at the expense of future revenues, in an attempt to reverse the worst quarter in Andrew's history to preserve the CommScope, Inc. acquisition, reflects the necessity of having the TRO issued by this court. See Davis Decl., ¶ 4.

Dated: September 12, 2007              DUANE MORRIS LLP

                                        /s/   Daniel J. Herling
                                       By:  Daniel J. Herling
                                       Attorneys for Plaintiffs
                                       EDDY DOMINGUEZ, NEWTON BUI, TAN
                                       NGUYEN and LICINO VALINO