# EXHIBIT A - PART 1

STOCK PURCHASE AGREEMENT

AMONG

ANDREW CORPORATION,

CELLSITE INDUSTRIES, INC.,

EDDY DOMINGUEZ, AS SELLERS' AGENT,

AND

THE SELLERS SIGNATORY HERETO

April 24, 2006

# STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement") is made as of April 24, 2006, by and among Andrew Corporation, a Delaware corporation (the "Buyer"), CellSite Industries Inc., a California corporation (the "Target"), each of the individuals listed on the Schedule of Sellers attached hereto (collectively, the "Sellers"), and only as to Sections 2(f), 2(g), 8 and 10 hereof, Eddy Dominguez, as agent for the Sellers (the "Sellers' Agent"). The Buyer, the Target, the Sellers, and the Sellers' Agent (as to Sections 2(f), 2(g), 8 and 10 hereof) are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

The Sellers in the aggregate own all of the outstanding capital stock of the Target.

This Agreement contemplates a transaction in which the Buyer will purchase from the Sellers, and the Sellers will sell to the Buyer, all of the outstanding capital stock of the Target in return for the cash consideration as set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.    Definitions. For all purposes of this Agreement, the following terms (which do not constitute all of the defined terms in this Agreement) shall have the respective meanings set forth below:

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act.

"Affiliated Group" means any affiliated group within the meaning of Code §1504 or any similar group defined under a similar provision of state, local or foreign law.

"Andrew Operating Income" means any and all Operating Income from maintaining or repairing the Buyer's products either (i) returned under the Buyer's warranty or (ii) returned out-of-warranty by original equipment manufacturer customers and currently serviced by or through the Buyer.   For purposes of this definition, "Buyer" (or "Buyer's" in the possessive) shall refer to Andrew Corporation as well as any of its direct or indirect subsidiaries.

"Andrew Revenues" mean any and all revenues from maintaining or repairing the Buyer's products either (i) returned under the Buyer's warranty or (ii) returned out-of-warranty by original equipment manufacturer customers and currently serviced by or through the Buyer. For purposes of this definition, "Buyer" (or "Buyer's" in the possessive) shall refer to Andrew Corporation as well as any of its direct or indirect subsidiaries.

"Articles of Incorporation" mean the Target's Articles of Incorporation, in full force and effect as of the Closing Date.

"Basis" means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could form the basis for any specified consequence.

"Buyer" has the meaning set forth in the preface above.

"Buyer's Indemnitees" has the meaning set forth in Section 8(b) below.

"Closing" has the meaning set forth in Section 2(c) below.

"Closing Date" has the meaning set forth in Section 2(c) below.

"Closing Payments" shall mean the payments by the Buyer to each particular Seller of their Pro Rata portion of the Closing Purchase Price less such Seller's Pro Rata portion of (i) the Indemnification Cash, (ii) the Software Tool Payment, (iii) the Performance Bonuses, and (iv) the Employee Bonus Payout, as reflected on Exhibit A hereto.

"Closing Purchase Price" has the meaning set forth in Section 2(b) below.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" has the meaning set forth in Section 6(d) below.

"Disclosure Schedules" shall mean the disclosure schedules to this Agreement.

"Earnout Payments" has the meaning set forth in Section 2(g)(ii) below.

"Earnout Period" shall mean any of the Year One Earnout Period, Year Two Earnout Period, and Year Three Earnout Period.

"Employee Bonus Payout" has the meaning set forth in Section 2(j) below, and in the aggregate, $123,625, which reflects a 15% tax "gross-up" (on an aggregate amount of $107,500) towards applicable withholdings.

"Environmental, Health, and Safety Requirements" shall mean all federal, state, local, and foreign statutes, regulations, ordinances, and similar provisions having the force or effect of law, all judicial and administrative orders and determinations and all common law, concerning public health and safety, worker health and safety, pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, discharge, release, control, or cleanup of any Hazardous Materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation, including, without limitation, (i) the Federal Clean Air Act, 42 U.S.C. §§7401 et seq.; (ii) the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§9601 et seq. ("CERCLA"); (iii) the Federal Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §§1101 et seq.; (iv) the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§136 et seq.; (v) the Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.; (vi) the Solid Waste Disposal Act, 42 U.S.C. §§ 6901 et seq.; (vii) the

- 2 -

Safe Water Drinking Act, 42 U.S.C. §§300f et seq.; (viii) the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; as such of the foregoing are amended or in effect prior to the Closing Date.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Hazardous Materials" means any hazardous, infectious or toxic substance, chemical, pollutant, contaminant, emission or waste which is regulated by any local, state, federal or foreign authority.     Hazardous Materials include, without limitation, anything which is: (i) defined as a "pollutant" pursuant to 33 U.S.C. §1362(6); (ii) defined as a "hazardous waste" pursuant to 42 U.S.C. §6921; (iii) defined as a "regulated substance" pursuant to 42 U.S.C. § 6991; (iv) defined as a "hazardous substance" pursuant to 42 U.S.C. §9601(14); (v) defined as a "pollutant or contaminant" pursuant to 42 U.S.C. §9601(33); (vi) petroleum; (vii) asbestos; and (viii) polychlorinated biphenyl.

"Indemnification Cash" has the meaning set forth in Section 2(e) below.

"Knowledge" means to the actual knowledge of the Sellers and the knowledge that such Sellers (in their capacity as officers, directors and/or employees of the Target, as the case may be) would have obtained of the matter represented after reasonable inquiry thereof under the circumstances.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Most Recent Balance Sheet" means the balance sheet contained within the Most Recent Financial Statements.

"Most Recent Financial Statements" has the meaning set forth in Section 4(h) below.

"Most Recent Fiscal Month End" means February 28, 2006.

"Multiemployer Plan" has the meaning set forth in ERISA §3(37).

"Operating Income" means earnings from core operations after deducting cost of goods sold and general operating expenses, and before deduction for interest and taxes.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"Party" has the meaning set forth in the preface above.

"<u>Performance Bonuses</u>" has the meaning set forth in Section 2(i) below, and in the aggregate, $200,000, less any applicable withholdings.

"<u>Person</u>" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"<u>Primary Sellers</u>" shall mean, collectively, Eddy Dominguez, Newton Bui, and Tan Nguyen.

"<u>Pro Rata</u>" means each Seller's respective portion of the Closing Purchase Price that such Seller is entitled to receive under this Agreement as a percentage of the full Closing Purchase Price.

"<u>Prohibited Transaction</u>" has the meaning set forth in ERISA §406 and Code §4975.

"<u>Securities Act</u>" means the United States Securities Act of 1933, as amended.

"<u>Securities Exchange Act</u>" means the United States Securities Exchange Act of 1934, as amended.

"<u>Security Interest</u>" means any mortgage, pledge, lien, encumbrance, charge, or other security interest, other than (a) mechanic's, materialmen's, and similar liens, (b) liens for Taxes not yet due and payable or for Taxes that the taxpayer is contesting in good faith through appropriate proceedings for which adequate reserves have been established, (c) purchase money liens and liens securing rental payments under capital lease arrangements, and (d) other liens arising in the Ordinary Course of Business not incurred in connection with the borrowing of money.

"<u>Sellers</u>" has the meaning set forth in the preface above.

"<u>Sellers' Agent</u>" has the meaning set forth in the preface above.

"<u>Software Tool</u>" means the software product described in <u>Schedule 1</u> hereof.

"<u>Software Tool Payment</u>" means the cash payment to be made to David Stout at the Closing in the amount of $450,000.

"<u>Subsidiary</u>" means any corporation with respect to which a specified Person (or a Subsidiary thereof) owns a majority of the common stock or has the power to vote or direct the voting of sufficient securities to elect a majority of the directors.

"<u>Target</u>" has the meaning set forth in the preface above.

"<u>Target Business</u>" has the meaning set fort in Section 2(g)(i)(A) below.

"<u>Target Share</u>" means any share of the Common Stock, without par value per share, of the Target.

- 4 -

"Tax" means any federal, state, local, or foreign income, capital gains, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, goods and services, severance, stamp, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Threshold Cash Amount" means $170,000 less, if any, the amount of any outstanding and due accounts payable of the Buyer for Target's prior services rendered as of the Closing Date in excess of the aggregate amount of $291,374, as calculated in connection with the determination of the Closing Net Working Capital in Section 2(f) hereof.

"Threshold NWC Amount" means $300,000.

"Year One Earnout Period" means the first four calendar quarters of the Buyer immediately following the Closing, provided that the first such quarter of such four quarters shall begin on May 1, 2006 and shall end on July 31, 2006.

"Year One Interpolated Earnout Amount" means an amount, and applicable only where the Target has met each of the requirements under the Year One Minimum Goal, but not applicable to the extent each of the requirements under the Year One Maximum Goal is achieved by the Target, equal to the sum of (i) $4,000,000 plus (ii) the product of $500,000 multiplied by (the sum of (the quotient of (x) the amount equal to the Year One Revenue Amount less $8,700,000 divided by (y) $2,200,000) plus (the quotient of (x) the amount equal to the Year One Operating Income Amount less $3,900,000 divided by (y) $1,000,000)), such sum not to exceed $4,999,999.

"Year One Maximum Goal" has the meaning set forth in Section 2(g)(i)(A) below.

"Year One Minimum Goal" has the meaning set forth in Section 2(g)(i)(A) below.

"Year One Operating Income Amount" means, and applicable only where the Target has met each of the requirements under the Year One Minimum Goal, but not applicable to the extent each of the requirements under the Year One Maximum Goal is achieved by the Target, the amount of the Target's Operating Income from the Target Business during the Year One Earnout Period and pursuant to Section 2(g) below.

"Year One Revenue Amount" means, and applicable only where the Target has met each of the requirements under the Year One Minimum Goal, but not applicable to the extent each of the requirements under the Year One Maximum Goal is achieved by the Target, the amount of the Target's revenues from the Target Business during the Year One Earnout Period and pursuant to Section 2(g) below.

- 5 -

"Year Two Earnout Period" means the first four calendar quarters of the Buyer immediately following the Year One Earnout Period.

"Year Two Interpolated Earnout Amount" means an amount, and applicable only where the Target has met each of the requirements under the Year Two Minimum Goal, but not applicable to the extent each of the requirements under the Year Two Maximum Goal is achieved by the Target, equal to the sum of (i) $4,000,000 plus (ii) the product of $500,000 multiplied by (the sum of (the quotient of (x) the amount equal to the Year Two Revenue Amount less $13,600,000 divided by (y) $3,400,000) plus (the quotient of (x) the amount equal to the Year Two Operating Income Amount less $6,200,000 divided by (y) $1,500,000)), such sum not to exceed $4,999,999.

"Year Two Maximum Goal" has the meaning set forth in Section 2(g)(i)(B) below.

"Year Two Minimum Goal" has the meaning set forth in Section 2(g)(i)(B) below.

"Year Two Operating Income Amount" means, and applicable only where the Target has met each of the requirements under the Year Two Minimum Goal, but not applicable to the extent each of the requirements under the Year Two Maximum Goal is achieved by the Target, the amount of the Target's Operating Income from the Target Business during the Year Two Earnout Period and pursuant to Section 2(g) below.

"Year Two Revenue Amount" means, and applicable only where the Target has met each of the requirements under the Year Two Minimum Goal, but not applicable to the extent each of the requirements under the Year Two Maximum Goal is achieved by the Target, the amount of the Target's revenues from the Target Business during the Year Two Earnout Period and pursuant to Section 2(g) below.

"Year Three Earnout Period" means the first four calendar quarters of the Buyer immediately following the Year Two Earnout Period.

"Year Three Interpolated Earnout Amount" means an amount, and applicable only where the Target has met each of the requirements under the Year Three Minimum Goal, but not applicable to the extent each of the requirements under the Year Three Maximum Goal is achieved by the Target, equal to the sum of (i) $3,200,000 plus (ii) the product of $400,000 multiplied by (the sum of (the quotient of (x) the amount equal to the Year Three Revenue Amount less $22,600,000 divided by (y) $5,600,000) plus (the quotient of (x) the amount equal to the Year Three Operating Income Amount less $10,200,000 divided by (y) $2,500,000)), such sum not to exceed $3,999,999.

"Year Three Maximum Goal" has the meaning set forth in Section 2(g)(i)(C) below.

"Year Three Minimum Goal" has the meaning set forth in Section 2(g)(i)(C) below.

"Year Three Operating Income Amount" means, and applicable only where the Target has met each of the requirements under the Year Three Minimum Goal, but not applicable to the extent each of the requirements under the Year Three Maximum Goal is achieved by the Target,

the amount of the Target's Operating Income from the Target Business during the Year Three Earnout Period and pursuant to Section 2(g) below.

"Year Three Revenue Amount" means, and applicable only where the Target has met each of the requirements under the Year Three Minimum Goal, but not applicable to the extent each of the requirements under the Year Three Maximum Goal is achieved by the Target, the amount of the Target's revenues from the Target Business during the Year Three Earnout Period and pursuant to Section 2(g) below.

2.     Purchase and Sale of Target Shares.

(a)     Basic Transaction.     On and subject to the terms and conditions of this Agreement, the Buyer agrees to purchase from each of the Sellers, and each of the Sellers agrees to sell to the Buyer, all of his, her or its Target Shares for the consideration specified below in this Section 2.

(b)     Payment of Closing Purchase Price.     Pursuant to Sections 2(d) and 2(e) hereof, the Buyer agrees to pay to the Sellers in the aggregate by delivery of cash on the Closing Date (as defined in Section 2(c) below), Six Million Five Hundred Thousand Dollars ($6,500,000) (the "Closing Purchase Price") less (i) the Indemnification Cash, (ii) the Software Tool Payment, (iii) the aggregate amount of the Performance Bonuses, and (iv) the aggregate amount of the Employee Bonus Payout.   The Closing Purchase Price shall be allocated among the Sellers in proportion to their respective holdings of Target Shares as set forth in Exhibit A.   The Indemnification Cash shall be distributed Pro Rata to the Sellers pursuant, and subject, to Section 2(e) and Section 8 hereof.   Further, the Software Tool Payment shall be delivered by the Buyer at the Closing to David Stout, contingent on the satisfaction of the Closing conditions set forth in Section 7(a)(v) and Section 7(a)(vii) hereof, any Performance Bonus shall be delivered by the Buyer or Target to Stout or Sellers pursuant, and subject, to Section 2(i) hereof.   Finally, the Employee Bonus Payout shall be delivered to a specifically designated account of the Target pursuant to Section 2(j) hereof.

(c)     The Closing.     The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Sonnenschein Nath & Rosenthal LLP, 685 Market Street, San Francisco, California on the date hereof or such other date as the Buyer and the Sellers may mutually determine (the "Closing Date").   The Closing shall be deemed effective as of 12:01 a.m. (Central Time) on the Closing Date.

(d)     Deliveries at the Closing; Unconditional Covenant to Pay by Buyer.     At the Closing, (i) the Sellers will deliver to the Buyer the various certificates, instruments, and documents referred to in Section 7(a) below, (ii) the Buyer will deliver to the Sellers the various certificates, instruments, and documents referred to in Section 7(b) below, and (iii) each of the Sellers will deliver to the Buyer stock certificates representing all of his or her Target Shares, accompanied by a duly executed assignment (the "Stock Assignment").   In exchange for such Target Shares and the various certificates, instruments and documents referred to in Section 7(a) below, the Buyer shall (i) pay by wire transfer to each of the Sellers, net, the Closing Payments as set forth in Part A of Exhibit A hereto, and (ii) deposit the Indemnification Cash in escrow pursuant to Section 2(e) hereof.

(e)     Escrow Fund.   On the Closing Date, the Buyer will deposit in escrow cash in the amount of One Million Two Hundred Thousand Dollars ($1,200,000) (the "Indemnification Cash").   Such Indemnification Cash shall serve as partial security to fund the indemnification obligations of Sellers for Losses (defined in Section 8(b)) pursuant to the provisions of Section 8 hereof and the escrow agreement attached hereto as Exhibit B (the "Escrow Agreement").

(f)     Closing Working Capital.

(i)     Promptly after the Closing Date, the Buyer and its independent public accountants shall review those assets and liabilities of the Target constituting items of working capital for the purpose of preparing a schedule (the "Proposed Closing Net Working Capital Schedule") setting forth in reasonable detail its calculation of those assets of the Target constituting current assets (the "Current Assets") and those liabilities constituting current liabilities (the "Current Liabilities"), and a calculation of Closing Net Working Capital, in each case calculated in accordance with GAAP, applied on a basis consistent with the policies, procedures and practices utilized in the preparation of the audited financial statements of the Target for the period ended December 31, 2005, provided that the Parties hereby acknowledge and agree that such Current Assets and Current Liabilities shall include or exclude those assets and liabilities, respectively, as specified in Schedule 2(f)(i) and for purposes of calculating the Closing Net Working Capital.   For purposes of this Agreement, "Closing Net Working Capital" means the (A) sum of all Current Assets less (B) the sum of all Current Liabilities, in each case as of the Closing Date.   The Buyer shall use reasonable best efforts to deliver within 45 days after the Closing Date, but in no event later than 60 days after the Closing Date, its Proposed Closing Net Working Capital Schedule to the Sellers' Agent.

(ii)     The Sellers' Agent shall have the right to review the work papers of Buyer and its accountants utilized in preparing the Proposed Closing Net Working Capital Schedule and shall have reasonable access to the books, records and personnel of the Buyer and the Target for purposes of verifying the accuracy of the presentation of Closing Net Working Capital in the Proposed Net Working Capital Schedule.   The Proposed Net Working Capital Schedule shall be binding on the Sellers, unless the Sellers' Agent presents to Buyer written notice of disagreement with the Proposed Net Working Capital Schedule within 30 days after receipt thereof specifying in reasonable detail the nature and extent of the disagreement.

(iii)     If Buyer, on the one hand, and the Sellers' Agent, on the other hand, are unable to resolve any such disagreement within 15 days after Buyer receives notice of such disagreement, the disagreement shall be referred for final determination to an independent accounting firm as the parties shall mutually and promptly designate.   The accounting firm so designated to make the final determination is hereinafter referred to as the "Independent Accountants."   The Independent Accountants will be instructed to render and deliver in writing its determination of the Closing Net Working Capital to the Sellers and Buyer within 30 days after it has been retained.

(iv)     The Closing Net Working Capital shall be deemed to have been finally determined upon the first to occur of (A) acceptance by the Sellers' Agent of the

27235606\V-1

Proposed Net Working Capital Schedule (B) the Sellers' Agent's failure to object thereto within 30 days of receipt thereof, (C) resolution by mutual agreement of the Buyer and the Sellers' Agent after notice of a disagreement or (D) notification by the Independent Accountants of their final determination thereof.

(v)     If the Closing Net Working Capital as finally determined pursuant to subparagraph (iv) above and/or the cash portion of such Closing Net Working Capital, is less than (A) the Threshold NWC Amount and/or (B) the Threshold Cash Amount, respectively, the aggregate amount by which the Closing Net Working Capital is less than such Threshold NWC Amount and/or the Threshold Cash Amount (collectively, the "Negative Difference"; and provided, however, that if both the Threshold NWC Amount and the Threshold Cash Amount are not met, then the Negative Difference shall only reflect the difference from the greater of the Threshold NWC Amount and the Threshold Cash Amount) will be paid to Buyer out of the Escrow Fund, and such Negative Difference shall represent the sole and exclusive remedy for a Loss (as defined in Section 8(b)) to any Buyer's Indemnitee (as defined in Section 8(b)) with respect to this Section 2(f) and 4(ee), except without regard to, or application of, any provisions relating to the Basket Amount (as defined in Section 8(b)) or right of the Sellers' Agent to object pursuant to Section 8(f) hereof.

(vi)     The fees of the Independent Accountants will be paid one-half by the Sellers (but not out of the Escrow Fund) and one-half by the Buyer.

(g)     Earnout.     Subsequent to the Closing, the Closing Purchase Price shall be subject to upward adjustment based on the achievement of certain financial performance objectives of Target, as follows:

(i)     Up to an additional maximum of $14,000,000 (the "Maximum Aggregate Earnout Amount") in the aggregate in cash shall be payable by Buyer on a Pro Rata basis to the Sellers as set forth below:

(A)     As applicable solely to the Year One Earnout Period, between $4,000,000 (the "Year One Earnout Base") and up to a maximum of $5,000,000 (the "Year One Earnout Maximum") shall be payable in cash within seventy-five (75) days after the expiration of the Year One Earnout Period as follows: (x) with respect to the Year One Earnout Base, both revenues and Operating Income from the Target's business of maintenance or repair of telecommunications infrastructure, such business expressly excluding Andrew Revenues and Andrew Operating Income (the "Target Business"), shall equal $8,700,000 and $3,900,000, respectively (together, the "Year One Minimum Goal"); (y) with respect to the Year One Earnout Maximum, both revenues and Operating Income from the Target Business shall equal at least $10,900,000 and at least $4,900,000, respectively (together, the "Year One Maximum Goal"); and a Year One Interpolated Earnout Amount shall be payable for revenues and Operating Income from the Target Business which are between the Year One Minimum Goal and Year One Maximum Goal;

-9-

(B)     As applicable solely to the Year Two Earnout Period, between $4,000,000 (the "Year Two Earnout Base") and up to a maximum of $5,000,000 (the "Year Two Earnout Maximum") shall be payable in cash within seventy-five (75) days after the expiration of the Year Two Earnout Period as follows: (x) with respect to the Year Two Earnout Base, both revenues and Operating Income from the Target Business shall equal $13,600,000 and $6,200,000, respectively (together, the "Year Two Minimum Goal"); (y) with respect to the Year Two Earnout Maximum, both revenues and Operating Income from the Target's Business shall equal at least $17,000,000 and $7,700,000, respectively (together, the "Year Two Maximum Goal); and a Year Two Interpolated Earnout Amount shall be payable for revenues and Operating Income from the Target Business which are between the Year Two Minimum Goal and Year Two Maximum Goal; and

(C)     As applicable solely to the Year Three Earnout Period, between $3,200,000 (the "Year Three Earnout Base") and up to a maximum of $4,000,000 (the "Year Three Earnout Maximum") shall be payable in cash within seventy-five (75) days after the expiration of the Year Three Earnout Period as follows: (x) with respect to the Year Three Earnout Base, both revenues and Operating Income from the Target Business shall equal $22,600,000 and $10,200,000, respectively (together, the "Year Three Minimum Goal"); (y) with respect to the Year Three Earnout Maximum, both revenues and Operating Income from the Target's Business shall equal at least $28,200,000 and $12,700,000, respectively (together, the "Year Three Maximum Goal"); and a Year Three Interpolated Earnout Amount shall be payable for revenues and Operating Income from the Target Business which are between the Year Three Minimum Goal and Year Three Maximum Goal; provided, however, that and notwithstanding and in lieu of the foregoing in this clause (C), if the cumulative amounts for revenues and Operating Income from the Target Business at the end of the Year Three Earnout Period (accounting for the collective Earnout Periods) results in at least $56,100,000 and $25,300,000, respectively, then the Maximum Aggregate Earnout Amount less any payments made pursuant to clauses (A) and/or (B) under this Section 2(g)(i) shall be payable.

Examples of calculations in achieving the payments as set forth in clauses (A), (B) and (C) under this Section 2(g)(i) (including calculations for interpolation) are as set forth in Schedule 2(g)(i) attached hereto.

(ii)     For clarification and the avoidance of doubt, (A) no payments pursuant to this Section 2(g) shall be made unless both of the threshold revenue and Operating Income amounts required during the applicable Earnout Period and as set forth in Section 2(g)(i) have been met in accordance with the terms hereof, (B) both of the threshold revenue and Operating Income amounts required during the applicable Earnout Period and as set forth in Section 2(g)(i) specifically excludes any Andrew Revenue and Andrew Operating Income in determining such payments, and (C) the aggregate sums paid or payable to the Sellers under this Section 2(g) (collectively, the "Earnout Payments") shall in no instance exceed the Maximum Aggregate Earnout Amount.

- 10 -

(iii)    After each Earnout Period, the Buyer will conduct a review of records relating to revenues and Operating Income of the Target Business in accordance with GAAP, and applied on a basis consistent with the policies, procedures and practices utilized in the preparation of the financial statements of the Target for the period ended December 31, 2005 (each, an "Earnout Review") and deliver the financial statements reflecting the revenues and Operating Income of the Target Business pursuant to such Earnout Review to the Sellers' Agent within sixty (60) days after the applicable Earnout Period, and provided that such financial statements reflecting the Operating Income of Target shall have been determined pursuant to cost allocations between Andrew Revenues and non-Andrew Revenues as consistent with Buyer's internal corporate policies at the time of the subject Earnout Review, and as guided by its auditors and in accordance with GAAP.   The Sellers' Agent shall approve or contest each Earnout Review within ten (10) business days of receipt of the results of each applicable Earnout Review. Any disagreement between the parties regarding the results of any Earnout Review shall be resolved in accordance with Section 10(o) below.   A decision, act, consent or instruction of the Sellers' Agent in connection with this Section 2(g)(iii) shall constitute a decision of all Sellers and shall be final, binding and conclusive upon each such Seller, and the Buyer may rely upon any decision, act, consent or instruction of the Sellers' Agent as being the decision, act, consent or instruction of each and every such Seller.   The Buyer is hereby relieved from any liability to any person for any acts done by them in accordance with such decision, act, consent or instruction of the Sellers' Agent.

(iv)    The Parties acknowledge and agree that the Buyer shall have full control and discretion with respect to the decisions related to the Target Business, including, without limitation, its operations, budgeting, marketing, and business scope (collectively, the "Buyer Decisions"), and no Buyer Decision nor its effect on the Target Business shall result in any amendment or expectation of amendment by the Parties with respect to any of the terms under this Section 2(g)(iv), and such acknowledgment and agreement represents a material inducement to the Buyer entering into this Agreement.

(h)    Retention Payment.   Subsequent to the Closing, and in addition to and regardless of any Earnout Payments made to the Sellers pursuant to Section 2(g) hereof, any Seller who has continuously been employed by the Buyer or Target from the Closing for each month up through the expiration of the Year Three Earnout Period shall receive his accrued and Pro Rata portion of $27,777.78 per month within thirty (30) days after the end of the subject calendar quarter, less any applicable withholdings.

(i)    Stout Payment.

(i)    Subsequent to the Closing, and within thirty (30) days after each calendar quarter of the Year One Earnout Period and the Year Two Earnout Period, as the case may be, David Stout shall be paid a bonus of $25,000 (for an aggregate of up to $200,000), less any applicable withholdings (collectively, the "Performance Bonuses") to the extent he has (A) continuously been employed by the Buyer or Target from the Closing up through the expiration of the subject calendar quarter and (B) he has met all of the performance standards and requirements for payment of the applicable Performance

- 11 -

Bonus during such calendar quarter, and as further set forth in the Stout Letter Agreement (defined in Section 7(a)(v)) (the "Performance Standards").

(ii)    To the extent that (A) each and all of the Performance Standards have been met by David Stout but (B) certain amounts of the Performance Bonus remain unpaid (such amount, the "Performance Bonuses Remainder") due to his termination of employment with the Buyer or Target, whether voluntary or involuntary, prior to the expiration of the Year Two Earnout Period (the "Stout Early Termination"), the Performance Bonuses Remainder shall be paid Pro Rata to the Sellers, less any applicable withholdings, within thirty (30) days of the Stout Early Termination.

(iii)    For the avoidance of doubt, such cash allocated towards the Performance Bonuses shall not be factored in any respect towards determining the Closing Net Working Capital under this Agreement.

(j)    Employee Bonus Payout.

(i)    As soon as practicable after the Closing, but no later than two (2) business days prior to the next Target payroll date (the "Next Target Payroll Date"), the Buyer shall deliver to a specifically designated account of the Target an aggregate of $123,625 for purposes of paying certain Target employees bonuses (the "Employee Bonus Payout"), and Target shall in turn provide the entirety of such amount to its payroll provider to effect the Employee Bonus Payout to such employees on the Next Target Payroll Date in accordance with Schedule 2(j) attached hereto.

(ii)    For the avoidance of doubt, such cash allocated towards the Employee Bonus Payout shall not be factored in any respect towards determining the Closing Net Working Capital under this Agreement.

3.    Representations and Warranties Concerning the Transaction.

(a)    Representations and Warranties of the Sellers.    Each of the Sellers hereby represents and warrants to the Buyer that the statements contained in this Section 3(a) are correct and complete as of the Closing Date with respect to himself, except as set forth in Annex I attached hereto.

(i)    Authorization of Transaction.    The Seller has full power and authority to execute and deliver this Agreement and to perform his or her obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Seller, enforceable in accordance with its terms and conditions except as may be limited by (a) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) the effect of rules of law governing the availability of equitable remedies.    The Seller need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

27235606\V-1

(ii)    Noncontravention.    The execution and the delivery of this Agreement, and the consummation of the transactions contemplated hereby, will not violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Seller is subject or conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which he is bound or to which any of his or her assets is subject, other than in each case, a violation, conflict, breach, default, acceleration or creation of a right which would not have a material adverse effect on Seller.

(iii)    Brokers' Fees.    The Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Buyer could become liable or obligated.

(iv)    Target Shares.    The Seller holds of record and owns beneficially the number of Target Shares set forth next to his, her or its name in Schedule 4(c) of the Disclosure Schedules attached hereto, free and clear of any restrictions on transfer (other than any restrictions under the Securities Act and state securities laws), Taxes, Security Interests, options, warrants, purchase rights, contracts, commitments, equities, claims, and demands.    The Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Seller to sell, transfer, or otherwise dispose of any capital stock of the Target (other than this Agreement).    The Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of the Target.

(b)    Representations and Warranties of the Buyer.    The Buyer hereby represents and warrants to the Sellers that the statements contained in this Section 3(b) are correct and complete as of the Closing Date, except as set forth in Annex II attached hereto.

(i)    Organization of the Buyer.    The Buyer is a corporation duly organized, validly existing, and in good standing under the laws of Delaware.

(ii)    Authorization of Transaction.    The Buyer has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and to perform its obligations hereunder.    The execution, delivery and performance of this Agreement has been duly and validly approved and authorized by all necessary corporate action on the part of the Buyer's Board of Directors as required by applicable law and the Buyer's certificate of incorporation and bylaws, and no other corporate proceedings on the part of Buyer are necessary to authorize this Agreement.    This Agreement constitutes the valid and legally binding obligation of the Buyer, enforceable in accordance with its terms and conditions except as may be limited by (a) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) the effect of rules of law governing the availability of equitable remedies.    The Buyer does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any

- 13 -

government or governmental agency in order to consummate the transactions contemplated by this Agreement.

(iii)    <u>Noncontravention</u>.    The execution and the delivery of this Agreement, and the consummation of the transactions contemplated hereby, will not (A) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject or (B) violate any provision of its charter, bylaws or similar organizational document or (C) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Buyer is a party or by which it is bound or to which any of its assets is subject, other than in each case, a violation, conflict, breach, default, acceleration or creation of a right which would not have a material adverse effect on the business, financial condition, operations, or results of operations of Buyer.

(iv)    <u>Brokers' Fees</u>.    The Buyer has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated.

(v)    <u>Investment</u>.    The Buyer is not acquiring the Target Shares with a view to or for sale in connection with any distribution thereof within the meaning of the Securities Act.

4.    <u>Representations and Warranties Concerning the Target</u>.    The Sellers and the Target hereby represent and warrant to the Buyer that the statements contained in this Section 4 are correct and complete as of the Closing Date, except as set forth in the Disclosure Schedules. The Disclosure Schedules shall be arranged in sections corresponding to the numbered and lettered sections contained in this Section 4 and shall qualify the corresponding sections in this Section 4.

(a)    <u>Organization, Qualification, and Corporate Power; Predecessor-In-Interest</u>.

(i)    The Target is a corporation duly organized, validly existing, and in good standing under the laws of California.    The Target is duly authorized to conduct business and is in good standing under the laws of each jurisdiction in which the failure to be so authorized or in good standing has had or could reasonably be expected to have a material adverse effect on the business, prospects, financial condition, operations or results of operations of Target (a "<u>Target Material Adverse Effect</u>").    <u>Schedule 4(a)(1)</u> of the Disclosure Schedules lists each of the states where Target is qualified as a foreign corporation.    The Target has full corporate power and authority and all licenses, permits, and authorizations necessary to carry on the businesses in which it is engaged and in which it presently proposes to engage and to own and use the properties owned and used by it.    <u>Schedule 4(a)(2)</u> of the Disclosure Schedules lists the directors and officers of the Target.    The Target has made available to the Buyer correct and complete copies of the charter and bylaws of the Target (as amended to date).    The minute books (containing the records of meetings of the shareholders, the board of directors, and any

- 14 -

committees of the board of directors), the stock certificate books, and the stock record books of the Target are correct and complete.   The Target is not in default under or in violation of any provision of its charter or bylaws.

(ii)    The Target is the sole successor of its predecessor-in-interest, CellSite Industries, a California general partnership (the "General Partnership") governed by the California Uniform Partnership Act of 1994, effective as of January 15, 2004 (the "Effective Time," and such date reflecting the date that all of the outstanding interests of the General Partnership were contributed to the Target (the "Contribution") in exchange for, in the aggregate, 15,000 shares of the Common Stock of the Target, without par value per share (the "Common Stock")), and the General Partnership was immediately dissolved upon such Contribution (the "Partnership Dissolution") pursuant to the unanimous agreement of the partners of the General Partnership (the "CSI Partners"), as set forth in a Contribution Agreement dated as of January 15, 2004, by and among all of the CSI Partners and the Target.   At the Effective Time and pursuant to the Contribution as set forth in the foregoing, the Target was transferred to, vested in, and devolved upon all properties, licenses, franchises, rights and every other interest of the General Partnership, and the Target assumed all of the liabilities of the General Partnership. Regardless of any actions, filings, or certifications, or otherwise (collectively, the "Post-Dissolution Actions") which the former CSI Partners may have taken or effected after the Partnership Dissolution, the General Partnership was completely and irrevocably dissolved as of January 15, 2004, and no liability to the Target exists, nor succeeds to the Buyer, as a result from the Partnership Dissolution or any Post-Dissolution Action.

(b)    Authorization of Transaction.   The Target has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and to perform its obligations hereunder.   This Agreement constitutes the valid and legally binding obligation of the Target, enforceable in accordance with its terms and conditions except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) the effect of rules of law governing the availability of equitable remedies.   All corporate and shareholder approvals necessary to authorize the transactions contemplated hereby have been received and have not been rescinded or modified in any respect.

(c)    Capitalization.   The entire authorized capital stock of the Target consists of 1,000,000 Target Shares which are designated as Common Stock, of which 15,790 shares are issued and outstanding.   All of the issued and outstanding Target Shares have been duly authorized, are validly issued, fully paid, and nonassessable, and are held of record by the respective Sellers as set forth in Schedule 4(c) attached hereto.   There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Target to issue, sell, or otherwise cause to become outstanding any of its capital stock.   There are no outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights with respect to the Target.   There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of the capital stock of the Target.

- 15 -

27235600\V-1

(d)    Noncontravention.    The execution and the delivery of this Agreement, and the consummation of the transactions contemplated hereby, will not (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Target is subject, (ii) violate any provision of the charter or bylaws of the Target or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Target is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Security Interest upon any of its assets) other than, in the case of clauses (i) and (iii) above, a violation, conflict, breach, default, acceleration or creation of a right that has not had and could not reasonably be expected to have a Target Material Adverse Effect.    The Target is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement.

(e)    Brokers' Fees.    The Target does not have any Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

(f)    Title to Assets.    The Target has good and marketable title to, or a valid leasehold interest in, the properties and assets used by them, located on their premises, or shown on the Most Recent Balance Sheet or acquired after the date thereof, free and clear of all Security Interests, except for properties and assets disposed of in the Ordinary Course of Business since the Most Recent Fiscal Month End.

(g)    Subsidiaries and Affiliates.    There are no Subsidiaries of the Target and no Affiliates of the Target other than any Seller.

(h)    Financial Statements.

(i)    The Target has delivered to the Buyer its (i) audited financial statements (balance sheet, statement of operations and statement of cash flows) for the fiscal years ended 2004 and 2005 and (ii) unaudited financial statements (balance sheet, statement of operations and statement of cash flows) for the period beginning on January 1, 2006 and ending the Most Recent Fiscal Month End (the "Most Recent Financial Statements") (collectively, the "Target Financial Statements").    The Target Financial Statements are complete and correct in all material respects and have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods indicated and with each other.    The Target Financial Statements fairly and accurately present the consolidated financial condition and operating results of the Target as of the dates, and for the periods, indicated therein, except that the Most Recent Financial Statements may be subject to normal year-end adjustment which will not be material in amount.

(ii)    The Target maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed with management's

- 16 -

general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements of the Target and to maintain accountability for assets; (iii) access to the Target's assets is permitted only in accordance with management's authorization; and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.   The Target is not party to or otherwise involved in any "off-balance sheet arrangements" (as defined in Item 303 of Regulation S-K under the Securities Exchange Act).

(i)    Events Subsequent to Most Recent Fiscal Month End.    Since the Most Recent Fiscal Month End, there has not been any Target Material Adverse Effect, and without limiting the generality of the foregoing, since that date:

(i)    the Target has not sold, leased, transferred, or assigned any of its assets, tangible or intangible, other than in the Ordinary Course of Business;

(ii)    the Target has not entered into any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) either involving more than $25,000 or outside the Ordinary Course of Business;

(iii)    no party (including the Target) has accelerated, terminated, modified, or cancelled any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) to which the Target is a party or by which any of them is bound;

(iv)    the Target has not imposed any Security Interest upon any of its assets, tangible or intangible;

(v)    the Target has not made any capital expenditure (or series of related capital expenditures) either involving more than $25,000 or outside the Ordinary Course of Business;

(vi)    the Target has not made any capital investment in, any loan to, or any acquisition of the securities or assets of, any other Person (or series of related capital investments, loans, and acquisitions) either involving more than $25,000 or outside the Ordinary Course of Business;

(vii)    the Target has not issued any note, bond, or other debt security or created, incurred, assumed, or guaranteed any indebtedness for borrowed money or capitalized lease obligation;

(viii)    the Target has not delayed or postponed the payment of accounts payable and other Liabilities;

(ix)    the Target has not cancelled, compromised, waived, or released any right or claim (or series of related rights and claims) either involving more than $25,000 or outside the Ordinary Course of Business;

- 17 -

27235606\V-1

(x)    the Target has not granted or received any license or sublicense of any rights under or with respect to any Intellectual Property;

(xi)    there has been no change made to the accounting methods, practices or principles of the Target;

(xii)    there has been no change made or authorized in the charter or bylaws of the Target;

(xiii)    the Target has not issued, sold, or otherwise disposed of any of its capital stock, or granted any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its capital stock;

(xiv)    the Target has not declared, set aside, or paid any dividend or made any distribution with respect to its capital stock (whether in cash or in kind), or redeemed, purchased, or otherwise acquired any of its capital stock;

(xv)    the Target has not experienced any material damage, destruction, or loss (whether or not covered by insurance) to its property;

(xvi)    the Target has not made any loan to, or entered into any other transaction with, any of its directors, officers, employees, or shareholders;

(xvii)    the Target has not entered into any employment contract or collective bargaining agreement, written or oral, or modified the terms of any existing such contract or agreement;

(xviii) the Target has not granted any increase in the base salary compensation of any of its directors, officers, or employees;

(xix)    the Target has not adopted, amended, modified, or terminated any bonus, profit-sharing, incentive, severance, or other plan, contract, or commitment for the benefit of any of its directors, officers, or employees (or taken any such action with respect to any other Employee Plan (as defined in Section 4(x)(i));

(xx)    the Target has not made any other change in employment terms for any of its directors, officers, and employees outside the Ordinary Course of Business;

(xxi)    the Target has not made or pledged to make any charitable or other capital contribution outside the Ordinary Course of Business;

(xxii)    there has not been any other material occurrence, event, incident, action, failure to act, or transaction outside the Ordinary Course of Business involving the Target; and

(xxiii) the Target has not committed or agreed to do any of the foregoing.

(j)  Undisclosed Liabilities.  The Target does not have any Liability other than (i) Liabilities set forth in the Most Recent Balance Sheet, (ii) Liabilities incurred in the Ordinary Course of Business, (iii) transaction fees and costs incurred by the Target in connection with consummating this Agreement (including legal fees of Target's counsel and other costs of preparation and implementation hereof incurred by Target) and (iv) normal or recurring Liabilities incurred since the Most Recent Fiscal Month End in the Ordinary Course of Business.

(k)  Legal Compliance.  Each of the Target and its respective predecessors and Affiliates has complied in all material respects with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof), and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any of them alleging any failure so to comply.

(l)  Tax Matters.  The Target has filed all Tax Returns that it was required to file. All Tax Returns of the Target were timely filed, prepared in compliance with all applicable laws and regulations and are correct and complete in all respects.  All Taxes owed by the Target (whether or not shown on any Tax Return) have been paid.  The Target is not currently the beneficiary of any extension of time within which to file any Tax Return.  No claim has ever been made by an authority in a jurisdiction where the Target does not file Tax Returns that it is or may be subject to taxation by that jurisdiction.  There are no Security Interests on any of the assets of the Target that arose in connection with any failure (or alleged failure) to pay any Tax.

(i)  The Target has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder, or other third party.

(ii)  None of Target's directors or officers expects any authority to assess any additional Taxes for any period for which Tax Returns have been filed.  There is no dispute or claim concerning any Tax Liability of the Target either (A) claimed or raised by any authority in writing or (B) as to which the directors and officers of the Target have Knowledge.  Schedule 4(l) attached hereto lists all federal, state, local, and foreign income Tax Returns filed with respect to the Target, indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of an audit.  The Target has made available to the Buyer correct and complete copies of all Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by the Target.

(iii)  The Target has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(iv)  The Target has not filed a consent under Code §341(f) concerning collapsible corporations.  The Target has not made any payments, is not obligated to make any payments, and is not a party to any agreement that under certain circumstances could obligate it to make any payments that may not be deductible under Code §280G. The Target has not been a United States real property holding corporation within the meaning of Code §897(c)(2) during the applicable period specified in Code

- 19 -

§897(c)(1)(A)(ii).   The Target has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code §6662 or a reportable transaction understatement of Federal income tax within the meaning of Code §6662A.   The Target is not a party to any Tax allocation or sharing agreement.   The Target (A) has not been a member of an Affiliated Group filing a consolidated federal income Tax Return and (B) does not have any Liability for the Taxes of any Person (other than the Target) under Treasury Regulations §1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.   No asset of the Target is tax exempt use property under Code §168(h).   No portion of the cost of any asset of the Target has been financed directly or indirectly from the proceeds of any tax exempt state or local government obligation described in Code §103(a). The Target does not have or has not had a permanent establishment in any foreign country and does not and has not been engaged in a trade or business in any foreign country.   None of the Sellers or the Target is a foreign person or entity within the meaning of Code §1445.   Since the Target's inception, the Target has not been a party to a transaction that has been reported as a reorganization within the meaning of Code §368 or distributed a corporation (or been distributed) in a transaction that is reported to qualify under Code §355.

(v)     The unpaid Taxes of the Target (A) did not, as of the Most Recent Fiscal Month End, exceed the reserve for Tax Liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth in the Most Recent Balance Sheet and (B) does or will not as of the Closing Date exceed that reserve as adjusted for the passage of time through the Closing Date and taken into account in determining Closing Net Working Capital in accordance with the past custom and practice of the Target in filing its Tax Returns.

(vi)     The Target will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (A) change in method of accounting for a taxable period ending on or prior to the Closing Date; (B) "closing arrangement" as described in Code §7121 (or any corresponding or similar provision of state, local or foreign law) executed on or prior to the Closing Date; (C) installment sale or open transaction disposition made on or prior to the Closing Date; or (D) prepaid amount received on or prior to the Closing Date.

(vii)     Neither the Code nor any other provision of any law, rule or regulation requires the Buyer to withhold any portion of the Closing Purchase Price.

(m)     Leased Property.

(i)     The Target does not own any real property.

(ii)     Schedule 4(m) attached hereto lists all real property leased or subleased to or by the Target.   The Target has made available to the Buyer correct and complete copies of the leases and subleases listed in Schedule 4(m) (as amended to date).   With respect to each lease and sublease listed in Schedule 4(m) of the Disclosure Schedules:

- 20 -

(A)     the lease or sublease is legal, valid, binding, enforceable, and in full force and effect, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) the effect of rules of law governing the availability of equitable remedies;

(B)     the lease or sublease will continue to be legal, valid, binding, enforceable, and in full force and effect, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) the effect of rules of law governing the availability of equitable remedies, on identical terms immediately following the consummation of the transactions contemplated hereby;

(C)     Target is not in breach or default in any material respect, and no event has occurred which, with notice or lapse of time, would constitute a breach or default in any material respect or permit termination, modification, or acceleration thereunder;

(D)     to the Knowledge of Sellers, no other party to the lease or sublease is in breach or default in any material respect, and no event has occurred which, with notice or lapse of time, would constitute a breach or default in any material respect or permit termination, modification, or acceleration thereunder;

(E)     no party to the lease or sublease has repudiated any provision thereof;

(F)     there are no disputes, oral agreements, or forbearance programs in effect as to the lease or sublease;

(G)     to the Knowledge of Sellers, with respect to each sublease, the representations and warranties set forth in subsections (A) through (F) above are true and correct with respect to the underlying lease;

(H)     the Target has not assigned, transferred, conveyed, mortgaged, deeded in trust, or encumbered any interest in the leasehold or subleasehold;

(I)     each parcel of real property, building, structure and improvement leased or subleased by the Target thereunder (the "Premises") have received all approvals of governmental authorities (including licenses and permits) required to be obtained by the Target in connection with the occupancy and use by Target thereof and have been occupied and used by Target in accordance with applicable laws, rules, and regulations, including zoning regulations, none of which will, upon the sale of the Target Shares to Buyer, prohibit the use of such properties, buildings, structures, or improvements, for the purposes for which they are now utilized;

- 21 -

(J)     to the Knowledge of the Sellers, the Premises are of good quality construction throughout, are in good condition and working order, are adequate for their intended purposes, have no structural or other substantial deficiencies, and are free from deferred maintenance;

(K)     the Premises are supplied with utilities and other services which are adequate for the occupancy and use of said facilities by the Target as currently occupied and used;

(L)     to the Knowledge of Sellers, the owner of the Premises has good and marketable title to the parcel of real property, free and clear of any Security Interest, easement, covenant, or other restriction, except for installments of special easements not yet delinquent and recorded easements, covenants, and other restrictions which do not impair the current use, occupancy, or value, or the marketability of title, of the property subject thereto; and

(M)     The Target does not have any interest in (as owner, tenant, or otherwise) or use of any real property,   except as disclosed on <u>Schedule 4(m)</u> of the Disclosure Schedules.

(n)     <u>Intellectual Property.</u>

(i)     For purposes of this Agreement, "<u>Intellectual Property</u>" means:

(A)     all issued patents, reissued or reexamined patents, revivals of patents, utility models, certificates of invention, registrations of patents and extensions thereof, regardless of country or formal name (collectively, "<u>Issued Patents</u>");

(B)     all published or unpublished nonprovisional and provisional patent applications, reexamination proceedings, invention disclosures and records of invention (collectively "Patent Applications" and, with the Issued Patents, the "<u>Patents</u>");

(C)     all copyrights, copyrightable works, semiconductor topography and mask work rights, including all rights of authorship, use, publication, reproduction, distribution, performance transformation, moral rights and rights of ownership of copyrightable works, semiconductor topography works and mask works, and all rights to register and obtain renewals and extensions of registrations, together with all other interests accruing by reason of international copyright, semiconductor topography and mask work conventions (collectively, "<u>Copyrights</u>");

(D)     trademarks, registered trademarks, applications for registration of trademarks, service marks, registered service marks, applications for registration of service marks, trade names, registered trade names and applications for registrations of trade names (collectively, "<u>Trademarks</u>"); and

- 22 -

(E)    all technology, ideas, inventions, designs, proprietary information (including but not limited to technical schematics, specifications and functional descriptions of third-party equipment and systems developed by the Target's officers and employees or obtained by the Target), manufacturing and operating specifications, know-how, formulae, trade secrets, technical data, computer programs, hardware, software and processes.

(ii)    The Target owns and has good and marketable title to, or is licensed or otherwise possesses legally enforceable rights to use, all Intellectual Property used in the business of the Target as currently conducted by the Target.    The Intellectual Property owned by or licensed to the Target collectively constitutes all of the Intellectual Property, including products in development, necessary to enable the Target to conduct its business as such business is currently being conducted.    The Target has sole and exclusive ownership of and possesses sole title to that Software Tool and all Intellectual Property associated therewith and embodied therein, and no third party has any ownership interest therein.

(iii)    With respect to each item of Intellectual Property incorporated into any product of the Target or otherwise used in the business of the Target (except "off the shelf" or other software widely available through regular commercial distribution channels at a cost not exceeding $10,000 on standard terms and conditions, as modified for the Target's operations) (the "Target Intellectual Property") Schedule 4(n) of the Disclosure Schedules lists:

(A)    all Issued Patents and Patent Applications and all registered trademarks, and trademark applications and all registered copyrights; and

(B)    the following agreements relating to each of the products of the Target (the "Target Products") or other Target Intellectual Property:    all (A) agreements granting any right to distribute or sublicense a Target Product on any exclusive basis, (B) any exclusive licenses of Intellectual Property to or from the Target, (C) agreements pursuant to which the amounts actually paid or payable under firm commitments to the Target for $10,000 or more, (D) joint development agreements, (E) any agreement by which the Target grants any ownership right or interest to any the Target Intellectual Property owned by the Target except for those license interests granted in the ordinary course of business, as set forth in Schedule 4(n)(iii) of the Disclosure Schedules, (F) any purchase order relating to the Target Intellectual Property, (G) any option relating to any the Target Intellectual Property, and (H) agreements pursuant to which any party is granted any rights to access source code or to use source code to create derivative works of the Target Products.

(iv)    Schedule 4(n)(iv) of the Disclosure Schedules contains an accurate list as of the date of this Agreement of all licenses, sublicenses and other agreements to which the Target is a party and pursuant to which the Target is authorized to use any Intellectual Property owned by any third party excluding "off the shelf" or other software at a cost not exceeding $10,000 and widely available through regular commercial distribution

- 23 -

channels on standard terms and conditions, as modified for the Target's operations ("Third Party Intellectual Property"). The Target has not been subject to an audit by the Software Publishers Association as to any of its Third Party Intellectual Property.

(v)    There is no unauthorized use, disclosure, infringement or misappropriation of any the Target Intellectual Property by any third party, including any employee or former employee of the Target. The Target has not entered into any agreement to indemnify any other person against any charge of infringement of any Intellectual Property, other than as identified on Schedule 4(n)(v) of the Disclosure Schedules. There are no royalties, fees or other payments payable by the Target to any person by reason of the ownership, use, sale or disposition of Intellectual Property.

(vi)    The Target has not breached, or received any claim or threat that it has breached (i) any license, sublicense or other agreement (the "License Agreements") to which it is a party relating to the Target Intellectual Property or Third Party Intellectual Property involving more than $10,000 in consideration in each such case, or (ii) any License Agreement in such a manner as would permit any other party to cancel or terminate the same (with or without notice of passage of time) or would provide to any other party a claim for money damages (either individually or in the aggregate with all other such claims) from the Target or give rise to a right of acceleration of any material obligation or loss of any material benefit under any such License Agreement, which in the aggregate could reasonably be expected to have a Target Material Adverse Effect. Neither the execution, delivery or performance of this Agreement or any ancillary agreement contemplated hereby nor the consummation of the Merger or any of the transactions contemplated by this Agreement will contravene, conflict with or result in an infringement on the Target's or the Buyer's right to own or use any the Target Intellectual Property, including any Third Party Intellectual Property.

(vii)    The Target owns no Patents, registered Trademarks or Copyrights. Target has not and is not infringing, misappropriating or making unlawful use of any proprietary asset owned or used by any third party, and Target has received no notice or other communication of any actual, alleged, possible or potential infringement, misappropriation or unlawful use of any proprietary asset owned or used by any third party. There is no proceeding pending or, to the Knowledge of the Sellers, threatened, nor has any claim or demand been made, which challenges the legality, validity, enforceability or ownership of any item of the Target Intellectual Property or Third Party Intellectual Property or alleges a claim of infringement of any Patents, Trademarks, Copyrights or violation of any trade secret or other proprietary right of any third party. The Target has not brought a proceeding alleging infringement of the Target Intellectual Property or breach of any license or agreement involving Intellectual Property against any third party.

(viii)    All current and former officers and employees of the Target who have or had access to the Target's Intellectual Property have executed and delivered to the Target an agreement regarding the protection of proprietary information and the assignment to the Target of any Intellectual Property arising from services performed for the Target by such persons, the form of which is attached as Schedule 4(n)(viii) to the Disclosure

- 24 -

Schedules, and such form contains no exceptions or exclusions from the scope of its coverage.  All current and former consultants and independent contractors to the Target involved in the development or modification of the Target Products (including those involved in supporting those products) and/or the Target Intellectual Property have executed and delivered to the Target an agreement in the form attached as <u>Schedule 4(n)(viii)</u> to the Disclosure Schedules, and such form contains no exceptions or exclusions from the scope of its coverage.  No employee, consultant or independent contractor of the Target is in violation of any term of any Intellectual Property disclosure or assignment agreement or employment contract or any other contract or agreement relating to the protection of Target Intellectual Property.  No current or former officer, director, stockholder, employee, consultant or independent contractor has any right, claim or interest in or with respect to any the Target Intellectual Property.

(ix)    The Target has taken commercially reasonable and customary measures and precautions as necessary to protect and maintain the confidentiality of all the Target Intellectual Property (except such the Target Intellectual Property whose value would be unimpaired by public disclosure) and otherwise to maintain and protect the full value of all material Intellectual Property it owns, uses or has otherwise received from any third parties (the "<u>Confidential Information</u>").  Target has not disclosed, either directly or through a third party, any Confidential Information and/or Intellectual Property owned by the Target to third parties for use or appropriation by such third parties except pursuant to the terms of a written agreement between the Target and such third parties and, to the Knowledge of the Sellers, no disclosure, use or appropriation by or for a third party has occurred, either through the Target or through a third party, without the Target's consent. All use, disclosure or appropriation by the Target of Confidential Information not owned by the Target has been pursuant to the terms of a written agreement between the Target and the owner of such Confidential Information, or is otherwise lawful.

(x)    No product liability claims have been communicated in writing to or, to the Knowledge of the Sellers, threatened against the Target.

(xi)    A complete list of each of the Target Products and the Target's proprietary software (the "<u>Target Software</u>"), together with a brief description of each, is set forth in <u>Schedule 4(n)(xi)</u> of the Disclosure Schedules.  The Target Software and the Target Products conform in all material respects with any published specification, documentation or performance standard, as published through any means, provided with respect thereto by or on behalf of the Target.

(xii)    No source code of any Target Software that has been incorporated or embedded in any Target Products has been licensed or otherwise disclosed to another Person other than an escrow agent pursuant to the terms of a source code escrow agreement in customary form.  No software that has been incorporated or embedded in any Target Products contains any code that is owned by any third party, including any code that is licensed pursuant to the provisions of any "open source" license agreement, or any other license agreement that requires source code be distributed or made available in connection with the distribution of the licensed software in object code form or that limits the amount of fees that may be charged in connection with sublicensing or

- 25 -

distributing such licensed software (each, an "Open Source License"). None of such Target Products, as a result of the intermingling or integration of code owned by the Target with any "open source" software licensed under any Open Source License is, in whole or in part, subject to the provisions of any Open Source License.

(xiii)  The Target is not subject to any proceeding or outstanding decree, order, judgment, or stipulation restricting in any manner the use, transfer, or licensing thereof by the Target, or which may affect the validity, use or enforceability of the Target Intellectual Property. The Target is not subject to any agreement which restricts in any material respect the use, transfer, or licensing by the Target of the Target Intellectual Property or the Target Products.

(o)  <u>Tangible Assets</u>. The Target owns or leases all office space, machinery, equipment, and other tangible assets necessary for the conduct of its businesses as presently conducted. Other than office space, each such tangible asset is free from defects (patent and latent), has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear), and is suitable for the purposes for which it presently is used.

(p)  <u>Contracts</u>. <u>Schedule 4(p)</u> attached hereto lists the following contracts and other agreements, oral or written, to which the Target is a party:

(i)  any agreement (or group of related agreements) for the lease of personal or real property to or from any Person providing for lease payments in excess of $10,000 per annum;

(ii)  any agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or for the furnishing or receipt of services, the performance of which will extend over a period of more than one year from the effective date of such agreement, result in a material loss to the Target, or involve consideration in excess of $10,000;

(iii)  any agreement concerning a partnership or joint venture;

(iv)  any agency agreement;

(v)  any agreement (or group of related agreements) under which it has created, incurred, assumed, or guaranteed any indebtedness for borrowed money, or any capitalized lease obligation, under which it has imposed a Security Interest on any of its assets, tangible or intangible, including but not limited to mortgages, indentures, deeds of trust, guarantees, or commitments;

(vi)  any agreement concerning confidentiality or noncompetition;

(vii)  any agreement with any of the Sellers and their Affiliates (other than the Target);

- 26 -

(viii)  any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, or other plan or arrangement for the benefit of its current or former directors, officers, and employees;

(ix)  any collective bargaining agreement or union contract;

(x)  any agreement for the employment of any individual on a full-time, part-time, consulting, or other basis providing annual compensation in excess of $100,000 or providing severance benefits;

(xi)  any distribution or dealer agreement;

(xii)  any service agreement;

(xiii)  any advertising agreement;

(xiv)  any agreement under which it has advanced or loaned any amount to any of its directors, officers, and employees;

(xv)  any agreement under which the consequences of a default or termination has had or could reasonably be expected to have a Target Material Adverse Effect;

(xvi)  any other agreement (or group of related agreements) the performance of which involves consideration in excess of $10,000;

(xvii)  any agreement relating to the licensing of Intellectual Property by the Target to a third party or by a third party to the Target, or any other license agreement, and any agreements affecting the Target's ability to use or disclose any Intellectual Property; or

(xviii)  any agreement, contract or covenant limiting the Target from competing in any line of business or with any Person in any geographic area.

The Target has made available to the Buyer a correct and complete copy of each written agreement listed in Schedule 4(p) (as amended to date) and a true and correct written summary setting forth the terms and conditions of each oral agreement referred to in Schedule 4(p).  With respect to each such agreement:  (A) the agreement is legal, valid, binding, enforceable, and in full force and effect except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) the effect of rules of law governing the availability of equitable remedies; (B) the agreement will continue to be legal, valid, binding, enforceable, and in full force and effect, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) the effect of rules of law governing the availability of equitable remedies, on identical terms immediately following the consummation of the transactions contemplated hereby; (C) the Target is not in breach or default in any material respect, nor has Target taken any action which with notice or lapse of time would constitute a breach or default in any material respect, or permit termination, modification, or

- 27 -

acceleration, under the agreement; (D) to the Knowledge of Sellers, no other party is in breach or default in any material respect, and no event has occurred which with notice or lapse of time would constitute a breach or default in any material respect, or permit termination, modification, or acceleration, under the agreement; and (E)  no other party has repudiated any provision of the agreement.

(q)    Notes and Accounts Receivable.    All notes and accounts receivable of the Target are reflected properly on their books and records, are valid receivables subject to no setoffs or counterclaims, are current and collectible, in accordance with their terms at their recorded amounts, subject only to the reserve for bad debts set forth in the Most Recent Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Target.   Schedule 4(q) of the Disclosure Schedules is a list of all bank accounts, lock boxes, post office boxes and safe deposit boxes maintained in the name of or controlled by the Target, the purposes and use therefor, and the names of the persons having access thereto.

(r)    Powers of Attorney.    There are no outstanding powers of attorney executed on behalf of the Target.

(s)    Insurance.    Schedule 4(s) sets forth a list of all insurance policies covering the Target and its assets, copies of all of which have been made available to the Buyer.   With respect to each such insurance policy:    (A) the policy is legal, valid, binding, enforceable, and in full force and effect; (B) the policy will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms immediately following the consummation of the transactions contemplated hereby; (C) the Target is not in breach or default (including with respect to the payment of premiums or the giving of notices) in any material respect, and no event has occurred which, with notice or the lapse of time, would constitute a breach or default in any material respect, or permit termination, modification, or acceleration, under the policy; (D) to the Knowledge of Sellers no other party is in breach or default (including with respect to the payment of premiums or the giving of notices) in any material respect, and no event has occurred which, with notice or the lapse of time, would constitute a breach or default in any material respect, or permit termination, modification, or acceleration, under the policy, and (E) no other party to the policy has repudiated any provision thereof. The Target has been covered since its formation by insurance in scope and amount customary and reasonable for the Target for the businesses in which it has engaged during the aforementioned period. Schedule 4(s) of the Disclosure Schedules describes any self-insurance arrangements affecting the Target.   There is no material claim pending under any of such policies as to which coverage has been questioned, denied or disputed by or on behalf of the underwriters of such policies. No policy currently in force or issued to Target in the past is subject to any retrospective rating or retrospective premium provision, premium recapture provision, or similar provision.

(t)    Litigation.    Schedule 4(t) attached hereto sets forth each instance in which the Target   (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is a party or, to the Knowledge of Sellers, is threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator. None of the actions, suits, proceedings, hearings, and investigations set forth in Schedule 4(t) have had or could reasonably be expected to have a Target Material Adverse Effect.   None of

- 28 -

Target's directors and officers has any reason to believe that any such action, suit, proceeding, hearing, or investigation may be brought or threatened against the Target.

(u)    Service and Product Warranty.    Each service performed or provided by the Target, and product manufactured, sold, leased, or delivered, by the Target has been in conformity with all applicable contractual commitments and all express and implied warranties, and the Target has no Liability (and there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against the Target giving rise to any Liability) for re-performance of a service, or replacement or repair of a product, or other damages in connection therewith, subject only to the reserve for service warranty or product warranty claims set forth in the Most Recent Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Target. Schedule 4(u) of the Disclosure Schedules sets forth complete and accurate copies of the written warranties, guaranties and promises of indemnity by the Target currently in effect with respect to its products and/or services, and the Target has not made any oral or other warranty, guaranty or promise of indemnity with respect to its products and/or services not described in such Schedule 4(u).

(v)    Service and Product Liability.    The Target has no Liability (and there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against the Target giving rise to any Liability) arising out of any injury to individuals or property as a result of the performance of any service, or ownership, possession, or use of any product manufactured, sold, leased, or delivered by the Target, including, but not limited to, claims arising out of the defective or unsafe nature of its services or products. The Target has full and adequate insurance coverage for potential errors and omissions claims against it. The errors and omissions and personal injury insurance maintained by the Target has been on an "occurrence" basis since the Target's inception.

(w)    Employees.

(i)    Schedule 4(w) of the Disclosure Schedules contains a list of the names of all present officers, directors, employees and consultants of the Target and their respective salaries or wages, and other compensation (including, without limitation, commissions, bonuses, and fringe benefits), and dates of employment or engagement.

(ii)    To the Knowledge of the Sellers, no employee has any plans to terminate employment with the Target. The Target is not a party to or bound by any collective bargaining agreement, nor has the Target experienced any strikes, grievances, claims of unfair labor practices, or other collective bargaining disputes. None of the Sellers has any Knowledge of any organizational effort presently being made or threatened by or on behalf of any labor union with respect to employees of the Target. The Target is in full compliance with all applicable laws, rules, and regulations respecting employment and employment practices, terms and conditions of employment and wages and hours including, without limitation, the Fair Labor Standards Act, the Family and Medical Leave Act of 1993, the Americans with Disabilities Act of 1990, the Veterans Reemployment Rights Act, the Equal Employment Opportunities Act, as amended by the Civil Rights Act of 1991, the Occupational Safety and Health Act, the Employee

- 29 -

Retirement Income Security Act of 1974, the Immigration Reform and Control Act of 1986, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Older Workers Benefit Protection Act, and all other laws, rules, and regulations, each as amended to date, relating to employer/employee rights and obligations. The consummation of the transactions contemplated by this Agreement will not, to the Knowledge of Sellers, have a material adverse effect on the Target's relationship with its employees.

    (x)    <u>Employee Benefits</u>.

        (i)    <u>Schedule 4(x)</u> of the Disclosure Schedules contains a complete and accurate list of each plan, program, policy, practice, contract, agreement, or other arrangement providing for employment, compensation, deferred compensation, loans, severance, separation, relocation, repatriation, expatriation, visas, work permits, termination pay, performance awards, bonus, incentive, stock option, stock purchase, stock bonus, phantom stock, stock appreciation right, supplemental retirement, fringe benefits, cafeteria benefits, or other benefits, whether oral or written, including, without limitation, each "employee benefit plan" within the meaning of Section 3(3) of ERISA which is or has been sponsored, maintained, contributed to, or required to be contributed to by the Target and any trade or business (whether or not incorporated) which is treated as a single employer with the Target within the meaning of Section 414(b), (c), (m), or (o) of the Code (an "<u>ERISA Affiliate</u>"), for the benefit of any person who performs or who has performed services for the Target or with respect to which the Target or ERISA Affiliate has or may have any liability or obligation (collectively, the "<u>Employee Plans</u>"). There has been no amendment to, written interpretation or announcement by the Target or ERISA Affiliate which would materially increase the expense of maintaining any Employee Plan above the level of expense incurred with respect to such Employee Plan for the most recent fiscal year included in the Target's financial statements.

        (ii)    The Target has furnished to Buyer true and complete copies of documents embodying each of Employee Plans and related plan documents, including, without limitation, to the extent such documents exist, trust documents, group annuity contracts, plan amendments, insurance policies or contracts, participant agreements, employee booklets, administrative service agreements, summary plan descriptions, compliance, and nondiscrimination tests for the each of the plan years since the Target's inception, standard COBRA forms and related notices, registration statements and prospectuses, and, to the extent still in its possession, any material employee communications relating thereto.  With respect to each Employee Plan which is subject to ERISA reporting requirements, the Target has provided copies of the Form 5500 reports filed for each of the plan years since the Target's inception.  The Target has furnished Buyer with the most recent Internal Revenue Service determination or opinion letter issued with respect to each such Employee Plan, and nothing material has occurred since the issuance of each such letter which could reasonably be expected to cause the loss of the tax-qualified status of any Employee Plan subject to Code Section 401(a).

        (iii)    (A) Each Employee Plan has been administered in accordance with its terms and in compliance with the requirements prescribed by any and all statutes, rules,

- 30 -

and regulations (including ERISA and the Code) which are applicable to it, except as would not have, in the aggregate, a Target Material Adverse Effect, and the Target or ERISA Affiliate have performed all material obligations required to be performed by them under, are not in material respect in default under or violation of and have no knowledge of any material default or violation by any other party to, any of the Employee Plans; (B) any Employee Plan intended to be qualified under Section 401(a) of the Code has either obtained from the Internal Revenue Service a favorable determination, opinion advisory or notification letter, as applicable, to its qualified status under the Code, including all amendments to the Code effected by the Tax Reform Act of 1986 and subsequent legislation, or has applied to the Internal Revenue Service for such a determination letter, if applicable, prior to the expiration of the requisite period under applicable Treasury Regulations or Internal Revenue Service pronouncements in which to apply for such determination letter and to make any amendments necessary to obtain a favorable determination, or has been established under a standardized prototype plan for which an Internal Revenue Service opinion letter has been obtained by the plan sponsor and is valid as to the adopting employer; (C) none of the Employee Plans promises or provides retiree medical benefits to any person other than as required by law, (D) there has been no Prohibited Transaction (other than exempt Prohibited Transactions), with respect to any Employee Plan, which could reasonably be expected to have, in the aggregate, a Target Material Adverse Effect; (E) neither the Target nor any ERISA Affiliate is subject to any liability or penalty under Sections 4976 through 4980 of the Code or Title I of ERISA with respect to any of the Employee Plans; (F) all contributions required to be made by the Target or ERISA Affiliate to any Employee Plan have been made on or before their due dates and a reasonable amount has been accrued for contributions to each Employee Plan as applicable for the current plan years; (G) with respect to each Employee Plan, no "reportable event" within the meaning of Section 4043 of ERISA (excluding any such event for which the thirty (30) day notice requirement has been waived under the regulations to Section 4043 of ERISA) nor any event described in Section 4062, 4063 or 4041 or ERISA has occurred; (H) each Employee Plan subject to ERISA, has prepared in good faith and timely filed all requisite governmental reports (which were true and correct as of the date filed) and has properly and timely filed and distributed or posted all notices and reports to employees required to be filed, distributed or posted with respect to each such Employee Plan; and (I) no suit, administrative proceeding, action or other litigation has been brought, or to the knowledge of the Target is threatened, against or with respect to any such Employee Plan, including any audit or inquiry by the United States Internal Revenue Service or United States Department of Labor.

(iv)    Neither the Target nor any ERISA Affiliate has ever maintained, established, sponsored, participated in, contributed to, or otherwise incurred any obligation or liability (including without limitation, contingent liability) under any "multiemployer plan" (as defined in Section 3(37) of ERISA) or to any "pension plan" (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA or Section 412 of the Code.    Neither the Target nor any ERISA Affiliate has any actual or potential withdrawal liability (including without limitation, any contingent liability) for any complete or partial withdrawal (as defined in Sections 4203 and 4205 of ERISA) from any multiemployer plan.

- 31 -

(v)    With respect to each Employee Plan, the Target has complied with (i) the applicable health care continuation and notice provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the regulations thereunder; (ii) the applicable requirements of the Family and Medical Leave Act of 1993 and the regulations thereunder; (iii) the Health Insurance Portability and Accountability Act ("HIPAA"), and (iv) the Cancer Rights Act of 1998 except to the extent that such failure to comply would not in the aggregate, have a Material Adverse Effect. The Target has no material unsatisfied obligations to any employees, former employees, or qualified beneficiaries pursuant to COBRA, HIPAA, or any state law governing health care coverage extension or continuation.

(vi)    Any Employee Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code has been identified as such on Schedule 4(x) of the Disclosure Schedules. Each such Employee Plan has been operated in accordance with the requirements of Section 409A of the Code (including Notice 2006-4) and does not subject any participant or the Target under any such Employee Plan to any penalties or obligations for noncompliance thereunder.

(vii)    The consummation of the transactions contemplated by this Agreement will not (i) entitle any current or former employee or other service provider of the Target or any ERISA Affiliate to severance benefits or any other payment (including, without limitation, unemployment compensation, golden parachute bonus or benefits under any Employee Plan), except as expressly provided in this Agreement or (ii) accelerate the time of payment or vesting of any such benefits, or increase the amount of compensation due any such employee or service provider (other than full or partial vesting as a result of the actions required under the Agreement). No benefit payable or which may become payable by the Target pursuant to any Employee Plan or as a result of or arising under this Agreement shall constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code) which is subject to the imposition of an excise Tax under Section 4999 of the Code or the deduction for which would not be disallowed by reason of Section 280G of the Code. Each Employee Plan can be amended, terminated or otherwise discontinued after the Closing Date in accordance with its terms, without material liability to Acquirer or the Target (other than ordinary administration expenses typically incurred in a termination event).

(viii)    The Target does not now, nor has it ever, had the obligation to, maintain, establish, sponsor, participate in, or contribute to, any Employee Plan for the benefit of employees outside the United States.

(y)    Guaranties.    The Target is not a guarantor or otherwise is liable for any Liability or obligation (including indebtedness) of any other Person.

(z)    Environment, Health, and Safety.

(i)    The Target and its predecessors and Affiliates have complied and are in compliance with all Environmental, Health and Safety Requirements, including without

- 32 -

limitation all environmental permits required for the operation of the Target's business and the occupation of the Target's facilities.

(ii)    Neither the Target nor any of its predecessors or Affiliates have received any written or oral notice, report or other information regarding any actual or alleged violation of, or any actual or potential liabilities, including any investigatory, remedial or corrective obligations, arising under Environmental, Health and Safety Requirements.

(iii)    To the Knowledge of the Sellers, there are no pending or currently proposed changes to any Environmental, Health and Safety Requirements which, when implemented or effective, may affect the operations of the Target.

(iv)    Neither the Target nor any of its predecessors or Affiliates have treated, stored, disposed of, arranged for the disposal of, transported, handled, or released any substance, or owned or operated any property or facility (and no such property or facility is contaminated by any substance) in a manner that has given or would give rise to any liabilities or investigative, corrective or remedial obligations pursuant to the CERCLA or any other Environmental, Health or Safety Requirements.

(v)    No asbestos, polychlorinated biphenyls, lead-based paints, or radon are on any real property or in any building now or previously owned, operated, leased, or utilized by the Target.

(vi)    No employee or former employee of the Target has been exposed to any Hazardous Material owned, produced, or utilized by the Target.

(vii)    No underground tanks, piping, or subsurface structures of any type exist, or to the Knowledge of the Target's officers and directors, have existed on any real property now or previously owned, operated, leased, or utilized by the Target.

(viii)    No facts, events or conditions relating to the past or present facilities or operations of the Target or any predecessor or Affiliate of the Target will prevent or limit continued compliance by Target with Environmental, Health and Safety Requirements, or give rise to any obligations or liabilities of Target pursuant to Environmental, Health and Safety Requirements, including without limitation any relating to onsite or offsite exposure to or releases of hazardous materials, substances or wastes, personal injury, property damage or natural resources damages.

(ix)    The Target has furnished to Buyer all environmental audits, reports and other material environmental documents relating to its operations, and any current or former facilities and properties, to the extent in its possession, custody, or control.

(aa)    Absence of Certain Business Practices.    No rebates, payments, commissions, promotional allowances or other economic benefits are received by Sellers or Affiliate or agent of the Target or entity controlled by Sellers or the Target from customers, suppliers, trading companies, shopping companies, governmental employee, or other Person with whom the Target does business.    No gifts or similar benefits are given by Sellers or Affiliate or agent of the Target or entity controlled by Sellers or the Target to customers, suppliers, trading companies,

- 33 -

shopping companies, governmental employee, or other Person that may be in a position to help or hinder business of the Target.   The Target is in compliance with all laws relating to anti-competitive practices and price fixing.

(bb)   <u>Suppliers</u>.       No suppliers of goods or services to the Target that has made sales or provided services representing, individually or in the aggregate, more than $100,000 in payments or commitments by the Target within the last twelve (12) months has (i) ceased, or indicated any intention to cease, doing business with the Target, or (ii) changed or indicated any intention to change any terms or conditions for future supply or sale of products or services from the terms or conditions that existed with respect to the supply or sale of such products or services during the twelve (12) month period ending on the date hereof.

(cc)   <u>Customers</u>.       No customer of the Target that has made purchases representing, individually or in the aggregate, more than $100,000 in payments or commitments to the Target since the Target's inception has (i) ceased, or indicated any intention to cease, doing business with the Target, (ii) changed, or indicated any intention to change, any terms or conditions for future purchase of products or services from the terms or conditions that existed with respect to the purchase of such products or services during the twenty-four (24) month period ending on the date hereof, or (iii) experienced a change in ownership or control.   No employee or officer of any customer of the Target who is, or was, either (x) in charge of the Target's account for such customer or (y) in charge of budgeting for such customer has ceased to be employed by, or indicated an intention to leave the employ of, such customer during the twelve (12) month period ending on the date hereof.   <u>Schedule 4(cc)</u> of the Disclosure Schedules sets forth a list of the Target's twenty (20) largest customers (i.e., those customers that individually accounted for the Target's highest gross revenues) during the 12-month period preceding the date hereof.

(dd)   <u>Government Contracts</u>.       No contract listed on <u>Schedule 4(p)</u> of the Disclosure Schedules or other agreement to which the Target is a party or other aspect of the business of the Target   is subject to the Federal Acquisition Regulations or other regulations of any governmental agency.   The Target has not bid on or been awarded any "small business set aside contract," any other "set aside contract" or other order or contract requiring small business or other special status at any time since the Target's inception.   None of the Target's expected sales or orders will be lost, and the Target's   customer relations will not be damaged, as a result of the Target continuing its operations as an entity that does not qualify as a small business.

(ee)   <u>Closing Working Capital</u>.       The Closing Net Working Capital of the Target will be, as of the Closing Date and determined pursuant to Section 2(f), at least equal to the Threshold NWC Amount, and the cash portion of such Closing Net Working Capital of the Target will be at least equal to the Threshold Cash Amount.

(ff)   <u>Exclusivity Matters</u>.       The Target has not breached any of the exclusivity provisions as set forth in the Letter of Interest dated January 23, 2006 (the "<u>Exclusivity Date</u>"), as amended by that certain Amendment Agreement dated March 27, 2006 and further amended by that certain Second Amendment Agreement dated April 12, 2006, nor since such Exclusivity Date has the Target, directly or indirectly, through any Seller, officer, director, employee, representative or agent, (i) taken any action to solicit, initiate, encourage or support any inquiries or proposals that constituted, or could reasonably have been expected to lead to, a proposal or

- 34 -

offer for a merger, consolidation, business combination, sale of assets, sale of shares of capital stock or similar transactions involving the Target, other than the transactions contemplated or expressly permitted by this Agreement (any of the foregoing inquiries or proposals being referred to in this Agreement as a "Target Acquisition Proposal"), (ii) engaged in negotiations or discussions concerning, or provided any non-public information to any person or entity relating to, any Target Acquisition Proposal, or (iii) agreed to, approved or recommended any Target Acquisition Proposal.

(gg)    Certain Business Relationships with the Target.    None of the Sellers and their Affiliates has been involved in any business arrangement or relationship, pursuant to an oral or written contract or otherwise, with the Target (other than employment with the Target), and none of the Sellers and their Affiliates owns any asset, tangible or intangible, which is used in the business of the Target.

(hh)    Disclosure.    The representations and warranties contained in this Section 4 do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this Section 4 not misleading.

5.    Agreements.

(a)    Target's Waiver to Right of First Refusal.    In connection with the transactions contemplated by this Agreement, including the sale of shares by the Sellers to the Buyer (collectively, the "First Refusal Transfers"), the Target waives its right of first refusal under Article XI of the bylaws of the Target (as amended to date) with respect to each such First Refusal Transfer.

(b)    Termination of Prior Transaction Documents.    Each Seller who is a party to any of the documents set forth in the Schedule of Prior Transaction Agreements listed on Schedule 5(b) hereto hereby acknowledges and agrees that such agreement or agreements to which he is a party shall terminate and be of no further force and effect, effective upon the consummation of the Closing hereunder.

(c)    Release.    Except with respect to any executory obligations of the Target after the Closing as set forth in this Agreement, each of the Sellers and their Affiliates ("Seller Releasing Parties") hereby release, acquit and forever discharge Target and its officers, directors, shareholders and Affiliates, both past, present and future, from liability on or for any and all claims, demands, causes of action, damages, costs, expenses, compensation, and all other liabilities of any kind or nature whatsoever, direct or indirect, known or unknown, contingent or absolute, which any Seller Releasing Party has had, now has, or may hereafter have for any reason whatsoever, for or on account of, in consequence of, or arising out of acts or omissions on or prior to the Closing Date by Target and/or any of its officers, directors or Affiliates, past or present.

6.    Post-Closing Covenants.    The Parties agree as follows with respect to the period following the Closing.

(a)    General.    In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further

- 35 -

action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is the Buyer and as such is entitled to indemnification therefor under Section 8 herein).   Subject to Section 9(d) hereof, the Sellers acknowledge and agree that from and after the Closing the Buyer will be entitled to possession of all documents, books, records (including Tax records), agreements, and financial data of the Target.

(b)     Litigation Support.  In the event and for so long as any Party actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Target, each of the other Parties will cooperate with him, her or it and his, her or its counsel in the contest or defense, make available their personnel, and provide such testimony and access to their books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending Party is the Buyer and as such is entitled to indemnification therefor under Section 8 herein).

(c)     Confidentiality. Each of the Sellers acknowledges that all information provided to any of him, her or it and its Affiliates, agents and representatives by the Buyer and its respective Affiliates, agents and representatives is subject to the terms of a Joint Non-Disclosure Agreement by and between the Buyer and the Target, dated as of July 28, 2005, as amended March 27, 2006 pursuant to that Amendment Agreement by and between the Target and the Buyer (the "Confidentiality Agreement"), the terms of which are hereby incorporated herein by reference. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate; provided, however, that Sellers acknowledge that the Confidentiality Agreement shall terminate only with respect to information provided to any of Sellers and his, her or its Affiliates, agents or representatives that relates solely to the Target; and provided further, that Sellers acknowledge that any and all information provided or made available to any of such Sellers and their Affiliates, agents and representatives by or on behalf of the Buyer (other than information relating solely to the Target) shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

(d)     Press Releases and Public Announcements.  No Seller shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the Buyer.

(e)     Limitations in Buyer Claims against Former Target Affiliates.  For clarification and avoidance of doubt, each of the Sellers hereby agrees that he will not make any claim for indemnification or reimbursement against the Target or the Buyer by reason of the fact that he was a director, officer, employee, or agent of the Target or was serving at the request of the Target as a partner, trustee, director, officer, employee, or agent of another entity (whether such claim is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses, or otherwise and whether such claim is pursuant to any statute, charter document, bylaw, agreement, or otherwise) with respect to any action, suit, proceeding, complaint, claim, or demand brought by the Buyer against such Seller (whether such action, suit, proceeding, complaint, claim, or demand is pursuant to this Agreement, applicable law, or otherwise).

- 36 -

7.     Conditions to Obligation to Close.

(a)     Conditions to Obligation of the Buyer.     The obligation of the Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(i)     the representations and warranties set forth in Section 3(a) and Section 4 above shall be true and correct at and as of the Closing Date;

(ii)     the Sellers and the Target shall have performed and complied with all of their covenants hereunder in all material respects through the Closing;

(iii)     no action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement, (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, (C) affect adversely the right of the Buyer to own the Target Shares and to control the Target, or (D) affect adversely the right of the Target to own its assets and to operate its businesses (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect);

(iv)     All of the Target employees listed on Schedule 7(a)(iv) (the "Key Employees") shall have accepted an offer from the Buyer to continue to be employed by the Target pursuant to offer letters in the form(s) attached hereto as Exhibit B (the "Offer Letters") containing new terms of, and "at will," employment ("New Terms of Employment"), such New Terms of Employment to replace and terminate any prior terms of employment with the Target prior to the Closing, and further, such New Terms of Employment shall require, as a condition to employment, that the Key Employee enter into the Confidentiality and Inventions Assignment Agreement in the forms attached hereto as Exhibit C.   Notwithstanding and in addition to the foregoing, none of such Key Employees shall have given any notice or other indication that they are not willing to be employed by the Target or the Buyer subsequent to the Closing.

(v)     (x) the Software Tool shall have been fully transferred to the Target prior to the Closing pursuant to a Software Purchase Agreement by and between the Target and David Stout, and (y) David Stout shall have entered into a Letter Agreement with the Target with respect to, among other things, the payout of Performance Bonuses (the "Stout Letter Agreement"), each in a form previously approved by the Buyer, and which shall be in full force and effect;

(vi)     (x) the following obligations of the Target shall have been paid to, or forgiven by, the Primary Sellers in full satisfaction and cancellation of the Target's obligations and/or any liability thereunder: (A) loans evidenced by promissory notes, dated November 30, 2005 and December 31, 2005, in the aggregate principal amount of $813,403.50 and carrying an annual interest rate of 6.5% and (B) any accrued liability under the Target's Retirement Plan and Trust (the "Profit Sharing Plan"), dated as of

- 37 -

December 21, 2005, by and between the Target and Eddy Dominguez as Trustee thereto, and (y) all necessary steps shall have been taken by the Target and the Trustee to the Profit Sharing Plan to terminate such Profit Sharing Plan prior to the Closing.

(vii)    the Target shall have delivered to the Buyer a certificate to the effect that each of the conditions specified above in Section 7(a)(i)-(vi) is satisfied in all respects, and the Sellers shall have delivered to the Buyer a certificate to the effect that each of the conditions specified above in Sections 7(a)(i) and 7(a)(ii) is satisfied in all respects; provided, however, that the Sellers and Target shall certify solely as to themselves with respect to Section 7(a)(i) and 7(a)(ii) where the condition refers or applies to representations and warranties made by, and compliance of covenants by, the Sellers severally;

(viii)    the Target shall have received all authorizations, consents, and approvals of governments, governmental agencies and third parties referred to in Section 3(a)(ii) or Section 4(d) above;

(ix)    the Target shall deliver to Buyer an affidavit, under penalties of perjury, stating that Target is not and has not been a United States real property holding corporation, dated as of the Closing Date and in form and substance required under Treasury Regulation §1.897-2(h) so that Buyer is exempt from withholding any portion of the Closing Purchase Price under Code §1445;

(x)    the Buyer shall have received from counsel to the Target an opinion in form and substance satisfactory to Buyer, addressed to the Buyer, and dated as of the Closing Date;

(xi)    the Buyer shall have received the resignations, effective as of the Closing, of each director of the Target other than those whom the Buyer shall have specified in writing;

(xii)    all actions to be taken by the Sellers in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be satisfactory in form and substance to the Buyer;

(xiii)    the Escrow Agreement shall have been entered into by and among the Sellers' Agent, the Buyer, and the Escrow Agent (as defined in Section 8(c));

(xiv)    each of the Sellers shall have entered into a noncompetition agreement with the Buyer in the form attached hereto as Exhibit D hereto, and each such agreement shall be in full force and effect; and

(xv)    each Primary Seller shall have entered into an acknowledgment agreement, in the form previously approved by the Buyer, with respect to confirming responsibility for all obligations pertaining to his corresponding vehicle listed in Schedule 7(a)(xiv), and each such agreement shall be in full force and effect.

- 38 -

The Buyer may waive, to the extent legally permissible, any condition specified in this Section 7(a) if it executes a writing so stating at or prior to the Closing.

(b)     <u>Conditions to Obligation of the Sellers and the Target</u>.   The obligation of the Sellers and the Target to consummate the transactions to be performed by them in connection with the Closing is subject to satisfaction of the following conditions:

(i)     the representations and warranties set forth in Section 3(b) above shall be true and correct at and as of the Closing Date;

(ii)     the Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(iii)     no action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement or (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect);

(iv)     the Buyer shall have delivered to the Sellers a certificate to the effect that each of the conditions specified above in Section 7(b)(i)-(iii) is satisfied in all respects;

(v)     the Key Employees shall have received an offer from the Buyer to continue to be employed by the Target pursuant to the Offer Letters containing the New Terms of Employment;

(vi)     the Buyer shall have received all authorization, consents and approvals of governments and governmental agencies referred to in Section 3(b)(ii) hereof;

(vii)     the Buyer shall have paid $291,374 towards outstanding and due accounts payable to the Target for prior services rendered;

(viii)     all actions to be taken by the Buyer in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be satisfactory in form and substance to the Sellers; and

(ix)     the Escrow Agreement shall have been entered into by and among the Sellers' Agent, the Buyer, and the Escrow Agent (as defined in Section 8(c)).

The Sellers may waive, to the extent legally permissible, any condition specified in this Section 7(b) if they execute a writing so stating at or prior to the Closing.

- 39 -

8.    <u>Escrow and Indemnification</u>.

(a)    <u>Survival of Representations and Warranties</u>.    The representations and warranties in this Agreement by any of the Parties shall survive the Closing for a period of two (2) years from the Closing Date; <u>provided</u>, <u>however</u>, that the Sections 4(a), 4(b), 4(c), 4(g), 4(l) 4(n)(ii) (but limited to the last sentence of such Section 4(n)(ii) regarding the Software Tool), 4(z), and 4(ff) shall survive until the expiration of the applicable statute of limitations (such day, the "Termination Date").    For the avoidance of doubt, no claim arising out of any breach of any representation or warranty may be made following the Termination Date.    The Sellers shall not have any liability under this Section 8 to the Buyer with respect to any representation, warranty or indemnity, unless the Buyer provides notice of the claim to the Sellers on or before the Termination Date specifying the basis of the claim in reasonable detail to the extent known.

(b)    <u>Indemnification by Sellers</u>.    Sellers shall jointly and severally indemnify Buyer and its officers, directors, employees and agents (collectively, the "<u>Buyer's Indemnitees</u>") and hold them harmless from any loss, liability, damage or expense (including reasonable legal fees and expenses) ("<u>Losses</u>") suffered or incurred by any such indemnified party to the extent arising from (i) any breach of any representation or warranty of the Target and Sellers contained in Section 4 of this Agreement, (ii) any breach of any representation or warranty of the several Sellers contained in Section 3(a) of this Agreement, (iii) any breach of any covenant of Sellers contained in this Agreement; and (iv) any indemnification obligations of Sellers relating to Taxes as set forth in Section 9(a) (the "<u>Tax Indemnification</u>"); <u>provided</u>, <u>however</u>, and subject to Section 2(f)(v) and the last proviso of this sentence, that the Sellers shall not have any liability for Losses under this Section 8(b) unless the aggregate of all Losses relating thereto for which the Sellers would, but for this proviso, be liable exceeds on a cumulative basis an amount equal to $100,000 (at which point the Sellers will be obligated to indemnify the Buyer from and against all such Losses relating back to the first dollar) (the "<u>Basket Amount</u>"); <u>provided further</u>, and subject to the last proviso of this sentence, that the Sellers' aggregate liability under this Section 8(b) shall not exceed the amount of the Indemnification Cash; <u>provided</u> <u>further</u>, the Sellers shall not have any obligation to any Buyer Indemnitee for any inaccuracy in or breach of a representation or warranty made by the Sellers and the Target in Section 4(h)(i) hereof to the extent of any Loss incurred on account thereof which is compensated by the Negative Difference pursuant to Section 2(f) and 4(ee) hereof; and <u>provided further</u>, that the limitations on Sellers' indemnification obligations as set forth in the foregoing provisos to this Section 8(b) shall not apply in the case of any Losses resulting from a breach of Sellers' and/or Target's representations and warranties in Sections 4(a), 4(b), 4(c), 4(g), 4(l), 4(n)(ii) (but limited to the last sentence of such Section 4(n)(ii) regarding the Software Tool), 4(z) and 4(ff) hereof; resulting from Tax Indemnification; or in the event of fraud or intentional misrepresentation (collectively, the "<u>Specific Indemnification Matters</u>"), and in case of any such Losses resulting from any Specific Indemnification Matter, the Buyer shall be indemnified from the first dollar and up to the aggregate of the payments actually made to the Sellers by the Buyer under this Agreement.

(c)    <u>Escrow Fund</u>.    Pursuant to Section 2(e) hereof and to serve as partial security for the Sellers' indemnification obligations for Losses, the Indemnification Cash shall be deposited with U.S. Bank, National Association (or such other institution selected as escrow agent by Buyer with reasonable consent of the Seller's Agent) (the "<u>Escrow Agent</u>") on the Closing Date,

- 40 -

the treatment of which shall be governed by the terms set forth herein and the Escrow Agreement. The foregoing deposit of the Indemnification Cash into an interest bearing account established by the Escrow Agent shall constitute the escrow fund (the "Escrow Fund") and will be governed by the terms set forth herein and the Escrow Agreement. Buyer may not receive any proceeds from the Escrow Fund unless and until one or more Officer's Certificates (as defined in Section 8(e) below) identifying Losses has or have been delivered to the Escrow Agent as provided in Section 8(e) below.

(d)    Escrow Period; Release From Escrow.

(i)    The escrow period shall commence on the date hereof and terminate as to 40% of the amount in the Escrow Fund on the one (1) year anniversary from the Closing Date, and as to any amounts remaining in such Escrow Fund on the two (2) year anniversary from the Closing Date (each, an "Escrow Termination Date"); provided, however, that a portion of the Escrow Fund, which, in the reasonable judgment of Buyer, is necessary or reasonably and potentially necessary to satisfy any unsatisfied claims specified in any Officer's Certificate theretofore delivered to the Escrow Agent prior to expiration of an Escrow Termination Date shall remain in the Escrow Fund until such claims have been resolved.

(ii)    Within five (5) business days after an Escrow Termination Date (the "Release Date"), the Escrow Agent shall release from Escrow to the Sellers their Pro Rata portion of the Indemnification Cash as set forth in Appendix B of the Escrow Agreement, with any interest which has accrued thereon, from the Escrow Fund, less with respect to each such Seller the amounts of Indemnification Cash in the Escrow Fund with a value equal to (A) such Seller's Pro Rata portion of any Indemnification Cash delivered to Buyer in accordance with Sections 8(e) and 8(f) in satisfaction of indemnification claims by the Buyer and (B) such Seller's Pro Rata portion of any amount retained in the Escrow Fund pursuant to Section 8(d)(i). Any of the Indemnification Cash held in escrow held as a result of clause (B) shall be released to the Sellers or released to Buyer (as appropriate) promptly upon resolution of each specific indemnification claim involved.

(e)    Claims Upon Escrow Fund.    Upon receipt by the Escrow Agent on or before the Escrow Termination Date of a certificate signed by an authorized officer of the Buyer (an "Officer's Certificate") stating that in regards to the indemnification obligations of the Sellers, Losses exist and specifying in reasonable detail the individual items and corresponding amounts of Losses included, the date each such item was paid, or properly accrued or arose, and the nature of the claim to which such item is related, the Escrow Agent shall, subject to the provisions of this Section 8, deliver to Buyer out of the Escrow Fund, as promptly as practicable after the claim is determined to be undisputed or any dispute concerning the claim is resolved as set forth in this Section 8, the portion of the Indemnification Cash held in the Escrow Fund having a value equal to such Losses.

(f)    Objections to Claims.    At the time of delivery of any Officer's Certificate to the Escrow Agent, a duplicate copy of such Officer's Certificate shall be delivered by Buyer to the Sellers' Agent, and for a period of fifteen (15) business days after such delivery, the Escrow

- 41 -

Agent shall make no delivery of any cash, pursuant to Section 8(e) hereof, unless the Escrow Agent shall have received written authorization from the Sellers' Agent to make such delivery. After the expiration of such fifteen (15) business day period, the Escrow Agent shall make delivery of the Indemnification Cash in the Escrow Fund in accordance with Section 8(e) hereof, unless and to the extent that the Sellers' Agent shall have by that time objected in a written statement delivered to the Buyer and the Escrow Agent to the claim made in the Officer's Certificate.

(g)    <u>Sellers' Agent</u>.

(i)    Without any further act of the Sellers, Eddy Dominguez is hereby constituted and appointed by the Sellers as Sellers' Agent, as agent for and on behalf of the Sellers to give and receive notices and communications, to authorize delivery to Buyer of up to the aggregate amount of the Indemnification Cash from the Escrow Fund in satisfaction of claims for Losses, to object to such deliveries, to agree to, negotiate, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims, and to take all actions necessary or appropriate in the judgment of the Sellers' Agent for the accomplishment of the foregoing. Such agency may be changed by the holders of a majority of the Pro Rata interests in the Escrow Fund from time to time upon not less than ten (10) days' prior written notice to Buyer. No bond shall be required of the Sellers' Agent. Notices or communications to or from the Sellers' Agent shall constitute notice to or from each of the Sellers.

(ii)    The Sellers' Agent shall not be liable for any act done or omitted hereunder as Sellers' Agent while acting in good faith and in the exercise of reasonable judgment and any act done or omitted pursuant to the advice of counsel shall be conclusive evidence of such good faith. The Sellers shall severally indemnify the Sellers' Agent (but not out of the Escrow Fund) and hold them harmless against any loss, liability or expense incurred without gross negligence or bad faith on the part of the Sellers' Agent and arising out of or in connection with the acceptance or administration of their duties hereunder.

(iii)    The Sellers' Agent shall have reasonable access to the Buyer, and Buyer will not preclude the Sellers' Agent from relevant discussions with former officers and other employees of Target, provided that the Sellers' Agent shall treat confidentially and not disclose any nonpublic information from or about the Target to anyone (except on a need to know basis to their counsel or advisors who agree to treat such information confidentially).

(h)    <u>Actions of the Sellers' Agent</u>. A decision, act, consent or instruction of the Sellers' Agent in connection with the Escrow Fund shall, including pursuant to this Section 8, the Escrow Agreement, and Section 2(e) hereof, constitute a decision of all Sellers and shall be final, binding and conclusive upon each Seller, and the Escrow Agent and Buyer may rely upon any decision, act, consent or instruction of the Sellers' Agent as being the decision, act, consent or instruction of each and every Seller. The Buyer is hereby relieved from any liability to any

- 42 -

Person from any acts done by the Buyer in accordance with such decision, act, consent or instruction of the Sellers' Agent.

(i)    <u>Procedures Relating to Third Party Claims; Settlements</u>.

(i)    In the event Buyer becomes aware of a third-party claim made by any person, firm, governmental authority or corporation against a Buyer's Indemnitee which the Buyer believes may result in an indemnification claim against the Escrow Fund and/or one or more of the Sellers (a "<u>Third Party Claim</u>"), the Buyer shall promptly notify the Sellers' Agent of such claim, and the Sellers' Agent shall be entitled, at the Sellers' expense, to undertake control of the defense thereof by counsel of Sellers' Agent's own choosing reasonably acceptable to the Buyer; <u>provided</u> <u>however</u>, that the Sellers' Agent acknowledges in writing to the Buyer that any damages, fines, costs or other liabilities that may be assessed against the Buyer in connection with such Third Party Claim constitute Losses and shall be entitled indemnification pursuant to Section 8 of this Agreement (but subject to the limits thereof); <u>provided</u> <u>further</u>, that if damages or claims of such third person exceed or are reasonably likely in the Buyers' reasonable judgment to exceed the value of the Escrow Fund available for indemnification of such damages or claims, or seek injunctive action restricting or inhibiting the conduct of the Target's businesses, the Sellers' Agent may not undertake the defense of such Third Party Claim; and <u>provided</u> <u>further</u>, that while the Buyer must notify the Sellers' Agent to be entitled to indemnification under this Section 8, that no delay on the part of Buyer in notifying the Sellers' Agent shall relieve the Sellers of any liability or obligation hereunder except to the extent of any damage, loss, cost or expense or liability arising out of such failure. The Buyer may participate in (but not control) the defense through its own counsel, provide that so long as the Sellers' Agent is diligently defending such Third Party Claim, the Sellers shall not be liable to Buyer for any fees of other counsel or any other expenses with respect to the defense of such Third Party Claim, other than reasonable costs of investigation. Notwithstanding the foregoing and for the avoidance of doubt, the Sellers shall be liable for the fees and expenses of counsel employed by the Buyer for any period during which the indemnifying party has not assumed the defense thereof.

(ii)    If the Sellers' Agent chooses to defend any Third Party Claim, all the Parties hereto shall cooperate in the defense or prosecution of such Third Party Claim. Such cooperation shall include the retention and (upon the request of the Sellers' Agent) the provision to the Sellers' Agent of records and information which are reasonably relevant to such Third Party Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(iii)    The Sellers' Agent shall not consent to a settlement of, or the entry of any judgment arising from, any such claim or legal proceeding, without the prior written consent of the Buyer (which consent shall not be unreasonably withheld or delayed). The Buyer shall not settle or compromise any Third Party Claim for which it is entitled to indemnification hereunder without the prior written consent of the Sellers' Agent (which consent shall not be unreasonably withheld or delayed); <u>provided</u>, <u>however</u>, that if,

- 43 -

Sellers' Agent fails or refuses to undertake the defense of such Third Party Claim within twenty (20) days after written notice of such claim has been delivered to the Sellers' Agent by the Buyer pursuant to Section 8(i)(i), shall have the right to undertake the defense, compromise and, settlement of such Third Party Claim with counsel of its own choosing; and provided further, that in the event that the Sellers' Agent has consented to the specific terms of any settlement, such consent not to be unreasonably withheld, including, but not limited to, the dollar amount of such settlement, neither the Sellers nor the Sellers' Agent shall have any power or authority to object to the amount of any claim by Buyer against the Escrow Fund and/or one or more of the Sellers for indemnity that is consistent with such settlement.

(j)    Dispute Resolution.    Any dispute arising between the Sellers and the Buyer with respect to the provisions of this Section 8 shall be resolved pursuant to the arbitration procedures set forth in Section 10(o).

9.    Tax Matters.    The following provisions shall govern the allocation of responsibility as between the Buyer and the Sellers for certain tax matters following the Closing Date:

(a)    Tax Indemnification.    Each Seller shall jointly and severally indemnify the Target and the Buyer and hold them harmless from and against full amount of any loss, claim, liability, expense, or other damage attributable to (i) all Taxes (or the non-payment thereof) of the Target for all Tax periods ending on or before the Closing Date and the portion through the end of the Closing Date for any Tax period that includes (but does not end on) the Closing Date ("Pre-Closing Tax Period"), (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which the Target (or any predecessor of the Target) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation §1.1502-6 or any analogous or similar state, local, or foreign law or regulation, (iii) any and all Taxes of any person imposed on the Target as a transferee or successor, by contract or pursuant to any law, rule, or regulation, which Taxes relate to an event or transaction occurring before the Closing Date, (iv) the breach of any of the covenants contained in this Section 9, and (v) any breach of the representations and warranties set forth in Section 4(l).

(b)    Tax Periods Ending on or Before the Closing Date.    The Sellers shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Target for all periods ending on or prior to the Closing Date which are filed after the Closing Date.    The Sellers shall permit the Buyer to review and comment on each such Tax Return described in the preceding sentence prior to filing.    The Sellers shall reimburse the Buyer for Taxes of the Target with respect to such periods that are in excess of the accruals for Tax Liabilities as of the Closing Date at least five (5) days before payment by the Buyer or the Target of such Taxes.

(c)    Tax Periods Beginning Before and Ending After the Closing Date.    The Buyer shall prepare or cause to be prepared and file or cause to be filed any Tax Returns of the Target for Tax periods which begin before the Closing Date and end after the Closing Date.    The Sellers shall pay to Buyer at least five (5) days before the date on which Taxes are paid with respect to such periods an amount equal to the portion of such Taxes which relates to the portion of such Taxable period ending on the Closing Date.    For purposes of this Section 9(c), in the

- 44 -

case of any Taxes that are imposed on a periodic basis and are payable for a Taxable period that includes (but does not end on) the Closing Date, the portion of such Tax which relates to the portion of such Taxable period ending on the Closing Date shall (x) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Taxable period multiplied by a fraction the numerator of which is the number of days in the Taxable period ending on the Closing Date and the denominator of which is the number of days in the entire Taxable period, and (y) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable if the relevant Taxable period ended on the Closing Date.   Any credits relating to a Taxable period that begins before and ends after the Closing Date shall be taken into account as though the relevant Taxable period ended on the Closing Date.   All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with prior practice of the Target.

(d)     <u>Cooperation on Tax Matters.</u>

(i)     The Buyer, the Target and the Sellers shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to this Section 9(d) and any audit, litigation or other proceeding with respect to Taxes.   Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.   The Target and the Sellers agree (A) to retain all books and records with respect to Tax matters pertinent to the Target and its Subsidiaries relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Buyer or the Sellers, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, the Target or the Sellers, as the case may be, shall allow the other Party to take possession of such books and records.

(ii)     Except for the amended filing of the Target's 2004 federal and California state "C" corporation income Tax Returns to report taxable income consistent with the Target Financial Statements, the Buyer shall not cause the Target to file any amended income, sales, franchise, property or other tax return for any period or portion thereof ending on or prior to the Closing Date without the prior written consent of Sellers' Agent, which shall not be unreasonably withheld.   Prior to requesting the Sellers' Agent's approval to the filing of any such amended return, the Buyer shall cause Target to furnish the Sellers' Agent a copy of the amended return which the Target proposes to file, including all applicable attachments.   Immediately upon the filing of any amended tax return, the Target shall provide the Sellers' Agent with a copy of the amended return as filed.

(iii)     The Buyer and the Sellers further agree, upon request of the other Party, to use their best efforts to obtain any certificate or other document from any governmental

- 45 -

authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

(iv)    The Buyer and the Sellers further agree, upon request of the other Party, to provide the other party with all information that either Party may be required to report pursuant to Section 6043 of the Code and all Treasury Department Regulations promulgated thereunder.

(v)    Neither the Buyer nor any of its Affiliates shall make any election under IRC Sec 338 with respect to the transaction contemplated by this Agreement.

(e)    <u>Certain Taxes</u>.    All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement, shall be paid by the Sellers when due, and the Sellers will, at their own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable law, the Buyer will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

10.    <u>Miscellaneous</u>.

(a)    <u>Remedies Cumulative</u>.    Except as explicitly provided herein, any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)    <u>No Third Party Beneficiaries</u>.    This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(c)    <u>Entire Agreement</u>.    This Agreement (including the documents referred to herein), and the Confidentiality Agreement constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

(d)    <u>Succession and Assignment</u>.    This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of his, her or its rights, interests, or obligations hereunder without the prior written approval of the Buyer or the Sellers, as the case may be; <u>provided, however</u>, that the Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates and (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases the Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

(e)    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

- 46 -

(f)    <u>Headings</u>.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(g)    <u>Notices</u>.  All notices, requests, demands, claims, and other communications hereunder will be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then two business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient.  Such notices, demands and other communications shall be sent to the Sellers at the addresses indicated on the <u>Schedule of Sellers</u> attached hereto and to Target and the Buyer at the addresses indicated below:

<u>If to the Target:</u>

CellSite Industries, Inc.
1940 Milmont Drive
Milpitas, CA 95025
Telephone: 408-719-9620
Facsimile: 408-719-9627
Attention: Eddy Dominguez

<u>with copies, which alone shall not constitute notice, to:</u>

Duane Morris LLP
One Market, Spear Tower
San Francisco, CA 94105-1104
Telephone: 415-957-3064
Facsimile: 415-957-3001
Attention: Edward Davis

<u>If to the Buyer:</u>

Andrew Corporation
3 Westbrook Corporate Center
Suite 900
Westchester, IL 60154
Telephone: 708-236-6556
Facsimile: 708-492-3823
Attention: Jim Petelle

<u>with copies, which alone shall not constitute notice, to:</u>

Sonnenschein Nath & Rosenthal LLP
685 Market Street, 6th Floor
San Francisco, CA 94105
Telephone: 415-882-1023
Facsimile: 415-543-5472
Attention: William Choe

- 47 -

<u>If to the Sellers' Agent:</u>

Eddy Dominguez
1940 Milmont Drive
Milpitas, CA 95025
Telephone: 408-719-9620
Facsimile: 408-719-9627

<u>With a copy to, which alone shall not constitute notice, to:</u>

Duane Morris LLP
One Market, Spear Tower
San Francisco, CA 94105-1104
Telephone: 415-957-3064
Facsimile: 415-957-3001
Attention: Edward Davis

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address indicated above using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

(h)      <u>Governing Law</u>.      This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(i)      <u>Amendments and Waivers</u>.      No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Buyer and the Sellers.      No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(j)      <u>Severability</u>.      Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(k)      <u>Expenses</u>.      Each of the Parties will bear his, her or its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.      The Target has borne and will bear any of Target's costs and expenses, including legal expenses, in connection with this Agreement or any of the transactions

- 48 -

27235606\V-1

contemplated hereby; provided, however, that neither the Target nor the Buyer shall bear any Seller's legal or other professional fees and expenses.

(l)    Construction.    The Parties have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.    Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.    The word "including" shall mean including without limitation. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance.    If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

(m)    Incorporation of Exhibits, Annexes, and Schedules.    The Annexes, schedules, Disclosure Schedules and Exhibits (excluding Exhibits which are separate agreements) identified in this Agreement are incorporated herein by reference and made a part hereof.

(n)    Specific Performance.    Each of the Parties acknowledges and agrees that the other Parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, except as provided in Section 10(o) below, each of the Parties agrees that the other Parties shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any court of the United States or any state thereof having jurisdiction over the Parties and the matter, in addition to any other remedy to which they may be entitled, at law or in equity.

(o)    Arbitration.    Except as expressly provided in this Agreement or with respect to disputes or claims for which injunctive relief is sought (which may be pursued in any court of competent jurisdiction as specified below), each Party hereto agrees that the arbitration procedure set forth in Exhibit D hereto shall be the sole and exclusive method for resolving any claim or dispute ("Claim") arising out of or relating to the rights and obligations acknowledged and agreed to in this Agreement, whether such Claim arose or the facts on which such Claim is based occurred prior to or after the execution and delivery of this Agreement.    The Parties agree that the result of any arbitration hereunder shall be final, conclusive and binding on all of the Parties. · Nothing in this paragraph shall prohibit a Party hereto from instituting litigation to enforce any Final Determination (as defined in Exhibit D hereto).    Each party hereto hereby irrevocably submits to the jurisdiction of any United States District Court for the Northern District of California or California state court of competent jurisdiction sitting in Santa Clara County, and agrees that such court shall be the exclusive forum with respect to disputes and claims for injunctive relief and for the enforcement of any Final Determination.    Each party hereto irrevocably consents to service of process by registered mail or personal service and waives any objection on the grounds of personal jurisdiction, venue or inconvenience of the forum.    Each party hereto further agrees that each other party hereto may initiate litigation in

- 49 -

any court of competent jurisdiction to execute any judicial judgment enforcing a Final Determination.

[SIGNATURE PAGE FOLLOWS.]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

ANDREW CORPORATION

By: _____
Title: _____

CELLSITE INDUSTRIES, INC.

By: _____
Title: _____

SELLERS:

_____
Eddy Dominguez

_____
Newton Bui

_____
Tan Nguyen

_____
Licinio Valino

SELLERS' AGENT, solely as to Section 2(f), Section 2(g), Section 8, and Section 10 of this Agreement

_____
Eddy Dominguez

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

ANDREW CORPORATION

By: _____
Title: _____


CELLSITE INDUSTRIES, INC.

By: _____
Title: _____


SELLERS:

_____
Eddy Dominguez

_____
Newton Bui

_____
Tan Nguyen

_____
Licinio Valino


SELLERS' AGENT, solely as to Section 2(f), Section 2(g), Section 8, and Section 10 of this Agreement

_____
Eddy Dominguez

## SCHEDULE OF SELLERS

<u>Eddy Dominguez</u>
1940 Milmont Drive
Milpitas, CA 95025
Telephone: 408-719-9620
Facsimile: 408-719-9627

<u>Newton Bui</u>
1533 Albany Court
Milpitas, CA 95025
Telephone: 408-718-2609
Facsimile: 408-719-9627

<u>Tan Nguyen</u>
2782 Croft Drive
San Jose, CA 95148
Telephone: 408-207-7763
Facsimile: 408-719-9627

<u>Licinio Valino</u>
19608 Pruneridge Ave, Apt 2104
Cupertino, CA 95014
Telephone: 408-480-7560
Facsimile: 408-719-9627

## ANNEX I

None.

## ANNEX II

None.

**SCHEDULE 1**

**Software Tool Description**

**Description of the Software Tool (referred to as the Starlite Test System):** The Starlite Test System is a stimulus/response test system designed for test procedure development and execution. With the Starlite Test System, operators can control test execution sequences for diagnostic applications. The Starlite Test System includes a run time test executive application, developed in LabVIEW, which includes a modular architecture that enables users to perform diagnostic tests via a graphical user interface. Test sequencing is based on pass/fail results, and test results may be logged for later analysis.

## SCHEDULE 2(f)(i)

## <u>Current Assets and Liabilities Inclusions and Exclusions</u>

<u>Current Liability Inclusion</u>

2005-2006 Accrued Vacation Liability

<u>Current Assets and Liabilities Exclusions</u>

Deferred Tax Assets

Primary Sellers' Loans Liability

Accrued Liability under Profit Sharing Plan

Automobile Loans or Lease (for benefit of Primary Sellers) Liability

27235606\V-1

## SCHEDULE 2(g)(i)

### Examples of Earnout Payment Calculations

This schedule sets forth examples of calculations (and parameters for such calculations) in determining the amount of earnout payments, if any, pursuant to Section 2(g)(i) of the Agreement.    The amounts used for revenues and Operating Income in the examples are arbitrary and are not intended to in any way reflect actual revenues or Operating Income, and are solely used for purposes of illustration and clarifying the formulas set forth in Section 2(g)(i) of the Agreement.

Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Agreement.

### Legend

EO = The earnout amount to be paid pursuant to the terms of the Agreement with respect to a particular Earnout Period.

Interpolated EO = The EO determined pursuant to the applicable interpolation formula.

M = 1,000,000

OI = Operating Income from the Target Business for the applicable Earnout Period.

Rev = Revenues from the Target Business for the applicable Earnout Period.

*[Parameters and Examples begin on next page.]*

**Parameters and Examples**

*Year One Earnout Period Parameters*

No EO paid if Rev < $8.7M <u>or</u> OI < $3.9M.
$5M EO paid if Rev ≥   $10.9M <u>and</u> OI ≥   $4.9M ("<u>Year One Max</u>").
Interpolated EO paid if Rev ≥   $8.7M <u>and</u> OI ≥   $3.9M, if Year One Max is not met.
Interpolated EO = $4M + $0.5M(((Rev − $8.7M)/$2.2M) + ((OI − $3.9M)/$1M)).
Interpolated EO may not exceed $4,999,999.

*Year One Earnout Period Examples*

Example 1-<u>A</u>:    The (i) Rev is $8,500,000 and (ii) OI is $4,100,000.    There is no EO because Rev does not meet the minimum goal of $8,700,000, even though OI exceeds the minimum goal of $3,900,000.

Example 1-<u>B</u>:    The (i) Rev is $10,000,000 and (ii) OI is $4,100,000.    EO is $4,395,455*, as shown below:

   $4,000,000 + $500,000((($10,000,000 - $8,700,000) / $2,200,000) + (($4,100,000 - $3,900,000) / $1,000,000)) = $4,395,455

Example 1-<u>C</u>:    The (i) Rev is $8,700,000, and (ii) OI is $4,800,000. EO is $4,450,000, as shown below:

   $4,000,000 + $500,000((($8,700,000 - $8,700,000) / $2,200,000) + (($4,800,000 - $3,900,000) / $1,000,000)) = $4,450,000

Example 1-<u>D</u>:    The (i) Rev is $15,000,000, and (ii) OI is $4,500,000.    EO is $4,999,999, as shown below:

   $4,000,000 + $500,000((($15,000,000 - $8,700,000) / $2,200,000) + (($4,500,000 - $3,900,000) / $1,000,000)) = $5,731,819, but because the Interpolated EO may not exceed $4,999,999, EO is $4,999,999.

Example 1-<u>E</u>:     The (i) Rev is $15,000,000, and (ii) OI is $5,000,000.    EO is $5,000,000 because the Rev and OI each meet or exceed the Year One Max.


**[*Year Two Earnout Period Parameters and Examples Set Forth on Next Page.*]**

---

\* The results of the example calculations in this <u>Schedule 2(g)(i)</u> are rounded up or down to the nearest dollar amount.

*Year Two Earnout Period Parameters*

No EO paid if Rev < $13.6M <u>or</u> OI < $6.2M.
$5M EO paid if Rev ≥ $17M <u>and</u> OI ≥ $7.7M (collectively, "<u>Year Two Max</u>").
Interpolated EO paid if Rev ≥ $13.6M <u>and</u> OI ≥ $6.2M, if Year Two Max is not met.
Interpolated EO = $4M + $0.5M(((Rev – $13.6M)/$3.4M) + ((OI – $6.2M)/$1.5M)).
Interpolated EO may not exceed $4,999,999.

*Year Two Earnout Period Examples*

<u>Example 2-A</u>:   The (i) Rev is $13,000,000 and (ii) OI is $7,000,000.   There is no EO because Rev does not meet the minimum goal of $13,600,000, even though OI exceeds the minimum goal of $6,200,000.

<u>Example 2-B</u>:   The (i) Rev is $18,000,000 and (ii) OI is $7,000,000.   EO is $4,913,725, as shown below:

$4,000,000 + $500,000(((($18,000,000 - 13,600,000) / $3,400,000) + (($7,000,000 - $6,200,000) / $1,500,000)) = $4,913,725

<u>Example 2-C</u>:   The (i) Rev is $13,600,000, and (ii) OI is $6,500,000.   EO is $4,100,000, as shown below:

$4,000,000 + $500,000(((($13,600,000 - 13,600,000) / $3,400,000) + (($6,500,000 - $6,200,000) / $1,500,000)) = $4,100,000

<u>Example 2-D</u>:   The (i) Rev is $20,000,000, and (ii) OI is $7,500,000.   EO is $4,999,999, as shown below:

$4,000,000 + $500,000(((($20,000,000 - 13,600,000) / $3,400,000) + (($7,500,000- $6,200,000) / $1,500,000)) = $5,374,510, but because the Interpolated EO may not exceed $4,999,999, EO is $4,999,999.

<u>Example 2-E</u>:   The (i) Rev is $20,000,000, and (ii) OI is $7,700,000.   EO is $5,000,000 because the Rev and OI each meet or exceed the Year Two Max.

***[Year Three Earnout Period Parameters and Examples Set Forth on Next Page.]***

## *Year Three Earnout Period Parameters*

No EO paid if Rev < $22.6M <u>or</u> OI < $10.2M.
$4M EO paid if Rev ≥   $28.2M <u>and</u> OI ≥   $12.7M (collectively, "<u>Year Three Max</u>").
Interpolated EO paid if Rev ≥   $22.6M <u>and</u> OI ≥   $10.2M, if Year Three Max is not met.
Interpolated EO = $3.2M + $0.4M(((Rev − $22.6M)/$5.6M) + ((OI − $10.2M)/$2.5M)).
Interpolated EO may not exceed $3,999,999.

## *Year Three Earnout Period Examples*

<u>Example 3-A</u>:   The (i) Rev is $23,000,000 and (ii) OI is $10,000,000.   There is no EO because OI does not meet the minimum goal of $10,200,000, even though Rev exceeds the minimum goal of $22,600,000.

<u>Example 3-B</u>:   The (i) Rev is $25,000,000 and (ii) OI is $11,000,000.   EO is $3,499,429, as shown below:

> $3,200,000 + $400,000((($25,000,000 - 22,600,000) / $5,600,000) + (($11,000,000 - $10,200,000) / $2,500,000)) = $3,499,429

<u>Example 3-C</u>:   The (i) Rev is $22,600,000, and (ii) OI is $12,600,000. EO is $3,584,000, as shown below:

> $3,200,000 + $400,000((($22,600,000 - 22,600,000) / $5,600,000) + (($12,600,000 - $10,200,000) / $2,500,000)) = $3,584,000

<u>Example 3-D</u>:   The (i) Rev is $32,000,000, and (ii) OI is $11,500,000.   EO is $3,999,999, as shown below:

> $3,200,000 + $400,000((($32,000,000 - 22,600,000) / $5,600,000) + (($11,500,000 - $10,200,000) / $2,500,000)) = $4,079,429, but because the Interpolated EO may not exceed $3,999,999, EO is $3,999,999.

<u>Example 3-E</u>:   The (i) Rev is $32,000,000, and (ii) OI is $12,700,000.   EO is $4,000,000 because the Rev and OI each meet or exceed the Year Three Max.

**[*Year Three Cumulative EO Parameters and Examples Set Forth on Next Page.*]**

*Year Three Cumulative EO Parameters*

Paid in lieu of Year Three (noncumulative) Earnout Payment
Cumulative EO paid if cumulative Years One - Three Rev $\geq$   $56.1M <u>and</u> OI $\geq$ $25.3M.
Cumulative EO = $14M – EOs for Years One - Two.

*Year Three Cumulative Earnout Examples*

<u>Example 3-F:</u>  The (i) Year One Rev is $15,000,000, (ii) Year Two Rev is $10,000,000, (ii) Year
Three Rev is $32,000,000, (iii) Year One OI is $5,000,000, (iv) Year Two OI is $9,000,000, (v)
Year Three OI is $11,500,000, (vi) Year One EO is $5,000,000, and (vii) Year Two EO is $0.
The Year Three Cumulative EO is $9,000,000, as shown below:

> Cumulative Rev:   $15,000,000 + $10,000,000 + $32,000,000 = $57,000,000, which
> exceeds the minimum cumulative Rev of $56,100,000.

> Cumulative OI:   $5,000,000 + $9,000,000 + $11,500,000 = $25,500,000, which exceeds
> the minimum cumulative OI of $25,300,000

> Cumulative EO:   $14,000,000 – ($5,000,000 + $0) = $9,000,0000

<u>Example 3-G:</u>   The (i) Year One Rev is $8,500,000, (ii) Year Two Rev is $18,000,000, (ii) Year
Three Rev is $32,000,000, (iii) Year One OI is $4,100,000, (iv) Year Two OI is $7,000,000, (v)
Year Three OI is $10,200,000, (vi) Year One EO is $0, and (vii) Year Two EO is $4,913,725.
There is no Year Three Cumulative EO, as shown below:

> Cumulative Rev:   $8,500,000 + $18,000,000 + $32,000,000 = $58,500,000, which
> exceeds the minimum cumulative Rev of $56,100,000.

> Cumulative OI:   $4,100,000 + $7,000,000 + $10,200,000 =   $21,300,000, which does
> not meet the minimum cumulative OI of $25,300,000.   The cumulative Rev and OI must
> each meet or exceed the minimum.

> However, a Year Three (noncumulative) Earnout of $3,999,999 will be paid because the
> Year Three Rev and OI each meet or exceed the applicable minimum goals, as shown
> below:

> $3,200,000 + $400,000((($32,000,000 - $22,600,000) / $5,600,000) + (($11,500,000 -
> $10,200,000) / $2,500,000)) = $4,079,429, but because the Interpolated EO may not
> exceed $3,999,999, EO is $3,999,999.

[END]

## SCHEDULE 2(j)

**(To come:   Employee Bonus Payout Schedule –
For each individual, amounts to include 15% gross up )**

**SCHEDULE 5(b)**

**Schedule of Prior Transaction Agreements**

1.  Employment Agreement by and between the Company and Eddy Dominguez dated July 15, 2005

2.  Employment Agreement by and between the Company and Tan Nguyen dated July 15, 2005

3.  Employment Agreement by and between the Company and Newton Bui dated July 15, 2005

4.  Promissory Note dated November 30, 2005 from the Company to Eddy Dominguez in the principal amount of $75,709.46

5.  Promissory Note dated December 31, 2005 from the Company to Eddy Dominguez in the principal amount of $203,350

6.  Promissory Note dated November 30, 2005 from the Company to Tan Nguyen in the principal amount of $86,262.78

7.  Promissory Note dated December 31, 2005 from the Company to Tan Nguyen in the principal amount of $203,350

8.  Promissory Note dated November 30, 2005 from the Company to Newton Bui in the principal amount of $41,381.26

9.  Promissory Note dated December 31, 2005 from the Company to Newton Bui in the principal amount of $203,350

10. CellSite Industries, Inc. Retirement Plan & Trust dated December 21, 2005

## SCHEDULE 7(a)(iv)

### Key Employees

Eddy Dominguez

Newton Bui

Tan Nguyen

Licinio Valino

Rita Dominguez

Trung Pham

Keith Malone

David Stout

Anh Lam

Quoc Chung

Thinh Nguyen

## SCHEDULE 7(a)(xiv)

## Listing of Vehicles

1.    Eddy Dominguez:   2002 BMW 745 IL.

2.    Tan Nguyen:   2004 BMW 745 LI.

3.    Newton Bui:   2004 Mercedes Benz E320 W.

## DISCLOSURE SCHEDULES

The representations and warranties of the Target and Sellers in Section 4 of the Agreement are made and given subject to, and qualified by, the disclosures in these Disclosure Schedules. The disclosures in these Disclosure Schedules are to be taken as relating to the representations and warranties in the section of the Agreement to which they expressly relate and to no other representation and warranty in the Agreement. Terms defined in the Agreement are used with the same meaning in these Disclosure Schedules.

**Schedule 4(a)**

**Organization, Qualification and Corporate Power**

None.

**Schedule 4(a)(1)**

**Foreign Qualification**

None.

**Schedule 4(a)(2)**

**Directors and Officers**

List of directors and officers:

**<u>Directors</u>:**

Eddy Dominguez

Tan Nguyen

Newton Bui

**<u>Officers</u>:**

| | |
|---|---|
| Eddy Dominguez | President and Secretary |
| Newton Bui | Vice-President |
| Tan Nguyen | Treasurer |

4

**Schedule 4(b)**

**Authorization**

None.