1  Daniel J. Herling (SBN 103711)
   Keller and Heckman LLP
2  50 California Street, Suite 1500
   San Francisco, CA  94111
3  415.277.5952
   415.277.5954
4
   Attorneys for Plaintiffs
5  EDDY DOMINGUEZ, NEWTON BUI,
   TAN NGUYEN and LICINO VALINO
6

7

8                IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 | EDDY DOMINGUEZ, NEWTON BUI,          | Case No. C 07-04679 CW
   | TAN NGUYEN and CLICINO VALINO,       |
12 |                                      | **APPENDIX OF NON-CALIFORNIA CASES**
   |              Plaintiffs,             | **IN SUPPORT OF ITS MOTION FOR**
13 |                                      | **PRELIMINARY INJUNCTION**
   |        vs.                           |
14 |                                      | Date:  November 29, 2007
   | ANDREW CORPORATION,                  | Time:  2:00 p.m.
15 |                                      | Dept:  Courtroom 2, 4th Floor
   |              Defendant.              |
16 |                                      | Complaint Filed:  September 11, 2007

17

18                 <u>**TABLE OF NON-CALIFORNIA AUTHORITY**</u>

19

20 <u>**Cases**</u>

21 *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 586 (Del. Ch. 1998)...........................................1

22 *Council of Dorset Condo. Apts. v. Gordon*, 801 A.2d 1, 7 (Del. 2001)...........................................2

23 *Nolan v. Eastern Co.*, 241 A.2d 885, 891 (Del. Ch. 1968)...............................................................3

24 *Sealy Mattress Co. v. N.J.D. Sealy, Inc.*, 532 A.2d 1324, 1341 (Del. Ch. 1987 3) ........................4

25 *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 a.2d 536, 557 (Del. Ch. 2000) .........................5

26 *True North Communications, Inc. v. Publicis S.A.*, 711 A.2d 34, 44 (Del. Ch. 1997)....................6

27

28

1

2
Dated: November 14, 2007                    Keller and Heckman LLP
3

4

5                                           By: /s/ Daniel J. Herling
                                                Daniel J. Herling
6
                                            Attorneys for Plaintiffs
7                                           EDDY DOMINGUEZ, NEWTON BUI,
                                            TAN NGUYEN and LICINO VALINO
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX OF NON-CALIFORNIA AUTHORITY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

1

CANTOR FITZGERALD, L.P. v. CANTOR    Del. **571**
Cite as, Del.Ch., 724 A.2d 571 (1998)

*American Hawaii Cruises, Inc.,* 971 F.2d 423, 425–26 (9th Cir.1992).

[14] Focusing primarily on the fourth factor, I conclude that even if Delaware were to adopt this privilege, it could not properly be asserted in the present situation. Defendant argues that rejection of the privilege will have a chilling effect on the special committee process of corporations residing in Delaware. Defendant further argues that if committee reports are not privileged, the integrity of the process itself is likely to be compromised because corporations will no longer be honest in their self-evaluations and thus will have an adverse impact on shareholders. Further, in the shareholder demand context, absent assurances that its determinations and recommendations will be kept confidential, boards and special committees would no longer have any incentive to perform an objective and candid analysis of the issues raised by the demand.

I reject the defendant's argument that such a result will occur if Delaware courts refuse to adopt the self-critical analysis privilege. In a shareholder demand situation, far from discouraging candor and objectivity, subjecting the report to disclosure should encourage the committee and the board to undergo a thorough investigation. A thorough report may convince a shareholder not to file a derivative suit or, if one is filed, provide strong evidence that the committee and the board undertook a comprehensive investigation which fully supported its determination to refuse the demand.

\*    \*    \*

Because the privilege issues in this matter have been litigated in general terms and not with reference to particular parts of the Special Committee's report or other documents which may contain or reflect confidential communications or advice deserving protection for reasons other than those already addressed in this opinion, I will allow DSC to redact from the documents to be produced any such passages which it believes, in good faith, may be subject to a successful assertion of privilege for such a reason. Should DSC choose to follow this procedure, it should promptly move for an order confirming its actions.

**IV. CONCLUSION**

For the reasons stated, and the terms discussed, judgment will be entered for the plaintiff and against the defendant. The plaintiff is directed to submit a form of order, on notice.



**CANTOR FITZGERALD, L.P., Plaintiff,**

v.

**Iris CANTOR, Individually, and as De Facto Trustee of the Cantor Family Trust, and Iris Cantor as Trustee of the Michelle Labozzetta Trust, Iris Cantor as Trustee of the Suzanne Fisher Trust, Iris Cantor as Trustee of the Howard Lutnick Trust, Iris Cantor as Trustee of the Stuart Fraser Trust, Iris Cantor as Trustee of the Monica Muhart Trust, and Iris Cantor as Trustee of the Randi Ross Trust, Cantor Fitzgerald Incorporated, Rodney Fisher, Market Data Corporation and Chicago Board Brokerage, L.L.C., Defendants.**

C.A. No. 16297.

Court of Chancery of Delaware,
New Castle County.

Submitted: July 10, 1998.

Decided: July 12, 1998.

Limited liability partnership brought action against three of its limited partners, a corporation under their control, and an unassociated limited liability company, alleging that these entities developed a product that would compete directly with the partnership's core business and seeking preliminary injunction to prevent the new product's launch. The Court of Chancery, New Castle County, Steele, Vice Chancellor, held that partnership was not entitled to preliminary

injunction absent evidence of imminent, non-speculative damages.

Motion denied.

**1. Injunction ⊜138.1**

A plaintiff may obtain a preliminary injunction if it establishes the following three elements: (1) a reasonable likelihood of success on the merits; (2) imminent, irreparable harm will result if an injunction is not granted; and (3) the damage to plaintiff if the injunction does not issue will exceed the damage to the defendants if the injunction does issue.

**2. Injunction ⊜138.1**

The elements for a preliminary injunction are not necessarily weighted equally, and a strong showing on one element may overcome a weak showing on another element.

**3. Injunction ⊜147**

A failure of proof on one of the elements of preliminary injunction will defeat the application.

**4. Injunction ⊜147**

The applicable standard on a motion for preliminary injunction falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made.

**5. Injunction ⊜147**

Where the critical disputes between the parties are disputes of fact, a court will find that a plaintiff has a reasonable probability of success on the merits, as required for a preliminary injunction, if, after considering all evidence currently in the record, the court believes it to be reasonably likely that, at the final hearing, the plaintiff will establish the necessary facts by a preponderance of the evidence.

**6. Partnership ⊜366**

Under limited partnership agreement, limited partners were prohibited from competing with partnership; although some provisions seemed to allow competitive activity,

these provisions only applied to a limited partner that had been terminated or was bankrupt.

**7. Evidence ⊜450(5)**

Since limited partnership agreement clearly and unambiguously prohibited limited partners from engaging in competitive activity or competing business, extrinsic evidence on that subject could not be considered.

**8. Contracts ⊜152**

Although contract headings are not controlling evidence of the meaning of a contract's substantive provisions, they may be considered as additional evidence tending to support the substantive provisions.

**9. Partnership ⊜366**

Limited partnership's prior failure to object to data enhancement deals between its competitors and a corporation controlled by three of its limited partners did not constitute an acquiescence to corporation's subsequent transaction with competitor regarding development of computer software that would compete directly with the partnership's core business.

**10. Estoppel ⊜90(1)**

Acquiescence arises where a complainant has full knowledge of his rights and the material facts and: (1) remains inactive for a considerable time; (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.

**11. Injunction ⊜151**

Since acquiescence/waiver arguments went to the merits of limited liability partnership's breach of fiduciary duty claims against three of its limited partners and were factually intensive, they could not be finally resolved on motion for preliminary injunction.

**12. Estoppel ⊜90(1)**

Acquiescence is a species of waiver.

**13. Fraud ⬡7**

The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; and (3) a knowing participation in the breach by the non-fiduciary defendant.

**14. Torts ⬡12**

The elements of tortious interference with a contract are: (1) a contract; (2) defendant's knowledge of the contract; (3) an intentional act that is a significant factor in causing the breach of the contract; (4) lack of justification; and (5) injury.

**15. Injunction ⬡138.24**

Since corporation controlled by three of the limited partners of a limited liability partnership and the limited liability company for which corporation developed computer software had reason to believe that the transaction might constitute a breach of the limited partners' duty of loyalty to the partnership, or tortious interference with the partnership agreement, partnership was reasonably likely to succeed on merits of its accomplice liability claims, as required for preliminary injunction.

**16. Implied and Constructive Contracts ⬡3**

"Unjust enrichment" is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.

> See publication Words and Phrases for other judicial constructions and definitions.

**17. Implied and Constructive Contracts ⬡3**

The elements of unjust enrichment are: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law.

**18. Injunction ⬡138.24**

Since corporation controlled by three of the limited partners of a limited liability partnership and the limited liability company for which corporation developed computer software knew that limited partners were prohibited from producing and marketing a product that would compete with partnership, partnership was reasonably likely to succeed on merits of its unjust enrichment claim against corporation and limited liability company, as required for preliminary injunction.

**19. Injunction ⬡138.6, 138.9**

Preliminary injunction, which is an extraordinary form of equitable relief, should not be granted if the injury to plaintiff is merely speculative, or if the injury can be fully compensated after a full trial on the merits, either by an award of damages or by any other form of final equitable relief.

**20. Injunction ⬡138.6**

Preliminary injunctive relief may be appropriate when a plaintiff's damages are difficult or impossible to quantify.

**21. Injunction ⬡138.24**

Limited liability partnership was not entitled to preliminary injunction to stop launch of product developed by corporation controlled by three of its limited partners in contravention to non-compete clause of partnership agreement, absent evidence that partnership would suffer imminent, non-speculative damages.

**22. Injunction ⬡138.15**

A court of equity has discretion to grant or deny an application for injunctive relief in light of the relative hardships of the parties.

**23. Injunction ⬡138.12**

When determining whether to grant a preliminary injunction, it is appropriate to consider the impact an injunction will have on the public and on innocent third parties.

----

Rodman Ward, Karen L. Valihura, Joseph M. Asher and George F. Fraley, III of Skadden, Arps, Slate, Meagher & Flom, Wilmington; Thomas J. Schwarz and Jeremy A. Berman of Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel for Plaintiff.

Lawrence C. Ashby, Stephen E. Jenkins, Richard D. Heins and Richard I.G. Jones, Jr. of Ashby & Geddes, Wilmington; Jack C. Auspitz and Howard E. Heiss of Morrison & Foerster, New York City; Steven M. Weinberg of Weinberg Sullivan, Phoenix, Arizona; Barry I. Slotnick, J. Lawrence Crocker and Joshua T. Rabinowitz of Slotnick Shapiro & Crocker, New York City; David F. Dobbins and Saul B. Shapiro of Patterson, Belknap, Webb & Tyler, New York City, of counsel for Defendants Iris Cantor, Cantor Fitzgerald Incorporated, Rodney Fisher and Market Data Corporation, of counsel.

Martin P. Tully and William Lafferty of Morris, Nichols, Arsht & Tunnell, Wilmington; Josef J. Riemer, Ellen M. Moskowitz and Mark A. Racanelli of Kirkland & Ellis, New York City, of counsel for Defendant Chicago Board Brokerage, L.L.C.

### OPINION

STEELE, Vice Chancellor.

Cantor Fitzgerald, L.P. ("CFLP" or "Plaintiff"), a Delaware limited partnership, alleges that three of its limited partners, working through Market Data Corporation ("MDC"), a Delaware corporation under their control, and in conjunction with Chicago Board Brokerage, L.L.C. ("CBB"), an unassociated Delaware limited liability corporation, have developed a product that will compete directly with CFLP's core business. Plaintiff CFLP seeks to preliminarily enjoin the new product's launch on July 31, 1998. Plaintiff may obtain a preliminary injunction if it establishes the following three elements: (1) a reasonable likelihood of success on the merits, (2) imminent, irreparable harm will result if an injunction is not granted and (3) the damage to Plaintiff if the injunction does not issue will exceed the damage to the defendants if the injunction does issue.[1] Although I find the evidence establishes that CFLP has a reasonable likelihood of establishing at a trial on the merits that defendant limited partners breached their fiduciary duty of loyalty to the general partner and the

partnership, I am also compelled by the present record to conclude that CFLP will not suffer imminent harm so damaging to its core business resulting from the breach of that duty of loyalty that it exceeds the harm to the defendants if they are enjoined from further development and use of MarketPower pending a final hearing.

Because issues remain unsettled on the record about MDC's factual assertions on waiver resulting from a prior pattern of acquiescence, Plaintiff's claims of breach of confidentiality and appropriation of trade secrets and the efficacy and appropriateness of the imposition of a constructive trust, a final hearing on the merits will be scheduled during a telephone conference at 2:00 p.m. Monday, July 13, 1998.

### BACKGROUND

Plaintiff CFLP is a leading inter-dealer and institutional broker of United States Treasury securities and other government securities. Three of the defendants in this action, Iris Cantor ("Cantor"), Rodney Fisher ("Fisher"), and Cantor Fitzgerald Incorporated ("CFI") (collectively "Limited Partner Defendants"), are Limited Partners in CFLP. Cantor, in addition to being a Limited Partner of CFLP, is also the Vice Chairman of CFLP and the owner[2] and CEO of CFI.

MDC, a fourth defendant in this action, is a Delaware corporation that was once a department within CFLP. CFLP spun off MDC in 1987 in order to enhance the focus of MDC's business as a separate profit center. MDC has two lines of business. The "data enhancement" business consists of collecting, adding value to, re-formatting and distributing financial data to CFLP's customers and competitors. The "software distribution" business consists of building electronic trading systems for license to brokers and other financial services entities, some of which are CFLP's competitors. Cantor is majority shareholder of MDC,[3] and Fisher is MDC's Chairman and CEO.

---

1. *Mills Acquisition Co. v. Macmillan, Inc.*, Del. Supr., 559 A.2d 1261, 1279 (1989).

2. Cantor owns CFI through the Iris Cantor Trust, of which Cantor is grantor, trustee and sole beneficiary.

3. Cantor is the majority shareholder of MDC

CANTOR FITZGERALD, L.P. v. CANTOR    Del. **575**
Cite as, Del.Ch., 724 A.2d 571 (1998)

The fifth defendant is CBB, a Delaware limited liability company. CBB is a joint venture of Ceres Trading Limited Partnership, a limited partnership controlled by the Chicago Board of Trade, and Prebon Yamane ("Prebon"), a broker/competitor of CFI. "CBB was formed to develop a new and more efficient way of brokering and trading Treasuries—through an interactive electronic trading system. . . . " [4]

CFLP filed this action after CBB announced that, on July 13, 1998,[5] it will launch a new electronic trading system called "MarketPower." CFLP contends the new system is intended to compete directly against CFLP in its "historic core business"—the brokerage of U.S. Treasuries. CBB concedes that, through MarketPower, it "intends to bring full and fair competition to the Treasuries market," which is currently "dominated by plaintiff CFLP." [6] CBB contends its system will "democratize" dealing in Treasuries by breaking a CFLP monopoly in benchmark issues and by opening access for "second and third tier" dealing to a broader market, long dominated by "primary" dealers.

CBB developed the specifications for MarketPower and searched for approximately four years for a vendor to build the system. The evidence clearly shows CBB's options to have been few, with even the most serious discussion with alternative suppliers resulting in no formal proposal. Ultimately, CBB chose MDC as its vendor because it could perform consistently within the specifications in CBB's "functional requirements" [7] and because it could develop the software within an acceptable time and on acceptable financial terms.[8]

through the Iris Cantor Trust.

4.  CBB's Memorandum of Law is Support of Its Motion to Dismiss the Complaint at 2–3 (hereafter "CBB's Open. Dismiss Br.").

5.  It now appears that CBB plans to beta test the 28 screens it has installed with 7 customers on July 13, 1998, but that the actual interactive trading on the system will not begin until July 31, 1998. Direct Examination of David E. Rutter, Transcript Vol. III at 550 (July 8, 1998).

6.  CBB's Open. Dismiss Br. at 3.

Although CBB did not sign a formal contract with MDC until February 9, 1998, and did not announce the impending launch of MarketPower until March 19, 1998, CFLP learned from one of its employees that MDC was close to signing a contract with CBB to develop an electronic trading system at least as early as September of 1997. On October 6, 1997, CFLP sent a letter to Cantor, Fisher and MDC objecting to MDC's role as CBB's software vendor. CFLP claimed that the activity constituted a breach of the 1996 Agreement of Limited Partnership of Cantor Fitzgerald, L.P. ("Limited Partnership Agreement" or "1996 Agreement"). CFLP knew that its warnings were going unheeded, however, in November of 1997, when a CFLP employee attended a high-profile, industry-wide, public demonstration of the MarketPower software that MDC built for CBB. Plaintiff did not initiate this action until April 6, 1998. Shortly after filing the Complaint, CFLP filed a Motion for Preliminary Injunction to prevent the July launch of MarketPower.

Plaintiff never expressed any concern directly to CBB about the propriety of using MDC as CBB's software vendor. Nevertheless, CBB learned of the allegations in CFLP's October 6, 1997, letter later that month, through MDC. Fisher assured CBB, however, as he had from the start of the companies' negotiations in June of 1997, that CFLP and MDC were separate companies and that CFLP's allegations were baseless. Fisher's representations accorded with David E. Rutter's, the Prebon co-chair of CBB, memory of a highly-publicized falling out between the principals of MDC and CFLP.[9] In

7.  Direct examination of David E. Rutter, Transcript Vol. III at 554–55 (July 8, 1998).

8.  CBB's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction at 4 (hereafter "CBB's Opposing P.I. Br.").

9.  Direct Examination of David E. Rutter, Transcript Vol. III at 566–67 (July 8, 1998) ("I do read the papers, and there was an awful lot written about . . . the family feud, which is the split between . . . Iris Cantor and Howard [Lutnick]. And it seemed to me that there was clearly a separation that was achieved at that time. . . .").

addition, Fisher agreed, in the June 1997 negotiations, to include a provision in any future agreement between MDC and CBB that MDC would "give [CBB] the software for free" [10] should CFLP ever materially interfere in the venture.

Rutter called Patriot Securities and Tullet & Tokyo, mutual competitors of CFLP and Prebon, to confirm that MDC had done work for them and to inquire about the nature and quality of MDC's work. Rutter did not contact CFLP to explore the nature and scope of its objection to MDC's collaboration with CBB, nor did he authorize anyone else from CBB to do so. Fisher, Patriot and Tullet apparently succeeded in comforting Rutter, however, because CBB eventually determined, in its business judgment, to take the calculated risk of contracting with MDC to develop MarketPower, even in the face of CBB's knowledge of CFLP's reputation for aggressive litigation. [11] CBB did receive contractual assurances from MDC, consistent with what was promised in the June 1997 negotiations. The Agreement Between Chicago Board Brokerage, L.L.C., and Market Data Corporation (the "CBB/MDC Software Licensing Agreement") provides that if CFLP ever materially interferes with MDC's participation in the CBB/MDC deal, MDC will be in material breach of the CBB/MDC Software Licensing Agreement, and CBB may terminate the agreement and look to its rights as stated in paragraphs 8.3 and 11.3. [12] Thus, between October of 1997, and April of 1998, in reliance on MDC's and others' assurances, CBB "made substantial commitments . . . to prepare for the launch of MarketPower, including hiring more staff and undertaking the significant task of building a network to support the system." [13] Despite seeing caution flags waved, CBB intends to begin beta testing of the system already in place with seven current customers on July 13, 1998, and it will launch trading through MarketPower on July 31, 1998.

10. *Id.* at 567.

11. Cross Examination of David E. Rutter, Transcript Vol. III at 632 (July 8, 1998).

I conducted a hearing on Plaintiff's Motion for a Preliminary Injunction on May 26, 1998 and on July 6—10, 1998.

## CONTENTIONS OF THE PARTIES

### A. Plaintiff's Contentions

CFLP contends that it has a reasonable likelihood of success on the merits of its Complaint based on its interpretation of the Limited Partnership Agreement and on Delaware case law. Count I of the Complaint alleges that the Limited Partner Defendants, by allowing or causing MDC to collaborate with CBB to develop and sell a product intended to compete directly against CFLP in its "historic core business," breached a fiduciary duty of loyalty owed to CFLP pursuant to section 3.03(b) of the Limited Partnership Agreement. Count III alleges that Cantor and CFI breached the 1996 Agreement by engaging in a Competitive Activity or Competing Business in violation of section 3.03(a). Counts II, IV and V of the Complaint, respectively, assert against MDC and CBB claims of aiding and abetting the Limited Partner Defendants' breach of their duty of loyalty, tortious interference with the Limited Partnership Agreement, and unjust enrichment.

CFLP also contends that, if MarketPower launches as planned, CFLP will suffer irreparable injury in the form of lost customers and lost market share. In addition, CFLP argues that it will have to lower its commissions to match CBB's lower prices. Thus, CFLP explains, it will be caught in a "vice"—charging lower commissions on fewer trades. CFLP explains this will cause a substantial loss in profitability, which will, in turn, damage its ongoing business prospects. Lost profitability, CFLP argues, will hinder its ability to fund its diversification program, which includes expansion into Europe and Canada. Of particular concern to CFLP is the requirement that it raise $20 million by January 1, 1999, in order to continue to expand into Europe in advance of the advent

12. Section 8.3 requires MDC to indemnify CBB, and section 11.3 secures CBB's right to receive the software for free.

13. CBB's Opposing P.I. Br. at 8.

CANTOR FITZGERALD, L.P. v. CANTOR    Del. **577**
Cite as, Del.Ch., 724 A.2d 571 (1998)

of the Euro.[14] Plaintiff also explains that if it cannot raise the required $20 million, it will have missed a major, historic opportunity in the world Treasuries markets. CFLP claims it will be unable to afford this substantial deposit during a time of declining profitability and market share. CFLP also contends that, during the pendency of this litigation, it cannot "in good conscience" seek further capital contributions from its partners and that it is at all times contractually prohibited from borrowing the full amount of the required deposit from commercial lenders. CFLP next argues that, once MarketPower is released, CFLP will lose its status as the company whose interest rate is the "benchmark by which U.S. Treasury interest rates are judged," a development that "could undo [CFLP's] business [in] its entirety." '[15] Finally, CFLP argues that the July release of MarketPower will cause its other limited partners to withdraw from the limited partnership. None of these injuries, CFLP argues, can be adequately quantified and fully remedied, even after a final hearing on the merits.

CFLP next argues that the harm it will suffer if I refuse to issue an injunction substantially outweighs the harm that defendants will suffer if I grant injunctive relief because CFLP is obligated to pay Cantor and CFI substantial sums under various agreements they have entered into over the years. CFLP believes it is unfair to allow its limited partners to collect these sums from CFLP and, at the same time, earn additional income from a business that will injure CFLP. Plaintiff further contends that the issuance of a preliminary injunction is in the public interest because it will support the policy of enforcing unambiguous contracts and because if it is later determined that the release of MarketPower must be permanently enjoined, "third parties who have contract-

ed to receive its services may face their termination of this new service."[16]

**B. Defendants' Contentions**

The Limited Partner Defendants contend that Plaintiff is not likely to succeed on the merits of its claims against them because the 1996 Agreement expressly allows them to compete with CFLP. Alternatively, Defendants argue that the terms of the 1996 Agreement, as they pertain to a limited partner's right to compete, are ambiguous, but that extrinsic evidence proves that the Limited Partner Defendants are allowed to compete with CFLP. Further, Defendants argue that even if the 1996 Agreement, by its terms, prohibits limited partners from competing with CFLP, the Limited Partner Defendants have earned the right to compete with CFLP through the parties' prior course of dealing. Finally, Defendants argue that Plaintiff is not reasonably likely to succeed on the merits of its aiding and abetting, tortious interference and unjust enrichment claims because it is unable to prove at least one fundamental element of each claim.

Defendants next contend that in the anticipated short space of time between MarketPower's launch and the final hearing on the merits, Plaintiff will not suffer irreparable harm for which a preliminary injunction is the only effective remedy. CFLP proclaims itself "the world's largest broker of United States Treasury securities"[17] and "the world leader in dollar volume and market share in the brokerage and trading of Treasuries."[18] Its market share is approximately 35–40 percent of all U.S. Treasuries and is above 70 percent in the U.S. Treasury 30–year benchmark. CBB, created solely to develop this electronic trading system for Treasuries, in contrast argues it is a fledgling competitor designed to appeal to "second and third tier" dealers, not primary dealers, and will have substantial difficulty achieving market pres-

---

14. It appears that raising the $20 million may be required by the European regulatory authorities.

15. Plaintiff's Opening Brief in Support of its Motion for Preliminary Injunction at 63 (hereafter "P's Open. P.I. Br.") (quoting Deposition of Howard Lutnick, May 12, 1998, at 223 (hereafter "Lutnick Depo.")). *See also* Direct Examination

of Howard Lutnick, Transcript Vol. I at 133 (July 6, 1998).

16. P's Open. P.I. Br. at 70.

17. P's Open. P.I. Br. at 1.

18. P's Open. P.I. Br. at 59.

ence for years. CFLP attributes its popularity with customers to, among other things: its excellent customer service, its personal relationships with customers, its reputation for integrity, its ability to handle large transactions and its ability to ensure anonymity when trading. Cantor and her expert witness, William James Kenney, contend, even more importantly, that pricing and liquidity advantages that CFLP brings to trading and to customers outweigh the attractiveness of a start-up electronic trading venture with only seven customers and twenty-eight potentially active screens.[19] These standards of excellence, all Defendants argue, will not be affected by MarketPower's launch. Moreover, MarketPower is a new product, as yet untested in a wide commercial market, and Plaintiff has conceded that being the first to market with a new product always entails risk.

Defendants contend that given CBB's size and lack of market presence, the risks associated with the introduction of a new technology, CFLP's dominance in the U.S. Treasuries market, CFLP's excellent reputation with customers, its pricing and liquidity advantages and the short period of time that will elapse before a final hearing, it is highly speculative that CFLP will suffer any injury at all at the hands of CBB and MarketPower. Defendants then concede, however, that Plaintiff might lose some customers and profits. Nevertheless, Defendants argue, to the extent that CFLP does lose customers to MarketPower in the short period of time between its launch and the final hearing on the merits, CFLP will be able to discern the identity of those customers and to calculate the amount of lost profits those customers represent. Defendants also note that CFLP has developed its own electronic trading system that will soon be ready for launch. Should CFLP's product be launched before the final hearing on the merits,[20] and should that product be attractive to customers, CFLP may regain the customers previously

lost and mitigate any injury that may be caused by MarketPower. In any event, Defendants argue, I need not issue a preliminary injunction because, after the final hearing on the merits, I will be able to make Plaintiff whole by awarding money damages and, if necessary, a permanent injunction or other equitable relief.

If I were to issue a preliminary injunction later determined to have been granted improvidently, however, Defendants argue it would be impossible to make them whole. Thus, Defendants argue that the balance of the equities favors denying the preliminary injunction. One critical aspect of the parties' respective equities, Defendants contend, is Plaintiff's delay in filing suit. Plaintiff knew at least as early as October of 1997, that MDC and CBB were working on an electronic trading system, yet CFLP did not promptly file suit. Instead, Plaintiff waited until April of 1998, to seek injunctive relief, approximately five months after the high-profile, industry-wide public demonstration of MarketPower and approximately two months after MDC and CBB signed the CBB/MDC Software Licensing Agreement. By the time CFLP filed its Motion for Preliminary Injunction, Defendants argue, both MDC and CBB had expended large sums of money on personnel and equipment, not to mention a great deal of time and effort.

If the preliminary injunction is granted, MDC explains that it will lose the time and money already invested in MarketPower, as well as the projected earnings from the system. More importantly, however, MDC believes it will be precluded from completing sales of other trading systems. MDC argues that a precedent suggesting that its business transactions are subject to CFLP veto would place a "stranglehold" on MDC's business with third parties. MDC contends that there will be no way to quantify the business lost and the harm to MDC's reputation between the dates the preliminary injunction is issued and is later vacated.

---

**19.** Direct Examination of Walter James Kenney, Transcript Vol. IV at 779 (July 9, 1998); Cross Examination of Walter James Kenney, Transcript Vol. IV at 812 (July 9, 1998).

**20.** It is unlikely that the parties can agree they will be prepared to hold the final hearing on the merits before CFLP releases its electronic trading system, which is likely to be this September. Direct Examination of Howard Lutnick, Transcript Vol. I at 77 (July 6, 1998).

CBB argues that if Plaintiff's Motion for Preliminary Injunction is granted, the injury to CBB will far outweigh any injury Plaintiff might suffer. CBB was created solely to develop this electronic trading system, and CBB argues that its entire business depends on the system's timely launch. Many of CBB's more-established competitors in the securities industry, including CFLP, soon will be releasing electronic trading systems.[21] For a fledgling company like CBB with little market presence, CBB argues, it is critical to be first to market with the new technology. CBB contends that any delay caused by a preliminary injunction, certainly one allowing CFLP to be first in the market, could remove CBB's biggest competitive advantage and "cripple" CBB's long-term potential. Should the preliminary injunction later be determined to have been granted improvidently, moreover, it will be impossible to quantify and remedy CBB's injury. Finally, CBB argues that the issuance of a preliminary injunction would harm the public interest by postponing full and fair competition that would make trading Treasuries more convenient and less costly for consumers.[22]

## DISCUSSION

[1–3] The extraordinary remedy of a preliminary injunction "is granted sparingly and only upon a persuasive showing that it is urgently necessary, that it will result in comparatively less harm to the adverse party, and that, in the end, it is unlikely to be shown to have been issued improvidently."[23] Plaintiff may obtain a preliminary injunction if it establishes the following three elements: (1) a reasonable likelihood of success on the

merits, (2) imminent, irreparable harm will result if an injunction is not granted and (3) the damage to Plaintiff if the injunction does not issue will exceed the damage to the defendants if the injunction does issue.[24] The elements are not necessarily weighted equally. A strong showing on one element may overcome a weak showing on another element. However, a failure of proof on one of the elements will defeat the application.

Because Plaintiff has established only one of the elements to my satisfaction, a short time frame between this decision and a final hearing on the merits is contemplated and I cannot fashion a form of preliminary injunction that could issue, specifically tailored to both maintain the status quo as I see it and to minimize any adverse consequences to the parties pending a final hearing,[25] the application must be denied.

### A. Reasonable Likelihood of Success on the Merits

[4, 5] "[T]he applicable standard on a motion for preliminary injunction falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made."[26] Where, as here, the critical disputes between the parties are disputes of fact, a court will find that Plaintiff has a reasonable probability of success on the merits if, after considering all evidence currently in the record, the court believes it to be reasonably likely that, at the final hearing, Plaintiff will establish the necessary facts by a preponderance of the evidence.[27] Counts I and III of the Complaint

---

21. All of the parties agree that the electronic trading of securities is "the wave of the future" and that the whole industry is moving in that direction.

22. CFLP contends that if MarketPower is introduced, CFLP will be forced to lower substantially its commissions in order to match CBB's prices and, in fact, asserts this is a critical element in analyzing its imminent, irreparable injury. Once lowered, history suggests, the market will not accept increases. Direct Examination of Howard Lutnick, Transcript Vol. I at 106–08 (July 6, 1998).

23. DONALD J. WOLFE, JR. AND MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 10–2(a).

24. *Mills Acquisition Co. v. Macmillan, Inc.*, Del. Supr., 559 A.2d 1261, 1279 (1989).

25. *See Brinati v. TeleSTAR, Inc.*, Del. Ch., C.A. No. 8118, 1985 WL 44688 at *5, Berger, V.C. (Sept. 3, 1985)(tailoring injunctive relief to serve the needs of the parties).

26. WOLFE AND PITTENGER, *supra* note 12 at § 10–2(b)(2).

27. *Id.* (citing *Paramount Commun., Inc. v. Time, Inc.*, Del. Ch., C.A. No. 10866, Allen, C., 1989

allege, respectively, that the Limited Partner Defendants breached their fiduciary duty of loyalty and engaged in a Competitive Activity or Competing Business in violation of the Limited Partnership Agreement.[28] In order to assess Plaintiff's likelihood of success on the merits of these claims, I must examine pertinent provisions of the Agreement.

Section 3.03(b) of the Limited Partnership Agreement states:

"Each Partner acknowledges its duty of loyalty to the Partnership and agrees to take no action to harm (or that would reasonably be expected to harm) the Partnership or any Affiliated Entity."

The Limited Partner Defendants are "Partners," [29] and Plaintiff contends they are, as a result, bound by the terms of section 3.03(b). CFLP contends that the Limited Partner Defendants, by allowing MDC to contract with CBB to develop a product that will compete with CFLP in its core business, breached their fiduciary duty of loyalty to CFLP and took an action that would reasonably be expected to harm CFLP.

Section 3.03(a) states, in pertinent part:

"Nothing contained in this Agreement shall be deemed to preclude the Managing General Partner, CFI or any of their respective Affiliates from engaging or investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; *provided*, that such activities do not constitute Competitive Activities." [30]

The 1996 Agreement states that "'Competitive Activity' shall have the meaning given in Section 11.04(c)." Section 11.04(c) states, in pertinent part:

"[A] Partner shall be considered to have engaged in a Competitive Activity if such Partner while a Partner . . .

(ii) solicits any of the customers of the Partnership or any Affiliated Entity (or any of their employees), induces such customers or their employees to reduce their volume of business with, terminate their relationship with or otherwise adversely affect their relationship with, the Partnership or any Affiliated Entity . . .

(iv) directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of the Partnership or of any Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business or

(v) assists others in engaging in any Competing Business in the manner described in the foregoing clause (iv)." [31]

CFLP contends that the Limited Partner Defendants, by allowing or causing MDC to help CBB develop and sell MarketPower, a product that will compete directly against CFLP in its core business of brokering U.S. Treasuries, have: (1) "solicit[ed] the customers of CFLP to reduce their volume of business with CFLP" in violation of section 11.04(c)(ii), (2) "directly engag[ed] in a Competing Business" in violation of section

WL 79880 (July 14, 1989), mem. op. at 5, *aff'd*, Del.Supr., 571 A.2d 1140 (1989).

**28.** I express no opinion as to whether a duty of loyalty may have existed in the absence of the express provision in the 1996 Agreement of Limited Partnership of Cantor Fitzgerald, L.P. (hereafter "Limited Partnership Agreement").

**29.** The Limited Partnership Agreement defines "Partner," in part, as "the General Partners and the Limited Partners." Limited Partnership Agreement § 1.01.

**30.** Limited Partnership Agreement § 3.03(a) (italics in original). Cantor and MDC appear to be Affiliates of CFI. Limited Partnership Agreement § 1.01. (defining "Affiliate" as any person or entity "that directly or indirectly through one

or more intermediaries controls or is controlled by or is under common control with the specified [person or entity]").

**31.** A Competing Business:

"(i) involves the conduct of the wholesale or institutional brokerage business, (ii) consists of marketing, manipulating or distributing financial price information of a type supplied by the Partnership or any Affiliated Entity to information distribution services or (iii) competes with any other business conducted by the Partnership or any Affiliated Entity if such business was first engaged [in] by the Partnership or an Affiliated Entity. . . ."

Limited Partnership Agreement § 11.04(c).

11.04(c)(iv) and (3) "assist[ed] others in engaging in [a] Competing Business" in violation of section 11.04(c)(v).[32]

The Limited Partner Defendants, however, contend that three other provisions of the 1996 Agreement, not cited by Plaintiff, expressly *grant* them the right to compete with Plaintiff. Defendants first cite section 1.02(b), which states:

"The Partnership hereby grants to CFI a perpetual, worldwide non-exclusive license . . . to use the name 'Cantor Fitzgerald' in connection with its business and activities; *provided, however,* that CFI shall not have the right to utilize such license to conduct any Competing Business." (Emphasis in original).

Defendants then refer me to the following sentence from section 11.02(c):

"Nothing in this Article XI shall be considered or interpreted as restricting the ability of [a] Partner in any way from engaging in any Competing Activity, or in other employment of any nature whatsoever."

Finally, Defendants cite section 11.02(d):

"A partner who *chooses* to engage in a Competitive Activity shall be entitled to receive all amounts payable pursuant to Section 11.03 and shall be entitled to receive additional amounts as are provided in Section 11.04 to the extent that such amounts are payable prior to the date on which a Partner first participates in a Competitive Activity." (Emphasis added).

[6] The Limited Partner Defendants contend that these provisions prove that CFLP is not reasonably likely to succeed on the merits of its breach of fiduciary duty claims because the provisions expressly permit any limited partner to compete with CFLP. Alternatively, Defendants argue that the foregoing provisions conflict with the provisions that CFLP contends prohibit competition and that the Limited Partnership Agreement is, therefore, ambiguous. Defendants have offered extensive extrinsic evidence they contend I may consider to resolve the ambiguity.

[7] The foregoing provisions cited by the Limited Partner Defendants, when read in the context of the entire 1996 Agreement, support rather than contradict Plaintiff's interpretation. Thus, I find that the 1996 Agreement clearly and unambiguously prohibits CFLP's limited partners from engaging in a Competitive Activity or a Competing Business. Because the 1996 Agreement is clear on its face, Defendants' extrinsic evidence may not be considered.[33]

Section 1.02(b) explains the conditions under which CFI may use the Cantor Fitzgerald name; it does not grant CFI, much less any other limited partner, the right to compete with CFLP. Because section 1.02(b) states that CFI may not use the Cantor Fitzgerald name if CFI is engaged in a Competing Business, a reader may infer that there *are* circumstances under which CFI may compete with CFLP, however, the reader would only be able to determine the precise circumstances under which CFI may compete by reading the rest of the contract. When section 1.02(b) is read in conjunction with section 3.03 and Article XI, it is clear that CFI may choose to compete with CFLP after CFI ceases to be a limited partner.[34] Section 1.02(b) provides that, in that circumstance, CFI may not use the Cantor Fitzgerald name.

[8] Subsections 11.02(c) and (d), when read in their entirety and in conjunction with the rest of the Limited Partnership Agreement, also dovetail into the Agreement's overall scheme. Article XI is entitled: "Withdrawal; Transfer and Admission of Additional Limited Partners," and it covers situations not present in this action.[35] Defen-

---

**32.** P's Open. P.I. Br. at 15. The quotation includes Rodney Fisher, but CFLP has since conceded that § 3.03(a) of the Limited Partnership Agreement does not apply to Fisher.

**33.** *Northwestern Nat'l Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43 (1996).

**34.** By its terms, Article XI applies to Partners who have been Terminated or who are in Bank-

ruptcy. Limited Partnership Agreement § 11.02(c). Termination and Bankruptcy are defined terms in the Limited Partnership Agreement. *Id.* § 1.01.

**35.** Although contract headings are not controlling evidence of the meaning of a contract's substantive provisions, they may be considered

dants rely on the second sentence of section 11.02(c) in support of their argument, but they fail to explain how that sentence is affected by the immediately preceding sentence: "Each Partner acknowledges that this Article XI is intended solely to reflect the economic agreement between the Partners with respect to amounts payable upon a Partner's Bankruptcy or Termination."[36] When read together, it is clear that subsections 11.02(c) and (d) provide that if a Partner is Terminated or is Bankrupt, it may seek to earn income in any manner it wishes. The caveat, however, is that if the former limited partner chooses to earn its income by competing with CFLP, it will not receive, in exchange for its Units, any of the additional amounts it would otherwise be entitled to under section 11.04.[37] Subsections 11.02(c) and (d) do not grant Defendants the right to compete with CFLP.

Based solely on the terms of the 1996 Agreement, I find it reasonable to conclude Plaintiff is likely to succeed on the merits of its breach of fiduciary duty claims. Where a fiduciary duty of loyalty is expressly written into an agreement, or where authority is granted to include this provision at a later time, I must conclude that the parties bargained for the provision. That Delaware courts uphold bargained-for fiduciary duties contained in limited partnership agreements is crucial to the orderly management of, and the related, economic success of, those limited partnerships.

[9, 10] Defendants, however, contend that regardless of the Limited Partnership Agreement's terms, CFLP should be estopped from raising a claim for breach of fiduciary duty under that Agreement. Defendants contend that the parties' prior course of dealing, establishes that CFLP routinely acquiesced in Defendants' competition with CFLP. Defendants, therefore, reasonably believed their alliance with CBB to be permissible under the 1996 Agreement. "Acquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved."[38]

Defendants contend that since 1993, the year CFLP first inserted the language currently found in sections 3.03(a), 3.03(b) and 11.04(c) of the 1996 Agreement, MDC has completed, or has proposed and negotiated, many transactions with CFLP's competitors that would arguably constitute Competitive Activities or Competing Businesses, or that might arguably be considered violative of the Limited Partner Defendants' duty of loyalty and harmful to CFLP. Defendants contend that Plaintiff never objected to, or sought to enjoin, these dealings, notwithstanding that some allegedly involved the development of electronic trading systems for companies that compete directly with CFLP. Thus, Defendants contend that Plaintiff led them to believe that their alliance with CBB was also permissible under the 1996 Agreement.

In support of their argument, Defendants provided the details of several transactions between MDC and CFLP's competitors. I am not, however, concerned with, and this case does not turn on the significance of, any of Defendants' data enhancement deals. CFLP has not yet attempted to enjoin MDC from pursuing that line of business, which also appears to fit within the broad definition of Competitive Activity or Competing Business. CFLP explained why it has not sought to enjoin the data enhancement deals in its reply brief: "Those arrangements began prior to the formation of CFLP and prior to the

---

as additional evidence tending to support the substantive provisions.

**36.** There is one exception to this general statement, however; section 11.04(c) sets forth definitions of Competitive Activity and Competing Business that apply to any section of the document.

**37.** The former limited partner may, however, receive additional amounts under section 11.04 for

the time period before the Competitive Activities began. Limited Partnership Agreement § 11.02(d).

**38.** *The NTC Group, Inc. v. West Point–Pepperell, Inc.*, Del. Ch., C.A. No. 10665, 1990 WL 143842 at *5, Hartnett, V.C. (Oct. 17, 1990) (citations omitted).

CANTOR FITZGERALD, L.P. v. CANTOR    Del. **583**
Cite as, Del.Ch., 724 A.2d 571 (1998)

[1993] amendments to the [Limited] Partnership Agreement that included the express non-compete provisions." [39]  It also appears that MDC's data enhancement deals generate revenues for CFLP as well as MDC.

The instant action, however, concerns only MDC's software distribution line of business. I have examined, as closely as the limited record will permit, MDC's history of developing software for CFLP's competitors. All of these transactions are not relevant, however. I find it most appropriate to focus on MDC's development of computer software for use by CFLP's competitors in the precise areas in which those rivals compete with CFLP. Those transactions provide the closest analogy to the transaction at issue in the instant action.

In this case, MDC helped CBB to create fully-interactive, electronic trading software for the brokerage of U.S. Treasuries. CFLP also brokers U.S. Treasuries, but it does not yet have a fully-interactive, electronic system. Thus, MDC has helped a CFLP competitor to obtain a potentially significant "edge" in the business of brokering U.S. Treasuries. MDC may also have aided the solicitation of CFLP's customers in order to convince them to make all of their future purchases and sales of U.S. Treasuries through the MarketPower system instead of through CFLP. These actions squarely fit the definition of a Competitive Activity and a Competing Business.

Defendants contend that MDC has, without objection from CFLP, engaged in other deals, precisely like the CBB deal, in the past and that, therefore, CFLP should be estopped from enforcing sections 3.03(a) and (b) of the 1996 Agreement now. For example, MDC explains that it created a system that allowed Cowen & Co., which was and is [40] CFLP's competitor in the mortgage-backed securities market, to trade mortgage-backed securities electronically. What is not clear is whether or not CFLP was able to trade mortgage-backed securities electronically at the time of the Cowen & Co. transaction. If CFLP did not have that capability, MDC would have conferred the identical competitive edge on a CFLP competitor that it conferred on CBB. This transaction, however, was completed before 1993, the year the pertinent language was added to the Limited Partnership Agreement. [41]

Similarly, MDC explains that it created a system that allowed InterCapital Debt Trading, Ltd., which at the time competed with CFLP in the emerging market field, to trade emerging market debt electronically, another transaction that would seem to constitute a Competitive Activity or a Competing Business. Again, it is not clear whether or not CFLP also had this capability at the time. This transaction was completed in late 1993, after CFLP added the pertinent provisions to the Limited Partnership Agreement. Defendants also contend that MDC proposed or negotiated, without objection from CFLP, additional transactions, similar to the MDC/CBB transaction, that were never completed. Defendants argue that by failing to object to the Cowen & Co., InterCapital, and various other uncompleted transactions as Competitive Activities or Competing Businesses under the 1996 Agreement, CFLP acquiesced in Defendants' competition with CFLP and created the impression that the CBB transaction also would not constitute a breach of fiduciary duty. The current record is wholly insufficient to address this point at this time.

Plaintiff contends that MDC has never pursued any of its software distribution deals independently, but that MDC has always sought permission from CFLP. Plaintiff further claims that it has denied MDC permission to build trading systems for at least three companies, where those systems would have allowed the companies to compete directly with CFLP. [42]  Plaintiff contends that

---

**39.**  Plaintiff's Reply Brief in Support of its Motion for Preliminary Injunction at 38.

**40.**  Patriot Securities is the successor to Cowen & Co.

**41.**  The arrangement, however, may have been renewed after 1993 with Cowen's successor, Patriot Securities.

**42.**  The companies (and their areas of competition with CFLP) are Winstar (government securities), Fundamental Brokers, Inc. (Treasuries), and Daiwa (emerging markets).

it allowed the Cowen & Co. deal to go forward because that deal was completed before the 1993 amendments to the Limited Partnership Agreement and because Cowen & Co. competed with CFLP only in the mortgage-backed securities market, an area of very little or no profitability for CFLP.

[11, 12] Plaintiff concedes that it permitted the InterCapital deal to go forward,[43] although that deal was consummated after the 1993 amendments to the Limited Partnership Agreement. Nevertheless, Plaintiff argues that I can find no acquiescence on Plaintiff's part as a matter of law because the 1996 Agreement contains an express non-waiver provision.[44] Section 20.09 of the 1996 Agreement states:

"No provision of this Agreement shall be deemed to have been waived unless such waiver is in writing signed by the waiving party. No such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given."

Thus, Plaintiff contends that CFLP could not have implicitly waived its rights by its failure to object to the InterCapital deal or any of MDC's other business dealings.[45] The acquiescence/waiver arguments go to the merits and are factually intensive. They cannot be finally resolved at this stage in the proceedings, on the limited record before me. It does appear, however, that Plaintiff has a reasonable likelihood of success on this issue.

[13, 14] Counts II and IV raise accomplice liability theories against MDC and CBB. Count II is a claim for aiding and abetting the Limited Partner Defendants' breach of fiduciary duty, and Count IV is a claim for tortiously interfering with the 1996 Limited Partnership Agreement. The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant.[46] The elements of tortious interference are: (1) a contract, (2) defendant's knowledge of the contract, (3) an intentional act that is a significant factor in causing the breach of the contract, (4) lack of justification and (5) injury.[47]

A common basis for disposing of accomplice liability theories is that Plaintiff has not proved the underlying claim for principal liability. As I have explained, however, Plaintiff has shown that it is reasonably likely to succeed on the merits of its breach of fiduciary duty and breach of contract claims. Nevertheless, MDC and CBB contend that Plaintiff is not likely to succeed on the merits of its aiding and abetting and tortious interference claims because it cannot prove the elements of knowing participation or of intentional action without justification.[48]

It is undisputed that MDC and CBB agreed to work together to develop and sell a product that would compete directly with CFLP in what CFLP alleges is its core business: brokering U.S. Treasuries. The product is operable and is set to launch in July of 1998. CBB admits that it has been

---

43. Defendants argue that they were not required to obtain CFLP's "permission," but rather that CFLP "did not object" to the InterCapital deal.

44. "[A]cquiescence is a species of waiver." *Frank v. Wilson & Co.,* 9 A.2d 82, 87 (1939), *aff'd,* 32 A.2d 277 (1943). *See also Realty Growth Invs. v. Council of Unit Owners,* 453 A.2d 450, 456 n. 6 (1982)("As we see it, acquiescence and waiver both go to the extent of any inference which can be reasonably drawn from [plaintiffs'] conduct.").

45. *Marta v. Mutual Life Ins. Co.,* 887 F.Supp. 722, 727 (D.Del.1995).

46. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, 1995 WL 694397 at *15, Allen, C. (1995).

47. *See CPM Indus. v. Fayda Chems. & Minerals, Inc.,* Del. Ch., C.A. No. 15996, 1997 WL 770683 at *7, Jacobs, V.C. (Nov. 26, 1997).

48. On the final day of the preliminary injunction hearing, July 10, 1998, CBB cited the very recent case of my esteemed colleague, Vice Chancellor Jacobs, as definitively establishing there is no merit as a matter of law to these claims. I find that case, clear in its reasoning on its own facts, wholly inapposite here. *See In Re Frederick's of Hollywood, Inc. Shareholders Litig.,* Del. Ch., C.A. No. 15944, Jacobs, V.C., 1998 WL 398244 (July 9, 1998) mem. op.

actively soliciting customers, including CFLP's customers, to use MarketPower. While MDC denies direct participation in the marketing effort, it has known since October 6, 1997, that in Plaintiff's opinion, developing this product constituted a breach of the Limited Partner Defendants' duty of loyalty found in the Limited Partnership Agreement. CBB admits that MDC shared this information with CBB, and Rutter testified this occurred in October of 1997.[49] It is clear, however, that CBB knew of Plaintiff's objections at least by February 9, 1998, the date that CBB and MDC signed the CBB/MDC Software Licensing Agreement in which MDC agreed to indemnify CBB in the event that Plaintiff should obtain "against MDC any final and unappealable permanent injunction, court order or settlement of any litigation...."[50]

[15] Under these circumstances, I find that Plaintiff is reasonably likely to succeed on the merits of its accomplice liability claims. It is undisputed that MDC and CBB knew of Plaintiff's allegations. Thus, MDC and CBB had reason to believe that developing and marketing MarketPower *may* constitute a breach of the Limited Partner Defendants' duty of loyalty found in the 1996 Limited Partnership Agreement or tortious interference with that contract. MDC argues that it made its own investigation and determined that Plaintiff's interpretation was wrong, and CBB contends it relied on MDC's evaluation. This scenario does not fall within any "good faith negotiation at arm's length" safe harbor recognized under Delaware law.[51] In my opinion, there is a reasonable likelihood that Plaintiff will prove at the final hearing that its interpretation is correct. If that is the case, it is reasonable to further infer that MDC's and CBB's continued development and market-

ing of MarketPower in the face of their knowledge satisfies the elements of knowing participation or intentional action without justification.

[16, 17] MDC and CBB also contend that Plaintiff is not reasonably likely to succeed on the merits of Count V, a claim for unjust enrichment. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[52] The elements of unjust enrichment have also been stated in this way: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law.[53] Unjust enrichment appears to be the underpinning for Plaintiff's claim for imposition of a constructive trust over the net proceeds garnered by both CBB and MDC from the MarketPower venture. CBB and MDC contend that any enrichment they may receive from MarketPower would neither violate "the fundamental principles of justice or equity and good conscience" nor be "unjustly retained." They will undoubtedly oppose the imposition of a constructive trust after a final merits hearing on the basis that the conduct of Cantor and Fisher did not rise to the level of unfair or unconscionable acts given their good faith interpretation of the Limited Partnership Agreement.

[18] It seems clear that the launch of MarketPower has the potential to enrich Defendants and to harm Plaintiff. If Plaintiff succeeds on the merits of its breach of fiduciary duty and contract interpretation claims (and I have already explained that Plaintiff is reasonably likely to do so), it is equally likely that it will also be able to prove that neither

---

49. Cross Examination of David E. Rutter, Transcript Vol. III at 626 (July 8, 1998). However, I cannot discern with precision the earliest date upon which CBB received this information.

50. Agreement Between Chicago Board Brokerage, L.L.C., and Market Data Corporation §§ 2.9, 8.3, 11.3.

51. *See In Re Frederick's of Hollywood, Inc. Shareholders Litig.*, Del. Ch., C.A. No. 15944, Jacobs,

V.C., 1998 WL 398244 (July 9, 1998) mem. op. at 7 n. 8.

52. *Fleer Corp. v. Topps Chewing Gum, Inc.*, Del. Supr., 539 A.2d 1060, 1062 (1988).

53. *Khoury Factory Outlets, Inc. v. Snyder*, Del. Ch., C.A. No. 11,568, 1996 WL 74725 at *11, Kiger, M. (Jan. 8, 1996).

MDC nor CBB can retain any benefit resulting from the success of MarketPower "justifiably" or in accordance with "the fundamental principles of justice or equity and good conscience," because they knew that Cantor, Fisher, and CFI were prohibited from producing and marketing a product that would compete with Plaintiff. Thus, I find that Plaintiff is also reasonably likely to be successful on the merits of its unjust enrichment claim against CBB and MDC.

### B.  Imminent, Irreparable Injury

[19, 20]  Plaintiff must also establish that I must preliminarily enjoin Defendants or Plaintiff will suffer immediate, discernible harm for which there is no adequate remedy at law. Stated another way, this extraordinary form of equitable relief should not be granted if the injury to Plaintiff is merely speculative [54] or if the injury can be fully compensated after a full trial on the merits, either by an award of damages or by any other form of final equitable relief.[55] Preliminary injunctive relief may be appropriate when Plaintiff's damages are difficult or impossible to quantify.[56]

[21]  Despite my conclusion that Plaintiff seems reasonably likely to succeed on the merits of its claim of wrongful conduct by its limited partners, I cannot conclude my level of confidence on that point overcomes my judgment that the record simply does not support imminent, non-speculative damages that can be stemmed only by *preliminary injunctive* relief. I find myself, in this my own short "window of opportunity" to decide this complex matter, convinced that CFLP's and Howard Lutnick's ("Lutnick") [57] actions, more than uncontrollable market forces, will determine both the scope and nature of any damage CFLP will suffer between now and the final hearing.

CFLP suggests it *must* lower commissions to meet the imminent threat of MDC's and CBB's wrongful competition in order to maintain market share, which will result in lower earnings, partners' dissatisfaction and diminished capitalization options—and all at once, within a critical time period. CFLP maintains the record is unassailable on this point. While it is understandably difficult to disagree that no testimony directly refutes Lutnick's declaration that CFLP *will have to* lower commissions and that lower commissions may be, in his view, the best and only immediate action able to protect market share, I do not find his testimony to be credible, at least as it applies to the time frame between July 13, 1998, and a final hearing. The record supports a conclusion that MarketPower has attracted only one primary dealer and six other contract customers and that CBB had placed only twenty-eight screens to date. In addition, under the most optimistic factual scenario, CBB would acquire a modest 1 percent market share by the end of 1998. There is no compelling evidence that the 1 percent share will be at the expense of CFLP as opposed to another broker or brokers. MarketPower seems unlikely to attract the primary dealers with whom CFLP does a substantial amount of its core business because their economic interests are also threatened by the featured "democratization" inherent in CBB's new trading system. Finally, commission costs are not the most important factor in a trade and, in fact, pale into insignificance next to the need for speed, the availability of liquidity and pricing opportunities and the presence of live brokers, who can serve as a source of quick, reliable information and as a hedge against falling victim to an innocent trading mistake.[58]

**54.**  *See, e.g., USACafes v. Office,* Del. Ch., C.A. No. 8186, 1985 WL 44685 at *4, Berger, V.C. (Oct. 28, 1985).

**55.**  *City Capital Assocs., L.P. v. Interco, Inc.,* 551 A.2d 787, 795 (1988) (Injunctive relief is proper if plaintiff can show "the threat of an injury that will occur before trial which is not remediable by an award of damages or the later shaping of equitable relief.").

**56.**  *Commonwealth Assocs. v. Providence Health Care, Inc.,* Del. Ch., C.A. No. 13135, 1993 WL 432779 at *9, Allen, C. (Oct. 22, 1993); *Sealy Mattress Co. v. Sealy, Inc.,* 532 A.2d 1324, 1341 (1987); *In re Anderson Clayton Shareholders' Litig.,* 519 A.2d 669, 676 (1986).

**57.**  Lutnick is the President and CEO of CFLP.

**58.**  Cross Examination of Walter James Kenney, Transcript Vol. IV at 812 (July 9, 1998).

CANTOR FITZGERALD, L.P. v. CANTOR     Del.  **587**
Cite as, Del.Ch., 724 A.2d 571 (1998)

Although Lutnick clearly testified that he would *have* to cut commissions *immediately* to meet the threat of CBB's promised reduction to 2/3 of CFLP's commission costs, I do not find that statement credible. My impression is that CFLP is much too shrewd a business player in this market to "knee-jerk" a price cut until it carefully assesses CBB's actual, immediate, as well as its potential, long-term, impact. This is particularly true because it appears that all dealing in Treasuries is conducted on a non-exclusive basis, and CFLP's own September launch of its interactive, electronic trading system, offered as a choice or alternative to broker-assisted trading, has the potential to win back any business initially lost to MarketPower. Its impending launch and potential advantages may well cause current customers to adopt a wait-and-see approach before rushing headlong into the arms of CBB and MarketPower.

Whether I consider the imminent nature of CFLP's perceived threat from CBB as a separate element for analysis or as one combined with the irreparable injury that might result from that threat, the conclusion that CFLP would have me reach remains illusory. If the threat is real and imminent, it may still not result in any injury at all beyond CFLP's imagined loss of market share and the loss of revenues that could result from CFLP's voluntary decision to cut commissions. The MarketPower launch date of July 31, 1998, is certainly imminent and *may* constitute a threat that can be aggravated by CFLP's own precipitous reaction; but, I conclude the notion of actual, irreparable damage from that perceived threat to be speculative at best and illusory at worst.

I focus on CFLP's ability to exercise reasoned business judgment before deciding to lower commissions because I believe the record reflects that that decision would drive the entire equation for evaluating partners' reactions, sources of capitalization, significant revenue impact and protection of market share. I, nonetheless, do not overlook the fact that market share and those very revenues *may be* impacted by the innovations of MarketPower, which include increased transaction speed, rapid confirmation and user-friendly screens. No doubt the Chicago Board of Trade's clearing facilities will be available to some, if not all, of CBB's customers for the advantages that derive from cross-margining, discussed at length at the hearing. Those advantages CBB believes it brings to the market, and can enhance by being first in the market, however, may not, in fact, have the expected appeal in either the short or long term. I cannot, therefore, believe CFLP will self-destruct by improvidently reducing commissions to create immediate, irreparable harm to meet a threatening competitor who may, in fact, be no more than a paper tiger. I do know that the record in this hearing does not support the requisite finding of immediate, irreparable injury required for the extraordinary relief of a preliminary injunction.

I conclude Plaintiff has not established the second requisite element upon which preliminary injunctive relief is predicated.

**C.  Balance of the Equities**

[22, 23]  "[A] court of equity has discretion to grant or deny an application for injunctive relief in light of the relative hardships of the parties." [59]  Thus, in order to obtain preliminary injunctive relief, Plaintiff must prove that this Court's failure to grant the injunction will cause Plaintiff greater harm than granting the injunction will cause Defendants. It is also appropriate to consider the impact an injunction will have on the public and on innocent third parties. [60]

I address the issue of the balance of the equities for two reasons even though I have already found Plaintiff unpersuasive on the element of an imminent threat of irreparable injury. First, I believe that this court of equity must look carefully at any accusation that a fiduciary has breached his or her duty of loyalty to a partner and has engaged in

---

**59.**  *Bernard Personnel Consultants, Inc. v. Mazarella,* Del. Ch., C.A. No. 11660, 1990 WL 124969 at *2, Allen, C. (Aug. 28, 1990)(citing *Richard Paul, Inc. v. Union Improvement Co.,* 91 A.2d 49, 54).

**60.**  *City Capital,* 551 A.2d at 795; *Newell Co. v. Wm. E. Wright Co.,* 500 A.2d 974, 975 (1985).

wrongful competition that harms his or her partners. Second, I view this case as one in which the public interest, and that of innocent third parties, may be seriously impacted by an improvident restriction of an attempt to broaden the basis of participation in an important national market. The tension between those interests and how they play out in the coming months have an impact on more business entities and individuals than the parties to this litigation. Therefore, I believe it is appropriate to explain my view of these equities supported by the record and their short-term relative importance. These views *may* be of benefit to the parties as they assess their business risks in relation to further legal proceedings as they progress toward integrating their respective versions of interactive, electronic trading into the marketplace. The more persuasive elements of the equities equation are as follows:

- Plaintiff's delay in bringing suit between the time of its initial discovery of its partners' actions through MDC and the date of filing this action induced Defendants to move forward with their business plan to their potential detriment and put them in a position of *greater risk.* I note, however, that the analysis of delay for the purpose of balancing the equities on an application for a preliminary injunction is not the equivalent of a determination that Defendants have unreasonably delayed in bringing an action resulting in prejudice sufficient to establish the affirmative defense of laches.

- If injunctive relief is granted, CBB will lose its parents' funding, and no matter how questionable a court may view that judgment to stop funding, CBB will cease to exist.[61]

- Although 98 percent of MDC's current business is data enhancement and distribution, with contracts in place until 2003 and 2006, with Reuters and Telerate, respectively, MDC will lose any meaningful opportunity to develop its technology business because its ability to operate independently of CFLP will

be suspect. With the looming spectre of being drawn into litigation by CFLP, prospective customers will shy away from doing business with MDC. MDC's future expansion of its more-promising technology division, and its employees' willingness to incur that risk, is problematic.

- Within the short period of time between the launch of MarketPower and the final hearing on the merits, there is no rational basis to conclude CFLP will actually cut commissions, given the irrevocable consequence, historically, of similar actions, in order to meet the speculative threat of CBB who currently has only seven contract customers, only one of which is a primary dealer, and with only twenty-eight screens currently in place.

- Under the most optimistic of realistic scenarios, CBB will be able, *by the end of 1998,* to capture only 1 percent of market share. No one can actually predict from what section of the broader market or at whose expense that 1 percent will come—from CFLP or from other brokers. The speculative nature of the perceived clout of CBB's parents, the advantages of cross-margining opportunities and user-friendly screens hardly offset the immediate economic realities.

- MarketPower seems unlikely to attract the primary dealers with whom CFLP does most of its core business because their economic interests are also threatened by the "democratization" of trading promised by CBB, its parents and CFLP.

- Within sixty days after the MarketPower launch, CFLP expects to launch its own interactive, electronic trading system and will be linked with the New York Cotton Exchange and its clearing facilities in an effort to provide a cross-margining option to its customers. I note, however, that the link with the New York Cotton Exchange is depen-

**61.** *See* Direct Examination of David E. Rutter, Transcript Vol. III at 556, 557 (July 8, 1998).

*See* Deposition of Patrick H. Arbor at 172 (June 30, 1998).

**CANTOR FITZGERALD, L.P. v. CANTOR**    Del. **589**
Cite as, Del.Ch., 724 A.2d 571 (1998)

dent upon approval from the Commodity Futures Trading Commission.

- When one recognizes that commission costs are only one, and even then not the single most, important factor in choosing a broker, CFLP will shortly have combined the following potent trading advantages, which strengthen its market position:

a) enhanced speed of transaction and confirmation;

b) broad liquidity and pricing opportunities;

c) a "live broker" alternative to interactive, electronic, "fat-fingered" trading, including a source of quick, reliable information and a hedge against falling victim to an innocent trading mistake;

d) a *de facto* economic alliance with primary dealers; and

e) a worldwide presence and reputation for being the place to do business, especially for benchmark issues and high-volume trades.

- The public has an interest in competitive trading and in the introduction of innovative efficiencies into the marketplace. The interplay of the efforts of these parties over the following months until their legal dispute can be resolved on the merits may serve the public interest.

A fair and objective analysis of the many issues all parties have brought to bear on the interim balancing of the equities requires that I conclude that issuing a preliminary injunction would cause more harm to Defendants, their employees and the public than the harm caused to Plaintiff by denying its application.

### CONCLUSION

Plaintiff's Motion for a Preliminary Injunction is *denied*.



**2**

COUNCIL OF DORSET CONDOMINIUM v. GORDON          Del.  **1**

Cite as, Del.Supr., 801 A.2d 1 (2002)

The COUNCIL OF The DORSET CON-
DOMINIUM APARTMENTS, an unin-
corporated condominium council or-
ganized and existing pursuant to 25
Del. C. §§ 2201, et. seq. Plaintiff Be-
low Appellant,

v.

Edward O. GORDON, Peggy S. Pranzo
and Drucilla D. Wetzel, Trustee U/A/D
October 27, 1998, Defendants Below
Appellees.

No. 238, 2001.

Supreme Court of Delaware.

Submitted: March 26, 2002.
Decided: May 22, 2002.

Condominium council filed action
seeking access to certain condominium
units for window and sliding door project,
and to compel condominium owners to pay
proportionate share of project expenses.
The Court of Chancery, New Castle Coun-
ty, found that exterior windows and sliding
doors were neither common elements nor
common expenses, and council appealed.
The Supreme Court, Steele, J., held that:
(1) exterior windows and sliding doors
were not common elements and right to
replace them rested with individual unit
owners, and (2) simple majority vote of
unit members to replace exterior windows
and doors did not turn replacement ex-
penses into common expenses.

Affirmed in part, reversed in part, and
remanded in part.

**1. Condominium ⟜3**

A condominium declaration and its ac-
companying code of regulations together
form no more than an ordinary contract
between the unit owners, and, initially, the
developer, created under the statutory

framework of the Unit Properties Act. 25
Del.C. § 2201 et seq.

**2. Condominium ⟜3**

As with any other contract, the intent
of the parties to a condominium declara-
tion or code of regulations must be ascer-
tained from the language of the contract.

**3. Condominium ⟜3**

Where the language in a condominium
declaration is clear and unambiguous, Su-
preme Court will accord that language its
ordinary meaning.

**4. Condominium ⟜6.1**

Exterior windows and sliding doors
were not common elements of condomini-
um association, and thus could not be con-
sidered as a common expense under Unit
Properties Act, where windows and sliding
doors were not included in condominium
declaration's list of general common ele-
ments, and declaration's description of a
unit included doors leading to patio's and
balconies, and all windows. 25 Del.C.
§ 2202(4)(a).

**5. Condominium ⟜8**

Unit Property Act requires unanimous
agreement among unit owners in order for
a condominium council to treat as common
any expense, notwithstanding any contrary
or ambiguous provision of a condominium's
governing documents. 25 Del.C.
§ 2202(4)(b).

**6. Condominium ⟜3, 6.1**

Replacement of windows and doors
did not fall within condominium council's
duty to maintain the exterior of condomini-
um building, as condominium declaration
specifically required unit owners to main-
tain, repair and replace windows and
doors, and declaration had to be interpret-
ed in such a way that gave effect to every
term of declaration, and reconciled all pro-
visions when read as a whole.

### 7. Condominium ⬤8

Majority vote of unit owners for assessment to replace condominium complex's windows and sliding doors did not authorize replacement expenses to be treated as a common expense that unit owners were required to pay; though condominium declaration defined common expenses as those agreed by the unit owners, declaration also stated that agreement had to be pursuant to condominium's governing documents, sole provision in condominium declaration that empowered owners to create a common expense only applied to improvements in common elements and windows and sliding doors were not common elements under condominium declaration, and code of regulations did not authorize a simple majority vote to establish that replacement of windows and sliding doors were to be treated as a common expense.

### 8. Condominium ⬤8

Provision in condominium's code of regulations that allowed owners to transact such other business at annual meetings as may come before them did not give majority carte blanche to conduct any business it chose and create new common expenses not otherwise authorized in condominium's governing documents.

### 9. Condominium ⬤8

Even if condominium's governing documents allowed a mere majority of unit owners to declare any expense common, vote authorizing replacement of windows and sliding doors was flawed; notice condominium council provided to owners stated that windows and sliding doors already were common elements, and nothing in notice would have led owners to believe that they were ceding control over the windows and doors of their units to the council.

### 10. Condominium ⬤13

Condominium declaration that reserved to unit owners the right to replace exterior windows and sliding doors would not be ignored for policy reasons, as declaration restricted a marginal unit owner from subjecting his neighbors to a truly incongruous appearance by requiring every unit owner to first obtain the written permission of the condominium council.

---

Court Below: Court of Chancery of the State of Delaware, in and for New Castle County, C.A. No. 18476.

Upon appeal from the Court of Chancery. **Affirmed in part and REVERSED and REMANDED in part.**

Daniel R. Losco (argued) and William P. Brady of Losco & Marconi, P.A., Wilmington, Delaware, for appellant.

Benjamin C. Wetzel, III (argued) and Natalie M. Ippolito of Bailey & Wetzel, P.A., Wilmington, Delaware, for appellees.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices.

STEELE, Justice.

This appeal arises out of an action initiated by the governing body of the Dorset Condominium Apartments against three of its unit owners. The action sought both injunctive and monetary relief in the Court of Chancery. The Council of the Dorset Condominium Apartments asked the Court of Chancery to grant injunctive relief giving it the right of access to certain units in order to replace the exterior windows and glass sliding doors of those units. In addition, the Council asked the court to enter a judgment requiring the defendant unit owners to pay their proportionate share of the expense assessed for both the window and door replacement project and a sepa-

rate project for the replacement of the condominium's parking deck.

In his opinion of April 10, 2001, the Vice Chancellor ruled in favor of the Council on the assessment for the parking lot expenses, but found that the Council lacked the authority to impose an assessment for the window and sliding door project.[1] He determined that the exterior windows and sliding doors were neither common elements nor common expenses subject to the control of the Council. Thus, the Court refused not only to grant the requested injunction but also refused to require the defendant unit owners to pay the portion of the special assessment relating to that undertaking.[2] The Vice Chancellor, however, did order each defendant unit owner to pay his or her proportionate share of the parking lot assessment and imposed interest at the legal rate.[3] He declined to award attorneys fees and costs to the Council.[4]

Neither party appeals the assessment for the parking lot expenses. The Council, however, contends that the Vice Chancellor committed legal error when he determined that the Council lacked the authority to undertake the window and door project, further erred when he applied an incorrect interest rate to the parking lot assessment owed and erred when he failed to award attorneys' fees in accordance with the Dorset Code of Regulations (COR). We find the Vice Chancellor's reasoning on the issue of the individual nature of the exterior windows and sliding doors persuasive and therefore affirm that portion of his opinion. We remand the issue of the proper inter-

est rate and the failure to award costs and fees to the Court of Chancery and request that the Court state the basis for its conclusions on these two rulings.

## I.

The Dorset Condominium Apartments is a mixed-use condominium established under the Unit Property Act[5] through an Enabling Declaration (the Declaration) dated December 22, 1983. The Council serves as the governing body of the condominium and is elected annually by the Association of Unit Owners, a group comprised of all of the unit owners of the Dorset Apartments. The stated purpose of the Council is to "manage the business, operation and affairs of the Property on Behalf of the Unit Owners in accordance with this Declaration and the COR." The Council's principal contention in this appeal is that the authority to contract for the window and sliding door replacement, as well as to impose the accompanying assessment, falls within this broad mandate and is consistent with the intent of the Dorset's governing documents.

Early in 2000, the Council contracted for the replacement of the Dorset parking deck and the performance of related work on the parking garage. The Council did not submit the issue of the parking contract to a vote of the unit owners and included the cost of that contract in the special assessment at issue in this litigation. In the Court of Chancery, the defendant unit owners contended, *inter alia*, that the parking deck project was subject to a vote under the terms of Article 12(I)[6]

---

1. *The Council of the Dorset Condominium Apartments v. Gordon*, Del. Ch., 787 A.2d 723 (2001) (hereinafter Chancery Opinion).

2. *Id.* at 730, 732.

3. *Id.* at 732.

4. *Id.*

5. Del.Code Ann. tit. 25, ch. 22 (1989).

6. Article 12(I) provides:
   [W]henever in the judgment of the Council the Common Elements shall require addi-

of the Declaration because the work that was performed was an improvement costing over $40,000. The Vice Chancellor determined that the parking area was a common element, but turned aside the defendant owners' argument, finding that the existence of minimal quality differences in the new structure did not constitute an improvement for purposes of Article 12(I).[7] The project thus fell within the Council's Article 12(F) duty to "maintain, repair, and replace" the common elements of the Dorset. Neither the exercise of this duty nor the assessment for its costs requires approval from a majority of the owners. Therefore, the Vice Chancellor held that the Council's assessment for this purpose was valid. As noted *supra*, although the unit owners chose not to appeal the ruling on the assessment itself, the Council appeals the rate of interest awarded by the Vice Chancellor. This issue is discussed later in this opinion.

In February 2000, the Council proposed replacing the exterior windows and sliding glass doors in the complex. The Council had first recommended this project in November 1998, but the Association rejected the proposal at a special meeting. In its solicitation of votes for the 2000 proposal, the Council estimated that the new contract would cost $600,000, and stated that between $160,000 and $200,000 would need to be spent to repair the existing windows if the proposal failed. The notice read, in part:

> tions, alterations or improvements costing in excess of Forty Thousand Dollars ($40,-000) and the making of such additions, alterations or improvements shall have been approved by a majority of the Unit Owners, the Council shall proceed to assess all Unit Owners the cost thereof as a Common Expense.

7. The Vice Chancellor concluded that the new deck was essentially the same as the old with

Since the Dorset windows and sliding glass doors are common elements, repair and replacement are the Council's responsibility. This was an intentional decision by the originaldevelopers [sic] of the Dorset in order to insure uniform appearance over the building exterior. Thus, window replacement by individual owners is not an option. Because the window replacement will constitute an upgrade costing in excess of $40,000.00 in one year, the consent of the unit owners holding a majority of the prorata interests is required for the replacement to proceed.

By April 1, 2000, a slim majority of the Unit Owners had voted in favor of the assessment for window replacement. After this vote, the defendant unit owners solicited the requisite number of signatures to force the Council to call a special meeting of the Association "for the purpose of debate, review and vote on the issue of window replacement; and to institute a super majority vote requirement on special assessments." In this notice for the special meeting, the Council declared, "*even if a quorum is achieved and even if a majority of attendees vote in favor of petitioner's proposals, neither of the proposals will be effective.*" (Emphasis in original). The special meeting was convened on May 31, 2000 and adjourned for lack of a quorum. Immediately thereafter, the Council met and entered into a contract for the window and door replacement.

the exception of superior waterproofing. He found that the evidence clearly showed that the old decking had reached the end of its useful life and that nothing in the record suggested that the water proofing quality of the new decking was the reason the project was undertaken or that it materially contributed to an increase in the cost. Chancery Opinion at 728.

## II.

[1–3]  A condominium declaration and its accompanying code of regulations together form no more than an ordinary contract between the unit owners (and, initially, the developer), created under the statutory framework of the Unit Properties Act.[8] As with any other contract, the intent of the parties to a condominium declaration or code of regulations must be ascertained from the language of the contract.[9]  Where that language is clear and unambiguous, this court will accord that language its ordinary meaning.[10]

As the Vice Chancellor noted, our principal inquiry must be into whether or not the assessed cost of replacing the exterior windows and sliding doors was a "Common Expense" under the terms of the Act. Indeed, both the statutory framework and the Dorset Declaration expressly empower the Council to levy those assessments necessary to meet common expenses.  The Unit Properties Act defines the term to include the following:

 a.  Expenses of administration, maintenance, repair and replacement of the common elements.

 b.  Expenses agreed upon as common by all the unit holders, and

 c.  Expenses declared common by provisions of this chapter or by the declaration or the code of regulations.[11]

To determine whether or not the windows and doors fall within the category of common elements or are otherwise covered as a common expense, we must look to the language of the Dorset's governing documents.

[4]  Article 9 of the Dorset Declaration describes the common elements as consisting of two parts, the general common elements and the limited common elements. The limited elements are listed in the Declaration Plan and generally encompass "outside" items reserved for individual unit use.  The general elements are described as consisting of "the entire Property other than the Units and Limited Common Elements."  Article 9 then proceeds to list, although admittedly not exclusively, a plethora of items that are considered to be in this category.  Neither windows nor sliding doors are mentioned.  The description of the unit, however, which Article 9 renders mutually exclusive of the common elements, states that each unit consists of, in part, "the patio and or balcony connected to a Unit (including all doors to leading to such patio or balcony), [and] all windows of a Unit."  Because this specific language excludes the windows and doors from the common elements, they similarly cannot be considered a common expense under Section 2202(4)(a) of the Unit Property Act.[12]

[5]  We must next examine whether the terms of the Declaration and the COR provide for the inclusion of the widows and doors as a common expense, despite the fact that they are not among the common elements.  As an initial matter, we find that Section 2202(4)(b)[13] is inapplicable to the case before us, and therefore we need not discuss it in any detail.  We note, however, that the Vice Chancellor correct-

8.  See Linden Knoll Condominium Ass'n v. McDermott, Del. Super., C.A. No. 93C–03–090, 1994 WL 555361, Del Pesco, J. (Aug. 19, 1994) (applying general rules of contract interpretation to the interpretation of a condominium's governing documents).

9.  Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del.1992),

10.  Id.

11.  Del.Code Ann. tit. 25 § 2202(4) (1989).

12.  Id.

13.  Id.

ly pointed out that subpart (b) "would seem to require unanimous agreement among unit owners," [14] and the very existence of this litigation indicates a lack of unanimity. The Council argues strenuously that the subpart (b) is indeed relevant because the language of the Declaration omits the term "all" from a similar provision, rendering the unanimity requirement inoperable. Although we will address this argument more fully *infra*, our examination, like the Vice Chancellor's, is under subpart (c), which governs *all* expenses declared common by operation of the Declaration or COR. [15] The narrow purpose of subpart (b) is to allow the body of unit owners to unanimously agree to treat as common "any expense," notwithstanding any contrary or ambiguous provision of a condominium's governing documents.

Despite the Council's misconception of the appropriate statutory framework for examining the effect of the Declaration and COR on this dispute, we wholly agree that Delaware's Unit Property Act in no way prohibits an enabling declaration from adopting a different definition of the term "common expense" than that in the statute. Indeed, the very purpose of Section 2202(4)(c) is to authorize a different or expanded definition of common expenses in the Declaration and COR. The Council raises two arguments in support of its position that the governing documents provide for the windows and sliding doors to be treated as a common expense. The first is that the replacement of the windows and doors falls within the Council's broad duty to maintain the exterior of the building. In the second, it contends that the governing documents for the Dorset authorize the majority owners to establish

any item as a common expense by a simple majority vote.

[6] The Council contends that Article 13 of the Declaration authorizes it to replace the windows as part of its duty to maintain the exterior of the building. Article 13(B)(2) states that the Council has responsibility "to repair, maintain or replace... [a]ll portions of a Unit which constitute a part of the exterior of the Building including any balcony or patio." Moreover, Article 13(C)(1) prohibits the Unit Owner from maintaining, repairing or replacing the portions of the Unit mentioned in Article 13(B). On its face, this appears to include the exterior windows, and the Vice Chancellor concluded that they were, indeed, part of the exterior. [16] Ultimately, however, this Court could confirm the Council's position only if we were to ignore the plain language in the Declaration that specifically places the windows and doors of the unit within the province of the unit owner. Article 13(C)(5) requires that the owner "maintain, repair and replace... all non-load bearing interior walls, floor, and partitions and windows and doors in such Unit." The Council argues that the term "interior" modifies not only the non-load bearing walls, floors and partitions, but also the windows and doors of the Unit. An ordinary reading of this clause, utilizing the most common rules of grammar, indicates that the word "interior" can only modify "walls, floors and partitions," while the phrase "windows and doors" must comprise a distinct, unmodified term. Therefore the Vice Chancellor correctly concluded that the language of Article 13(C)(5) carves out the windows and sliding doors from the exterior items for which the Council bears responsibility.

---

**14.** Chancery Opinion at 729.

**15.** *See* Footnote 11, *supra; see also* Chancery Opinion at 729.

**16.** Chancery Opinion at 729–30.

This interpretation is consistent with the specific inclusion of two parts of the unit—the balcony and patio—under the Council's Article 13(A) and 13(B)(2) maintenance responsibility; neither of these clauses mentions the exterior windows and sliding doors.

A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.[17] We nevertheless cannot agree with the Council's argument that the Vice Chancellor's interpretation is inconsistent with Article 13(C)(2). The Council stresses that Article 13(C)(2) requires that the owners maintain, but not replace and repair, the "interior surfaces of . . . doors, door frames, windows, window frames and vents within the Unit." It contends that the "interior surfaces" language is redundant if the Declaration also requires that unit owners "maintain, repair and replace" all components and surfaces of the same windows and doors. Article 13(C)(2), however, states in full: "It shall be the responsibility of the Unit Owner . . . [t]o paint, wallpaper, decorate and maintain the interior surfaces of all walls, ceilings, and floors, doors, door frames, windows, window frames and vents within the Unit and to keep clean any balcony or patio area within the Unit." This subsection clearly relates to the duty of each unit owner to maintain the *appearance* of the unit. On the other hand, Article 12(C)(5) outlines the duty of the unit owner to maintain the *structural integrity and mechanical functionality* of his unit. Because these items discuss two wholly independent responsibilities, their terms are not redundant on their face.

[7] We also cannot agree with the Council's second argument that the Declaration and COR allow for a simple majority vote to authorize an expense as common.[18] Article 2(D)(1) of the Declaration defines common expenses as those "agreed upon as Common Expenses by the Unit Owners pursuant to the Declaration and Code of Regulations." The Council asserts that this authorizes a majority of the owners to declare any expense common by an *ad hoc* vote. This argument is tenable only if we were to ignore the phrase "pursuant to the Declaration and COR" contained in Article 2(D)(1). Under Article 2 of the COR, the unit owners have the authority to act instead of the Council only when that authority is specifically provided for in the Declaration and the Unit Property Act. As the Vice Chancellor correctly discussed in a footnote, Article 12(I) is the only provision in either of the governing documents that in any way empowers the owners to "create" a common expense.[19] Because Article 12(I) applies only to improvements in the *common elements*, it is irrelevant here.

[8] The Council contends, on the contrary, that Article 2(D)(1), when read with other parts of the organizational documents, allows a mere majority of the unit owners to authorize the Council to invade the property interest of an individual owner, despite the lack of any provision to this effect. Specifically, the fact that Article 2(B)(5) of the COR states that the owners may "transact such other business at such [annual] meetings as may properly come before them" does not give the majority

17. *Warner Communications Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 971 (Del.Ch.1989), *aff'd*, 567 A.2d 419 (Table) (Del.1989).

18. The Vice Chancellor's opinion suggests that, at trial, this argument was made only in passing. Chancery Opinion at 731, n. 14.

19. *Id.*

*carte blanche* to conduct *any* business it chooses. The existence of the phrase "as may properly come before them" presupposes that the contemplated owner action is explicitly authorized somewhere in the Declaration, COR, or the Unit Property Act. In the documents before us in this case, it is not.

[9]    Even if we were to ignore our long-standing precedent [20] and twisted the language of the governing documents to allow a mere majority of unit owners to declare any expense common, the Court of Chancery would almost surely find the vote in this instance to be fatally flawed. The record clearly indicates that the Council failed to present squarely to the owners the issue of whether they should consider the replacement of the exterior windows and sliding doors to be a common expense. The notice the Council provided the owners before the Spring 2000 vote specifically stated that the windows and sliding doors *were already common elements* and that the vote of the owners was required under Article 12(I) because the work would upgrade the current windows and doors. Nothing in the notice would have led the owners to believe that they were affirmatively ceding control over the windows and doors of their units to the Council.

This Court recognizes that the language in the Dorset's governing documents demands that the provisions of those documents be "liberally construed" to create "a uniform plan for development and operation" of the condominium. We certainly understand the benefit that a uniform exterior would likely present to the ownership group as a whole. Yet even as we can conceive of a policy that supports the Council's ultimate goal of employing unfettered discretion to preserve every part of the Dorset complex that is within the public eye, the liberal construction of any contract is necessarily limited by the terms of the document. Here, the Declaration and COR are clear that the right to replace exterior windows and sliding doors rests with each individual unit owner. It is not within our purview to add unilaterally to the terms of an agreement to strengthen its perceived goal.

[10]    Moreover, even under the restrictive terms of the Dorset's Declaration and COR, the Council retains the right to maintain an essentially uniform exterior appearance. Articles 13(A) and 13(C)(4) of the Declaration restrict the marginal unit owner from subjecting his neighbors to a truly incongruous appearance by requiring every unit owner to first obtain the written permission of the Council before performing any repair or replacement work on the exterior of his unit. This caveat sufficiently preserves the appropriate balance between the property interest of the owner and the stated desire that the Council be allowed to create and maintain a uniform plan for the condominium for the benefit of that community. Because the Declaration protects the communal property interest in the Dorset building, we see no reason to ignore its terms for policy reasons.

### III.

The Vice Chancellor's ruling requires that each of the Appellee-defendant unit owners, remit to the Dorset that portion of the special assessment that related to the replacement of the parking deck, including interest at the "legal rate." [21]    The legal rate is defined as the prime rate plus five percent (5%) and all parties agree that the ten percent (10%) rate applied by the Vice

---

**20.**  *See, e.g., Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992).

**21.**  Chancery Opinion at 731.

Chancellor in his May 8, 2001 order is the appropriate "legal rate." The Council, however, contends that the proper rate is not the legal rate, but rather the eighteen percent (18%) allowed by the Unit Property Act. The Act states that all sums properly assessed against a unit shall constitute a charge against that unit and that the unit owner is personally liable for any assessment due "together with interest thereon not to exceed 18% per annum." [22] Article 9(A)(4) of the Dorset COR obliges any unit owner who is delinquent in paying any assessed common expenses to pay interest on the amount due at the highest rate permitted by law, "unless such interest is waived by the Council." Because the Vice Chancellor's opinion does not disclose any rationale for applying the legal rate as opposed to the interest rate the Council requested, we reverse and remand on this issue and request that he specify on remand the rationale for his conclusion.

Similarly, the Vice Chancellor's opinion offers no basis for his denial of Plaintiff's additional costs and expenses, including attorneys' fees.[23] We also reverse and remand this aspect of the Court's judgment and request specific findings related to Article 9(A)(2) of the COR, which appears to entitle the prevailing party "to recover the costs of the proceeding, and such reasonable attorneys' fees as may be determined by the court."

The judgment of the Court of Chancery is affirmed in part, and reversed and remanded in part. The Court of Chancery shall file its report within 30 days on the portion of this matter remanded. *See* Sup. Ct. R. 19. Jurisdiction is retained.



---

22. Del.Code Ann. tit. 25 § 2233 (1989).

23. Chancery Opinion at 731.

**3**

NOLAN v. EASTERN COMPANY         Del.  885
Cite as 241 A.2d 885

Moore vs. Chrysler Corporation, No. 3062 Civil Action, 1966, Superior Court, New Castle County.

This decision was affirmed by the Supreme Court in Moore v. Chrysler Corporation, supra. The decision in *Moore* was inevitable. At the time of the decedent's death, the law provided for abatement of the claim. The situation in the instant case is quite different since, at the time of the decedent's death, the law provided for survival of the claim. The mere fact that the survival amendment was passed after the industrial accident does not change this result. In Gorlitzer v. Wolffberg, 208 N.Y. 475, 102 N.E. 528 (1913), the issue was whether the question of abatement was governed by the law in force at the time of the injury or in force at the time of claimant's death. Holding that the law at the time of death governed, the court stated:

"When the defendant died in 1910, it for the first time became necessary to determine whether the cause of action survived, and this question is very properly determined by reference to the statute in force at that date."

In Lebkicher v. Crosby, 123 Cal.App.2d 631, 267 P.2d 361, 365 (1954), the court held that a statute providing for survival of actions for personal injuries which became effective prior to the death of the tort-feasor and prior to commencement of the action was applicable, even though it became effective subsequent to the date of the injury. See also Engen v. Arnold, 61 Wash.2d 641, 379 P.2d 990, 993 (1963), and cases to the same effect cited therein.

This Court finds that the question of the survival of the decedent's claim is governed by the law in force at the date of his death. Consequently, the Industrial Accident Board erred in dismissing the instant case, and its decision is accordingly reversed. The case shall be remanded to the Board for proceedings consistent with the above.

It is so ordered.

---

Lester S. NOLAN, Plaintiff,

v.

The EASTERN COMPANY, a Connecticut Corporation, Harry A. Hershey, Arnold Goldsborough Co., a Delaware Corporation, Van Demark and Lynch, Inc., a Delaware Corporation, and the Mayor and Council of Wilmington, Defendants.

Court of Chancery of Delaware.
New Castle.

April 17, 1968.

Action for permanent injunction against any interference on part of defendants with plaintiff's use of what he claimed to be a portion of public street bordering his land. Plaintiff and defendants moved for summary judgment. The Court of Chancery in and for New Castle County, Marvel, Vice Chancellor, held that merely because developer had duty imposed on it by 1891 statute providing for establishment of streets and grades on lands contiguous to city to prepare a plot-plan of that part of its lands which were located outside as well as contiguous to city limits, and to have such plot-plan recorded after approval thereof by board of directors of street and sewer department, did not mean that city portion of land depicted in such plot-plan was regulated by such statutes so as to effect dedication and acceptance of plotted road bordering property of one of successors of developer as a public street.

Plaintiff's motion denied; motions of defendants granted.

1. Dedication ⚖=19(1)

Merely because developer had duty imposed on it by 1891 statute providing for establishment of streets and grades on lands contiguous to city to prepare a plot-plan of that part of its lands which were located outside as well as contiguous to city limits, and to have such plot-plan recorded after approval thereof by board of directors of street and sewer department, did not mean

that city portion of land depicted in such plot-plan was regulated by such statute so as to effect dedication and acceptance of plotted road bordering property of one of successors of developer as a public street.

## 2. Dedication ⊜44

Although street was shown on plot-plan, in view of fact that portion thereof bordering property purchased by plaintiff had never been improved or open to public and had never purported to be a street or right of way, evidence would not support determination that a common-law dedication to public of unimproved portion had occurred, but rather indicated that street was merely a "paper street" drawn on city maps in order to serve notice on public that at some future date the city might open it to the public.

## 3. Dedication ⊜35(1)

In view of fact that there had been no user of unimproved section of avenue that bordered plaintiff's property and in view of lack of evidence that city had ever exercised any control over that section, mere approval of 1917 plot-plan showing subject avenue as proposed street by board of directors of then city and sewer department did not constitute an acceptance of avenue as a public street.

## 4. Dedication ⊜35(4)

Under circumstances, opening of a portion of street shown on plot-plan to public did not constitute an acceptance of unimproved portion thereof bordering plaintiff's property as a public street.

## 5. Dedication ⊜19(1)

Alleged dedication and acceptance of unimproved section of avenue bordering plaintiff's property as a public street could not be predicated on fact that all known plot-plans and city maps depicted avenue as running entire length of plaintiff's property, absent showing that area which plaintiff sought to use ever had any physical existence as a street.

## 6. Easements ⊜17(1)

Inasmuch as no road had ever existed over area through which plaintiff sought passage, plaintiff was not beneficiary of an implied easement in such area.

## 7. Principal and Agent ⊜177(4)

In view of fact that not only plaintiff's representative but also his then attorneys were informed of fact that plaintiff, upon taking title to plant area he desired, would have no rights in unpaved portion of avenue bordering area, such knowledge would be imputed to plaintiff so as to bar him from recovering damages from real estate agent and surveyor for their alleged false representations that avenue was a public street along entire length of subject property.

## 8. Principal and Agent ⊜177(1)

Knowledge of an agent acquired while acting within scope of his authority is imputable to the principal.

———◆———

Bruce M. Stargatt and Richard H. May, of Young, Conaway, Stargatt & Taylor, Wilmington, for plaintiff.

C. Edward Duffy and Murray M. Schwartz, of Longobardi & Schwartz, Wilmington, for defendants The Eastern Co. and Harry A. Hershey.

David A. Eastburn and Edmund J. Bodziak, Wilmington, for defendant Arnold Goldsborough Co.

Thomas J. Healy, Jr., Wilmington, for defendant Van Demark and Lynch, Inc.

Samuel H. Lewis, Asst. City Sol., for defendants The Mayor and Council of Wilmington.

MARVEL, Vice Chancellor:

On April 6, 1964, plaintiff and the defendant The Eastern Company, after negotiating several preliminary agreements, executed a conclusive contract providing for

NOLAN v. EASTERN COMPANY    Del.    887
Cite as 241 A.2d 885

the sale to plaintiff by the defendant Eastern of three parcels [1] of land owned by the latter on the east side of Wilmington, said parcels being roughly bounded by the main tracts of the Baltimore and Ohio Railroad, by two cut-off lines of the Penn-Central Railroad and by New Castle and New York Avenues. Plaintiff primarily seeks a permanent injunction against any interference on the part of the defendant Hershey with plaintiff's use of what he claims to be a portion of a public street bordering his above described lands. On the maps of record this street is referred to as New York Avenue. The defendant Hershey, the successor in title to Truck Terminal Realty Co., claims to be the owner of the fee to such alleged portion of street and denies that plaintiff has any interest therein. At the inception of the action Truck Terminal Realty Co. was a named defendant. However, the complaint as to such defendant has been dismissed, and The Mayor and Council of Wilmington have been permitted to intervene as a defendant.

Plaintiff's claim for injunctive relief is based on a contention that his contract with Eastern entitles him to use the entire length of New York Avenue as it is portrayed on certain maps of record and that he relied on such alleged representation in deciding to enter into the April 6 contract. According to such maps, such street runs from New Castle Avenue along the entire length of plaintiff's industrial plant to such tract's southeast corner. Plaintiff has moved for summary judgment against the defendants Harry A. Hershey and The Mayor and Council of Wilmington. All of the defendants have moved for summary judgment against plaintiff.

Defendants, while conceding that plaintiff has the right to use New York Avenue up to and including a gatehouse leading into his plant property, contend that such right of way does not exist beyond such gatehouse, the same being located some 1025 feet

from the intersection of New Castle and New York Avenues. Such defendants seek a ruling to such effect.

On April 23, 1964, title to the aforesaid three parcels of land was conveyed to plaintiff by Eastern, and plaintiff stresses the point that the deed whereby such conveyance was made, in its description of parcel no. 1 (the 27.1 acre tract above referred to), recites a course for such property along the northeasterly side of New York Avenue for a distance of 1314.4 feet, a course, which, when added to the 375 feet extending from parcel no. 1 to New Castle Avenue along plaintiff's 7.71 acre tract, constitutes the entire plotted length of New York Avenue from New Castle Avenue to a southeasterly outlet at the eastern end of such avenue. The deed is silent, however, as to plaintiff's actual rights in New York Avenue as plotted, and, in point of fact, at the time of the April 23, 1964 deed, New York Avenue, as it actually existed, terminated at the gatehouse on parcel no. 1, a point located some 1025 feet from New Castle Avenue.

In short, it is clearly established on the present record that while New York Avenue was depicted on maps submitted to plaintiff as an existing public street along the entire length of plaintiff's property, the portion of such avenue which extends beyond the gatehouse is and has been for many years a morass, virtually impassable for motor vehicles.

Plaintiff contends, however, that when he became interested in the possibility of purchasing the tracts here in issue, Eastern's agent, Arnold Goldsborough, furnished him with a brochure in which a map was included which depicted New York Avenue as extending from New Castle Avenue along the entire southwesterly length of the parcels plaintiff proposed to purchase, or a total distance of 1689.4 feet. Plaintiff was thus allegedly led to believe that he would have the right to use New York Avenue from its intersection with New Castle Ave-

1.  The largest of these tracts has an area of 27.1 acres, a second is made up of 0.8 acres, and a third contains 7.71 acres.

nue until it purportedly debouched into an open area to the southeast near the tracks of the New Castle cut-off of the Penn-Central Railroad.

Contending that New York Avenue is a duly dedicated public street for its entire indicated length or that he has an implied easement in such area, plaintiff, as noted earlier, seeks a permanent injunction against the defendant Hershey, who claims the fee to such area, enjoining such defendant from interfering with plaintiff's use of such street for its entire indicated length. In the alternative, should the Court find that New York Avenue is neither a dedicated public street nor one in which plaintiff has an implied easement for its entire indicated length, plaintiff prays that he be awarded damages to be assessed against the defendants, Eastern, Goldsborough, and Van Demark and Lynch, Inc., for their alleged false representations at the time of the sale here involved, the latter two being in the order named the real estate agent and surveyor who were instrumental in drawing up the brochure which depicted New York Avenue as a public street along the entire length of what was then Eastern's property.

At or about the time plaintiff became interested in purchasing industrial property between New Castle and New York Avenues, the defendant Truck Terminal Realty Co. was similarly engaged in negotiations with Eastern looking towards the purchase of the eastern portion of what was depicted on the official maps as "New York Avenue," namely the uncleared and untravelled area running east from what is now plaintiff's gatehouse towards the Christiana River as well as a much larger tract lying on the southerly side of New York Avenue. Such negotiations, after several missteps, was consummated at the end of April, 1964, after the City had entered the negotiations and at the insistence of Truck Terminal had removed the unimproved portion of "New York Avenue" from the City map. As a re-

sult of these changes and transactions, including a correction in the length of the area to be acquired by the City, the City of Wilmington acquired the fee to the entire paved 1025 feet of New York Avenue, while Truck Terminal acquired a similar interest in the remainder of what had been depicted on the maps as "New York Avenue," as well as the substantially larger tract lying along the southeasterly side of such avenue.

Plaintiff contends, first of all, that a statutory dedication and acceptance of New York Avenue as a public street was accomplished for its entire indicated length by reason of the provisions of an 1891 Delaware statute (19 Del.Laws, Chapter 205),[2] arguing that in 1917 all of the parcels here involved were part of a larger tract of land owned by the Eden Park Corporation which in that year prepared a plot-plan of its property. Such plot-plan discloses that such corporation's property lay partly in the City and partly in the County, the greater portion of the proposed development lying outside of the City limits. The parcels here involved, however, are shown to lie entirely within the City limits and at no point touch the boundary line between the City and County. Such plot-plan also discloses the proposed laying out of various streets in a planned development, including streets to be known as New York Avenue and Nearing Avenue, the latter street being shown to intersect the former at its eastern end. The Eden Park Corporation submitted such plot-plan to the board of directors of the Wilmington Street and Sewer Department for approval, and, upon such approval, recorded it.

Plaintiff contends that the preparation, approval and recordation of such plot-plan were effected in compliance with the 1891 statute above referred to and that under the terms of that statute New York Avenue was thereby dedicated and accepted as a public street. However, the terms of such statute make it clear that such a statutory

**2.** Entitled: "An Act to provide for the Establishment of Streets and Grades on lands contiguous to the City of Wilmington."

dedication concerns rights of ways laid out on plot-plans of lands bordering on the City limits of Wilmington. Furthermore, even if the statute applied here, plaintiff's reliance on the principle of statutory dedication is misplaced inasmuch as at the time of the filing of the Eden Park plan the developer did not formally acknowledge an intent to dedicate (see 19 Del.Laws, Chap. 205). Finally, the case of State Highway Department v. Roberts (Del.Ch.) 215 A.2d 250, which is concerned with a portion of Eden Park lying outside of the City, is of no help to plaintiff because dedication was there found to have been effected by public user.

Plaintiff goes on to point out, however, that under the terms of a statute enacted in 1895 (20 Del.Laws, Chap. 201), the provisions of the 1891 statute were made applicable to County lands within a half-mile radius of City limits. He argues that it would be senseless to have the 1891 statute, as supplemented, apply only to lands contiguous to or outside the City limits because of the many instances in which City streets might extend into the County, the statute would have reference only to that portion of such streets lying outside the City limits. Plaintiff's contention, however, overlooks the fact that the City's power to control the establishment and maintenance of streets within its borders antedates either of the statutes above referred to, such power having been transferred to the Street and Sewer Department of Wilmington as early as 1887 (18 Laws of Delaware, Chap. 188). Accordingly, the statutes of 1891 and 1895, while looking toward the orderly extension of City streets into the County, in no way affected the City's pre-existing authority over the maintenance of its own streets, and the maps of record clearly disclose that because of its short east-west course between New Castle Avenue and the area near the Penn-Central cut-off to New Castle, there has never been any possibility of New York Avenue being extended into the County.

241 A.2d—56¼

[1]  I conclude that merely because the Eden Park Corporation had the duty imposed on it by the 1891 statute to prepare a plot-plan of that part of its lands which were located outside as well as contiguous to the City limits, and to have such plot-plan recorded after approval thereof by the board of directors of the Street and Sewer Department of Wilmington, does not mean that the City portion of Eden Park depicted in said plot-plan was regulated by such statute.

Plaintiff next argues that, in any event, the undisputed material facts in the present record support a finding that a common law dedication to the public of the unpaved portion of what has been depicted on maps as New York Avenue, has been shown to have occurred.

[2]  However, while it is established on the record that New York Avenue, as it extends for a distance of 1025 feet east from New Castle Avenue up to the gatehouse which gives access to plaintiff's plant, has been open to the public at least since 1918, there is no evidence of use of such avenue east of plaintiff's gatehouse. The westerly part of New York Avenue was at first a dirt road but was subsequently paved around the beginning of this country's entrance into World War II. All parties agree that plaintiff is entitled to use such section of such avenue. However, the remaining portion of New York Avenue from the gatehouse to what was depicted as Nearing Avenue on the Eden Park map has never been improved or opened to the public and has never purported to be a street or right of way. Actually, it is covered with grass, weeds, rocks, small trees, and bushes, and has been in such condition for a number of years. At times, it is practically under tidewater. Hypothetically extended, it reaches tracks of the Penn-Central Railroad at a point where there is no crossing. Its theoretical terminus beyond the railroad tracks is at the banks of the Christiana River. In short, I am satisfied on consideration of the un-

disputed facts of record that New York Avenue, Nearing Avenue, and several other streets on the plot-plan here involved were merely "paper streets," drawn on City maps in order to serve notice on the public that at some future date the City might open them to the public. Until 1964, when it acquired the fee to the street in question, the City evinced no interest even in the travelled bed of New York Avenue although the public may well have acquired an easement in the travelled portion thereof many years earlier.

Plaintiff however, contends that irrespective of what the City's intentions were concerning the unopened portion of New York Avenue prior to 1964, the approval of the Eden Park Corporation's plot-plan in 1917 by the board of directors of the Street and Sewer Department of the City of Wilmington and the recordation of such plot-plan in the Recorder of Deeds Office constituted an acceptance of an offer to dedicate New York Avenue to public use, Reinhardt v. Chalfant, 12 Del.Ch. 214, 110 A. 663, and Kelly v. Phillips, 13 Del.Ch. 261, 118 A. 230.

[3,4]  In the Reinhardt case, the Court ruled that the recording of a plot-plan, viewed in the light of the wording of the conveyance involved, constituted an offer of dedication to public use of the street which bordered the land in question. The Court, however, pointed out that in order for such dedication to be complete, there must also be an acceptance of such proffered dedication either by public use or by other action on the part of the public authorities. In the present case, plaintiff concedes that there has been no user of the disputed section of New York Avenue, nor is there any evidence that the City ever exercised any control over that section. In fact, the deposition of the former Chief Engineer of the Street and Sewer Department and the 1964 resolutions of the board of directors of the Wilmington Department of Public Works which removed the unimproved section of New York Avenue from the City map would appear to confirm the

fact that the City evinced no interest in such portion of such street prior to its intervention in this case in 1964. The mere approval of the 1917 plot-plan by the board of directors of the then Street and Sewer Department did not therefor, under the surrounding circumstances, constitute an acceptance of New York Avenue as a public street. Compare Kelly v. Phillips, supra, in which the Court found sufficient evidence of public user. See also Maciey v. Woods, 38 Del.Ch. 528, 154 A.2d 901.

Plaintiff next contends that acceptance of New York Avenue as a public street may be predicated on the theory that a portion having been obviously opened to the public, as a consequence the entire street became effectively dedicated. To support such argument plaintiff cites the case of Singewald v. Girden, 36 Del.Ch. 152, 127 A.2d 607. In such case, however, a special situation existed in that the State owned the entire lands in question. The Court, noting a situation not found here, stated:

> "When a state makes a plat of its own land and publicly sells lots as abutting on streets shown therein, the same authority which makes the dedication, by the same act accepts it on behalf of the public. The dedication and its acceptance are in the same acts * * *".

[5]  Plaintiff further contends that dedication and acceptance may be predicated on the fact that all known plot-plans and City maps depict New York Avenue as running the entire length of plaintiff's property. This contention, and indeed other similar contentions of plaintiff concerning dedication are untenable in the light of the recent decision of the Supreme Court of Delaware in Lickle v. Diver, (Sup.Ct.Del.) 238 A.2d 326, a case in which the parties differed on the question as to whether or not plaintiff had the right to use what he claimed was a part of 13th Street between Union Street and Grant Avenue in Wilmington. The Supreme Court affirmed the finding of the lower court to the effect that despite the fact that the area in question appeared on City maps as a part of 13th

**NOLAN v. EASTERN COMPANY**    Del.    **891**
Cite as 241 A.2d 885

Street, and notwithstanding proof of acts such as the establishment of grades, the denial of a building permit for the area, and the erection of a street sign, nonetheless such evidence when balanced against the evidence to the contrary, particularly the City's disavowal of any interest in the area, did not warrant a holding that a public street existed. The holding is controlling here, there being no showing in the case at bar that the area which plaintiff here seeks to use ever had any physical existence as a street.

[6]  I conclude that plaintiff here has failed to establish that the plotted portion of New York Avenue over which he seeks a right to travel is a public way resulting from dedication by the owner thereof followed by user by the public or acceptance of responsibility for maintenance and the like by the appropriate public authority. Finally, plaintiff has failed to show that he is the beneficiary of an implied easement in such area, inasmuch as no road has ever existed over the area through which plaintiff seeks passage, Maciey v. Woods, supra.

Plaintiff goes on to contend that, in any event, inasmuch as the defendants other than the City were responsible for submitting to plaintiff certain plot-plans (on which he relied) which negligently or deliberately represented all of New York Avenue to be a public street, he is entitled to damages from such defendants, and that he is entitled to a trial of such issue of damages.

[7, 8]  In response to this contention, defendants point out that the record clearly establishes that not only plaintiff's representative, a Mr. Verbofsky, but also his then attorneys were informed of the fact

that plaintiff, upon taking title to the plant area he desired, would have no rights in the unpaved portion of New York Avenue. And I am satisfied that the record discloses that the relevant details concerning New York Avenue alluded to in this opinion were openly disclosed by counsel for Eastern and were discussed by representatives of both plaintiff and defendants, the last discussion having taken place on April 23, 1964, on the occasion of plaintiff's taking title to the three parcels which he had agreed to purchase from Eastern. In short, the undisputed facts are to the effect that imputed knowledge of the relevant facts concerning New York Avenue must be attributed to plaintiff (who incidentally was "in and out" of the room but present at the April 23 settlement), because his authorized agents had actual knowledge concerning the fact that plaintiff would have no rights in New York Avenue beyond the gatehouse. Knowledge of an agent acquired while acting within the scope of his authority is imputable to the principal. Finally, plaintiff can not rely on the principle of excusable neglect on his part. Assuming plaintiff was actually in the dark as to the true facts concerning New York Avenue, he clearly could and should have acquired the knowledge which his agents possessed. 7 Am.Jur. 2d, Attorneys at Law, § 107 and § 110. Compare Chadwick v. Parkhill Corporation, 16 Del.Ch. 105, 141 A. 823. Plaintiff's claim for damages based on the theory of fraudulent or negligent representations on the part of certain of the defendants is without merit and must be dismissed.

There being no dispute as to the facts here deemed material, plaintiff's motion for summary judgment will be denied while similar motions of the moving defendants will be granted.

Order on notice.