**5**

**536** Del.        **770 ATLANTIC REPORTER, 2d SERIES**

drugs after a confrontation with and pat-down of the defendant by the police in the absence of a reasonable, articulable suspicion that Caldwell possessed drugs prejudiced Caldwell, raises doubt about the fairness of the outcome and constitutes plain error. Accordingly, we **REVERSE** and **REMAND** for a new trial.



**T. ROWE PRICE RECOVERY FUND, L.P., Carl Marks Management Co., L.P., Carl Marks Strategic Investments, L.P. and Carl Marks Strategic Investments II, L.P., individually and derivatively on behalf of Seaman Furniture Co., Inc., Plaintiffs,**

**v.**

**James RUBIN, M.D. Sass Associates, Inc., Resurgence Asset Management, L.L.C., M.D. Sass Corporate Resurgence Partners, L.P., M.D. Sass Corporate Resurgence International, Ltd., Robert Symington, Byron Haney, Alan Rosenberg, Steven H. Halper, and Peter McGeough, Defendants,**

**and**

**Seaman Furniture Co., Inc., Nominal Defendant.**

**C.A.No. 18013.**

Court of Chancery of Delaware, New Castle County.

Submitted: June 19, 2000.

Decided: June 23, 2000.

Investment funds which owned 42 percent of corporation's stock brought action against majority shareholder and cor-

poration's chief executive officer (CEO), chief operating officer (COO), and chief financial officer (CFO), challenging the management and shared services agreements between corporation and its chief competitor, which was in bankruptcy and which was controlled by the corporation's majority shareholder. On plaintiffs' motion for preliminary injunction, the Court of Chancery, New Castle County, Lamb, Vice Chancellor, held that the evidence satisfied the elements for granting a preliminary injunction.

Motion granted.

**1. Injunction ⬤138.1**

Preliminary injunctive relief will be granted only where the moving party demonstrates the following: (1) a reasonable probability of success on the merits; (2) irreparable harm if the injunction is not granted; and (3) a balance of equities in favor of granting the relief.

**2. Corporations ⬤180**

When a controlling shareholder stands on both sides of the transaction, the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard.

**3. Corporations ⬤180**

The entire fairness standard of review applies in the non-merger context to an interested transaction involving controlling stockholders.

**4. Corporations ⬤190, 320(11)**

Corporation's majority shareholder and management would bear the burden of proving entire fairness of management and shared services agreements between corporation and its chief competitor, which was in bankruptcy and which was controlled by the corporation's majority share-

holder, where majority shareholder and management consciously chose not to employ any independent bargaining mechanism in negotiating the agreements.

**5. Corporations ⟨⟩190, 320(11)**

Fact that the agreements received unanimous board approval did not shift from corporation's majority shareholder and management, to challenging shareholders, the burden of proof at trial regarding entire fairness of management and shared services agreements between corporation and its chief competitor, which was in bankruptcy and which was controlled by the corporation's majority shareholder, where at least one of board's seven directors may have been unable to act independently of majority shareholder's principal, another director allegedly had significant dealings with majority shareholder, and two clearly independent directors had not known of the allegedly significant dealings between one director and majority shareholder.

**6. Injunction ⟨⟩147**

Evidence that the agreements were driven by majority shareholder's desire to rescue its investment in corporation's chief competitor, that majority shareholder had effectively disbanded corporation's special committee and had discharged the committee's independent legal and financial advisers, and that corporation's management had sold much of its stock, established reasonable probability of success on the merits for minority shareholder regarding "entire fairness" challenge, as element for preliminary injunction to enjoin implementation of management and shared services agreements between corporation and its chief competitor, which was in bankruptcy and which was controlled by the corporation's majority shareholder.

**7. Corporations ⟨⟩180**

There are two components to entire fairness in an interested transaction involving controlling stockholders: "fair dealing" embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, and disclosed to the directors, and how the approvals of the directors and the stockholders were obtained, while "fair price" relates to the economic and financial considerations of the proposed transaction.

See publication Words and Phrases for other judicial constructions and definitions.

**8. Corporations ⟨⟩180**

In making a determination as to the entire fairness of an interested transaction involving controlling stockholders, the court does not focus on one component over the other, but examines all aspects of the issue as a whole.

**9. Corporations ⟨⟩184**

A controlling stockholder may not use corporate assets to advantage itself to the corporation's disadvantage.

**10. Injunction ⟨⟩138.42**

Potential diversion of time and attention of corporation's management, likelihood that the agreements would become effective before the Court of Chancery could make a final determination under entire fairness standard, operational and financial entanglements with a business in unstable financial condition, and difficulty in using rescission as a future remedy, established irreparable harm if preliminary injunction was not granted to enjoin implementation of management and shared services agreements between corporation and its chief competitor, which was in bankruptcy and which was controlled by the corporation's majority shareholder.

**11. Injunction ⬤=138.6**

It is not necessary that the threatened injury, for purposes of the irreparable injury element for preliminary injunction, be beyond the possibility of repair by money compensation, but only that it be of such a nature that no fair and reasonable redress may be had in a court of law, so that to refuse the injunction would be a denial of justice.

**12. Injunction ⬤=138.9**

Alternative legal redress must be clearly available and as practical and efficient to the ends of justice, and its prompt administration, as the remedy in equity, in order to establish lack of irreparable harm, so that issuance of preliminary injunction is inappropriate.

**13. Corporations ⬤=190, 320(4)**

Corporation's chief competitor was not "necessary party" to minority shareholders' action challenging management and shared services agreements between corporation and its chief competitor, which was in bankruptcy and which was controlled by the corporation's majority shareholder; bankruptcy court had granted plaintiffs relief from the automatic stay, and competitor's interests were forcefully represented by corporation's majority shareholder.

> See publication Words and Phrases for other judicial constructions and definitions.

**14. Injunction ⬤=138.42**

Likelihood that corporation and defendant managers would benefit substantially from injunction against corporation's performance of what appeared to be unfair contract obligations, and difficulty in speculating as to ability of corporation's chief competitor to emerge from bankruptcy if injunction was granted, established balance of equities favoring the preliminary injunction sought by minority shareholder,

enjoining implementation of management and shared services agreements between corporation and its chief competitor, which was in bankruptcy and which was controlled by the corporation's majority shareholder.

———

Martin P. Tully, Esquire and David John Teklits, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Martin Flumenbaum, Esquire, Danya E. Perry, Esquire Joshua Groban, Esquire, of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, Attorneys for Plaintiffs.

Daniel A. Dreisbach, Esquire, of Richards, Layton & Finger, Wilmington, Delaware; Andrew J. Frackman, Tancred Schiavoni, Esquire, and Rob Stern, Esquire, of O'Melveny & Myers LLP, New York, New York, Attorneys for Defendants James Rubin, M.D. Sass Associates, Inc., Resurgence Asset Management LLC, Sass Corporate Resurgence Partners LP, M.D. Sass Corporate Resurgence International, Ltd., Robert Symington, and Byron Haney.

William D. Johnston, Esquire, and John J. Paschetto, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; Stefanie Gatti, Esquire, of Epstein Becker & Green, New York, New York, Attorneys for Defendants Rosenberg, Halper and McGeough.

Stephen C. Norman, Esquire, of Potter, Anderson & Corroon, Wilmington, Delaware; John M. Newman, Jr., Esquire, and Sean P. Costello, Esquire, of Jones, Day, Reavis & Pogue, Cleveland, Ohio, Attorneys for Nominal Defendant Seaman Furniture Company, Inc.

T. ROWE PRICE RECOVERY FUND, L.P. v. RUBIN    Del. **539**
Cite as, Del.Ch., 770 A.2d 536 (2000)

## OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

On April 26, 2000, two investment funds collectively holding 42% of the stock of Seaman Furniture Company, Inc. filed this individual and derivative action against Seaman, Resurgence Asset Management, L.L.C. (Seaman's majority stockholder), Resurgence's board designees, and the company's executive management. The funds seek to enjoin the implementation of management and shared services agreements (the "Agreements" or "Challenged Transactions") recently executed between Seaman and its chief competitor, Levitz Furniture, Inc., which has been in bankruptcy since 1997. The Agreements are an integral part of Levitz's plan to emerge from bankruptcy.

Resurgence is both the majority stockholder of Seaman and the controlling person of Levitz, due to its substantial holdings of Levitz's pre-petition and post-petition claims. Thus, the Agreements, contemplating a long-term business relationship between Seaman and Levitz, are interested-party transactions.

Plaintiffs originally sought an expedited trial in this matter. They later moved for a preliminary injunction when defendants insisted that the matter be heard more quickly to accommodate Levitz's need to present its plan of reorganization to the Bankruptcy Court. After thorough and exceptional briefing by each of the parties, I heard oral argument on June 19, 2000. This is my Opinion granting plaintiffs' motion.

## II. FACTUAL BACKGROUND[1]

### A. The Parties

Plaintiffs T. Rowe Price Recovery Fund, L.P. ("Price") and Carl Marks Management Co., L.P. ("Marks")[2] collectively own 42% of the common stock of Seaman on a fully diluted basis. Defendants Resurgence, M.D. Sass Associates, Inc. and M.D. Sass Corporate Resurgence International, Ltd. (collectively, "Resurgence") own approximately 55% of Seaman's common stock. Defendant James Rubin is a principal, and the co-chairman and chief investment officer, of Resurgence. Rubin and defendants Robert Symington and Byron Haney are Resurgence's designees to the Seaman board of directors.

Seaman is a furniture retailer with stores mainly in the northeastern United States. In January 1992, Seaman filed for protection under Chapter 11 of the United States Bankruptcy Code and emerged therefrom in October 1992. Plaintiffs and Resurgence, Seaman's largest creditors at that point, became its largest stockholders. The Seaman board of directors was then Robert Ruocco (Marks's designee), Kim Golden (Price's designee) Kay Handley (Resurgence's designee, later replaced by Rubin himself) defendant Alan Rosenberg

---

1. I rely principally on the uncontested facts in this matter. I have also, as is often necessary on a motion of this nature, made preliminary findings of fact on certain matters that may be contested by the parties. Should this matter ultimately go to trial, the parties will naturally have an opportunity to further develop the already voluminous record of this case in an effort to prove additional and, if the evidence so justifies, different factual findings.

2. Marks is actually the general partner of other funds who hold the Seaman stock. Those entities were made plaintiffs in this action by an amended complaint dated June 19, 2000. For ease of reference in this Opinion, I consider each of the Marks entities as a unit.

and independent directors Leo Peraldo and Barry Alperin.[3]

Defendants Rosenberg, as chief executive officer (and a director), Steven Halper, as chief operating officer, and Peter McGeough, as chief financial officer (collectively, "Management"), have constituted the executive management of Seaman since its successful emergence from bankruptcy. All parties ascribe to them much credit for their skill and effort in making Seaman a successful company in an industry that has seen numerous failures.[4]

In December 1997, the principals took the company private, resulting in an ownership breakdown in which plaintiffs owned 42%, Resurgence owned 38% and Management owned 18% of the company's equity.[5] As part of that transaction, the parties considered entering a shareholders agreement, but plaintiffs rejected that idea.[6] Since 1997, Seaman has continued to provide value to its stockholders, who have at times considered different transactions intended either to maximize value through continued growth or by providing an exit strategy for the investors.

**B. Resurgence's Investment in Levitz**

Levitz, a national chain of furniture stores, is Seaman's principal competitor.

According to defendants, about half of Levitz's 20 stores along the eastern seaboard compete directly with Seaman stores. Levitz filed for Chapter 11 protection in September 1997. As Levitz's largest pre-petition creditor and the provider of a substantial part of its post-petition debtor-in-possession financing, Resurgence controls Levitz. While Resurgence has not provided a definitive number, it is understood that Resurgence's investment in Levitz is in the $80–125 million range.

Plaintiffs assert that "Levitz is in abysmal financial straits."[7] While defendants astutely point out that in 1992, Seaman was in a similar position and still recovered impressively, Resurgence will face significant losses if Levitz fails. Plaintiffs point out that "Levitz's Disclosure Statement requires it to project what would happen if it were required to liquidate. In the Statement, Levitz reveals that, upon liquidation of Levitz, Resurgence would lose 100% of its pre-petition claims and 54% of its post-petition claims."[8] Defendants answer, however, that Levitz will not necessarily go into liquidation without Seaman's involvement and may emerge from bankruptcy on its own or with the help of some other entity.

---

**3.** Neither Peraldo nor Alperin were named as defendants in this action. Both were deposed and Alperin, but not Peraldo, submitted an affidavit on behalf of defendants.

**4.** Management correctly point to numerous references in the record to their value and skill. For example, Ruocco testified that "I know what they do is special and unique ..." Ruocco Dep. at 51. Further, "whatever it is they do is unique because they produce unique financial results. And there are countless other furniture retailers, Levitz included, who have not been able to do what Seaman does...." *Id.* at 57–58.

**5.** Although the record is unclear on this point, I assume, based on evidence of their recent

stock sales, that the tier of managers immediately below Management (hereinafter "Senior Management") held the remaining Seaman shares.

**6.** While plaintiffs assert that they rejected the idea because, to that point, the relationship had worked out so well that a formal agreement seemed unnecessary, defendants observe that at that time, when plaintiffs held the largest block of Seaman stock, such an agreement may not have served plaintiffs' interests.

**7.** Pl. Op. Br. at 9.

**8.** *Id.* at 11.

## C. Resurgence Purchases Voting Control of Seaman

Each of Seaman's principal investors has sought to pursue a transaction that could maximize shareholder value. In that regard, plaintiffs retained the advice of independent financial advisors with respect to potential acquisitions, mergers, sales of assets, an IPO, a recapitalization and so on.[9] At various times, Seaman also hired its own advisors to conduct such analyses. The advisors ruled out certain courses, such as an IPO, but thought others, such as strategic acquisitions or perhaps a sale of control to an interested buyer, to be feasible.

In May 1998, Rubin suggested a possible acquisition of Levitz. The board voted to consider that prospect and authorized Rosenberg to contact the CEO of Levitz to discuss the same. In October 1998, Ruocco and Golden met with McGeough, who reported that Levitz was not an attractive investment for Seaman.

Rubin, however, continued to suggest Levitz as a potential merger partner. Near the end of 1998, Rubin advised Management about a possible interest in purchasing some or all of their Seaman shares, and noted that their compensation would naturally increase if they were responsible for a combined Seaman–Levitz

entity. At about this same time, plaintiffs also approached Management with respect to a possible stock sale or purchase.

In early-Spring 1999, Seaman hired the accounting firm of Policano and Manzo ("P & M") to evaluate again a transaction with Levitz. P & M reported quite negatively, and the board again determined that no transaction was feasible. Price and Marks adamantly insisted that a deal with Levitz would not benefit Seaman.[10]

Rubin and Management signed agreements on June 22, 1999, resulting in Management's exercise of options to purchase 121, 717 shares (slightly more than 12%) of Seaman and immediate sale of those shares to Resurgence for $123 per share. Resurgence thus obtained a bare majority of Seaman's common stock. In addition, Management sold Resurgence an option to purchase additional shares from Management by the end of the year, which was subsequently exercised.[11]

On June 23, 1999, Rubin removed Golden and Ruocco, plaintiffs' board designees, from their positions. He replaced them with Symington and Haney, both Resurgence employees. On June 25, 1999, Rubin allegedly informed Golden that "he was going to put Levitz and Seaman together, that the majority of the value

---

**9.** Plaintiffs did not inform the company that they obtained such advice.

**10.** Each of the defendant groups, but especially Resurgence, makes much of the fact that Price has been in liquidation and needs to find an exit strategy for its Seaman investment. Defendants argue that because Price wanted to sell its shares, it hoped to use Rubin's interest in a merger as an avenue to gain leverage to force a favorable buyout. Thus, defendants argue that Price's interest in this litigation is not to protect Seaman but to force a buyout of its shares. Although in some situations, a plaintiff's investment objective might affect the court's analysis, I see no reason to consider these facts in great detail

on this motion. First, Price is clearly not abusing the judicial system in any way, and has a right to protect its investment, assuming it fails to achieve a buyout. Moreover, defendants do not call into question Marks' motivations in any way. The *ad hominem* attacks on Price are thus immaterial to my analysis.

**11.** While plaintiffs assert claims against Management with respect to their sales of control shares to Rubin, and certain evidence regarding the timing of those sales affects my analysis, Management's liability arising out of those sales, if any, was not the subject of this motion.

would go to Levitz, and that there was nothing Ruocco and Golden could do to stop the transaction." [12] After removing the Price and Marks designees, Rubin appointed Symington to Seaman's Compensation Committee. He thus controlled senior and executive management's compensation.

### D. Barry Ridings is Introduced as an Independent Director

Soon after replacing plaintiffs' board designees with his own, Rubin proposed as a Seaman director Barry Ridings, an investment banker who had recently left his long time position at Deutsche Banc Alex. Brown ("Alex Brown") to become the head of the Lazard Fréres & Co., L.L.C. ("Lazard") restructuring department. Rubin introduced Ridings to the board as a potential independent director. His background gave him expertise and special ability to evaluate transactions available to Seaman including, principally, a merger with Levitz.

At the board meeting of July 28, 1999 (and on later dates), Alperin and Peraldo, the independent directors, inquired into Ridings's capacity to act free from Rubin's influence. Ridings explained that he had worked on several debt restructurings in which Rubin was a significant creditor, but that Rubin was usually "on the other side." The independent directors thus believed Ridings to be independent himself, and apparently relied on him for his expertise and advice.

There is evidence in the record that Ridings was less than totally forthcoming with the independent directors.[13] On June 12, 1999, Ridings's restructuring group at Lazard was hired to represent the creditor's committee, co-chaired by Resurgence, in the bankruptcy of NextWave Personal Communications, Inc. The committee agreed to a monthly retainer of $150,000.[14] Plaintiffs assert that Ridings has additional significant dealings with Resurgence and Rubin.[15]

While defendants assert that none of these connections is material to Ridings or Lazard, the record is clear that Ridings did not disclose these connections to the independent directors. This fact is significant, at least on this limited record, because the independent directors questioned Ridings, when he was first introduced to the board on July 28 and during later meetings, about his independence of Rubin.[16] Ridings's silence in light of such pointed questioning at least creates some doubt about his independence.[17] I note also Ridings's eagerness to endorse

---

**12.** Pl. Op. Br. at 15.

**13.** The parties briefed the issue of Ridings's independence quite well. At Oral argument, however, there was little mention of his involvement as a Seaman director. While the record evidence creates doubt about Ridings's hiring and subsequent conduct, I expect that at trial, the details of his connections with Rubin and the extent of his work on behalf of the independent directors will become clearer.

**14.** Defendants state that the bankruptcy court lowered this figure.

**15.** For example, Ridings' group represents the creditors' committee and stands to gain a 1.5% success fee in the TV Filme bankruptcy, in which Resurgence is involved. Plaintiffs do not, however, explain precisely how much control Resurgence may have over this committee.

**16.** Indeed, Rubin's contacts with Ridings only became known during depositions.

**17.** Alperin and Peraldo clearly perceived Ridings to be conflict free. For example, it appears that Alperin first learned of a potential conflict by Ridings during his deposition.

Rubin's subsequent merger proposal [18] and his suggestion that the independent investment bankers hired to evaluate that proposal overly favored Seaman's point of view.

### E. The Independent Committee is Created and Thereafter Pressured

In August 1999, at Rubin's urging, Seaman created a three person special committee consisting of Alperin, Peraldo (both of whom are unquestionably independent), and Ridings, for the purpose of evaluating a potential Seaman/Levitz transaction (the "Special Committee"). The Committee hired Alex Brown as their financial advisor and the law firm of Swidler Berlin Shereff Friedman, LLP ("Shereff Friedman") as independent counsel. Additionally, the Special Committee sought the advice, input and guidance of Management. The Special Committee made slow progress because Alex Brown's analysis led it to the view that Levitz was not worth nearly as much as its representatives thought.

Rubin tried to accelerate the process, placing phone calls to several Seaman representatives, including McGeough and Rosenberg. McGeough took handwritten notes of a November 11, 1999 telephone conversation he had with Rubin. According to McGeough's notes, Rubin was "pissed off." McGeough testified as to his understanding that Rubin wanted him to be "less conservative" about evaluating Levitz's financial prospects. [19] Rubin was upset because Management was "dragging its heels in terms of reviewing or attempting to effectuate a transaction with Levitz." [20] McGeough recorded Rubin's in-

struction that Management "must lead and direct Alex and independent committee," and that Management must "be men." [21] Rubin wanted McGeough to call Leo (Peraldo) and convince him to endorse the deal. According to McGeough's notes, Rubin also indicated that if Management failed to persuade Alex Brown and the Committee of the merits of a Levitz transaction, he would "drag these [companies] to altar & all repercussions of such."

McGeough immediately contacted Halper and Rosenberg, conveyed to them Rubin's views, and scheduled a conference call that afternoon so that Rubin could discuss the matters in greater detail with Management. At that time, Management indicated to Rubin that while they supported the deal in general terms, they had significant concerns, including valuation matters such as the fairness of the "splits", in which they had no expertise. Management also indicated that they would allow Peraldo to make up his own mind, as he was a member of the Special Committee, and that they found it difficult to accept Levitz's financial figures at face value.

McGeough recorded Rubin's response. Among other comments, Rubin indicated that Management had "deferred too much to the board and shareholders," and that "honesty to a fault is a negative when [Management] should be in marketing mode to promote the deal." Rubin advised that, since Alex Brown was competent to address the "splits," he wanted Management to "provide guidance" as to Levitz's numbers. Specifically, Rubin encouraged Management to ascribe to Levitz higher

---

18. In addition to other evidence of Ridings's view of the merger, which is discussed below, Alperin allegedly stated that "Ridings was pushing for a deal and describing [Levitz] as a great opportunity before he knew anything about [Levitz]." Golden Aff. ¶ 23.

19. McGeough Dep. at 251.

20. *Id.* at 257.

21. McGeough indicated that Rubin actually used this term.

terminal multiples and lower discount rates and to supply Alex Brown with the exact opposite analysis for Seaman, thus impacting valuations in Levitz's favor.[22] Rubin indicated that if Alex Brown's analysis did not comport with his views, Resurgence, Alex Brown and the Independent Committee would have "irreconcilable differences."

According to these notes, Rubin commented on his successful seven year relationship with Management, stated that if not for him, there would be no Seaman, and mentioned that he was giving Management the opportunity to make over $100 million.[23] Responding to Management's stated concerns for their fiduciary duties and potential liability, Rubin indicated that because Kim (Golden) and Rob (Ruocco) would not have dissenters' rights under Delaware law, they could not sue. Even if they did, Rubin added, the suit would be against the combined entity and not Management.

### F. The 65/35 Split is Rejected as Grossly Inadequate

On November 17, 1999, Rubin formally proposed to the Seaman board a merger with a 65/35 valuation split in Levitz's favor. The record shows that Management, although willing to discuss *some* transaction, did not share Rubin's view of the

merits of the proposal.[24]  McGeough's notes dated December 9, 1999 evidence Management's position at that time regarding Ridings's suggestion of a 60/40 split favoring Seaman. Point one on the notes of that conversation states "No valuation [that the management] team will agree on without liquidating some of their equity."

In contrast with Management's and Alex Brown's view that the proposal was wholly inadequate, Ridings advised Rosenberg that he thought the proposal may be fair because "Levitz is worth more than Seaman's." According to Rosenberg, Ridings also opined that Alex Brown was being "too pro, in other words, they—they were more conservative to the Levitz side and more pro Seaman's as far as valuations."[25] Ridings thus encouraged Rosenberg and the Special Committee to make a counter-proposal along the lines of his suggested 60/40 split favoring Seaman.

While Rubin (supported to some extent by Ridings) sought to convince Management and the Special Committee that Levitz was worth more than Seaman, Alex Brown believed that Levitz's financial forecasts were not credible, and that the company's true state could be far worse than was disclosed.  Alex Brown unequivocally indicated that if a deal could be done at all,

---

**22.** In his deposition, McGeough claimed that his notes merely reflect Rubin's effort to explain to Management the type of information Alex Brown would address in doing its work.

**23.** While it appears that Management understood the import of Rubin's suggestion or offer, it is also clear that nobody actually thought he was specifically offering $100 million, just that he was trying to entice Management of the "benefits" of the deal.

**24.** Rosenberg explained that McGeough had contended that Seaman was worth "anywhere from very much more to much, much more" and that he and Halper generally agreed with

this evaluation.  Rosenberg Dep. at 127. Rosenberg also testified that Management kept Senior Management apprised of the various proposals and Senior Management "had real concerns of splits and wanted to know what their opportunity would be to liquidate some of their position because they did not want to be thrown into a situation where they would be participating in a split they might not agree upon that was the bulk of their—their wherewithal and that was not a risk they were willing to take." *Id.* at 135–36.

**25.** Rosenberg Dep. at 130.

the exchange ratio would have to weigh significantly in Seaman's favor.

Management communicated to Rubin their concern about their credibility as a team and would not endorse "projections that far outside the range of reasonable expectations." On December 3, 1999, Alex Brown reported that the 65/35 split for Levitz was not one with which they could concur, and advised, instead, that an 80/20 or 75/25 split *favoring Seaman may* be a fair exchange for Seaman's stockholders. The Special Committee then rejected the 65/35 split favoring Levitz. Instead, it proposed a 75/25 split favoring Seaman, contingent on certain factors, including obtaining a fairness opinion from an investment banker. However, when Levitz's actual year-end financial figures lagged their projections, Management believed that even the 75/25 split was unfair to Seaman. Before Levitz could respond to the offer or Seaman could withdraw it, however, Rubin proposed a structurally different transaction.

**G. Rubin Proposes the Management and Shared Services Agreements**

Defendants urge me to gloss over the negotiation of the proposed merger. They claim that the issue is a "red herring" raised by plaintiffs. Further, they state that, since the merger was never consummated, I should either apply a "no harm-no foul" view of these matters or credit Ridings and Management for their independence in resisting Rubin's concededly self-interested efforts. I disagree. The history of Rubin's conduct is integral to understanding the negotiation process underlying the subsequent approval of the Challenged Transactions.

In my preliminary view, Rubin was forced, against his apparently strong and unquestionably aggressive will, to give up his quest for the Seaman/Levitz merger that would salvage Resurgence's stake in Levitz. Positing that this occurred specifically because of the use of an independent committee and its reliance on independent financial and legal advisors, I consider what next transpired.

*1. The Proposed Agreements and the LHFI Exchange Offer*

Rubin proposed, on January 5, 2000, a transaction in which Seaman would manage Levitz's 20 east coast stores and provide additional operational services for all of Levitz. Seaman's managers, who are understood by all parties to be leaders in their field, having exceptional and unique skills,[26] would share those skills with Seaman's principal competitor for a period of five years. In exchange, Seaman would receive a fee, ultimately negotiated to be $3 million for the first year of the contract and $3.5 million per year for the final four years.[27] The record provides no indication that any person involved with Seaman ever before contemplated such a transaction with Levitz.

Rubin's proposal also contemplated the creation of a new holding company, LHFI, to own 100% of Levitz and at least the 54% of Seaman that Resurgence now holds. Resurgence would contribute all of its Seaman shares to LHFI in exchange for LHFI equity. Levitz's creditors would also exchange their claims for equity

---

**26.** Indeed, the employment contracts with each member of Management specifically identified these unique skills and stated that if the managers worked for a competitor, Seaman would be irreparably harmed and would be entitled to injunctive relief.

**27.** Defendants point to various cost savings (none of which were actually quantified by Management or the board) as an added benefit of the Agreements.

stakes in the new company. Finally, Seaman's other stockholders (principally Price and Marks) would have the opportunity to exchange their Seaman shares for equity in the Seaman/Levitz holding company. As defendants point out, this last step is structured as a voluntary exchange offer, and not the forcible exchange inherent to a merger.

The implied exchange ratio at the LHFI level mirrors the 60/40 equity split favoring Levitz that the Special Committee rejected as grossly unfair.

## H. Management Almost Exclusively Handled the Negotiations

### 1. *The Failure to Employ Independent Advisors Handicapped Management*

Seaman's approach to analyzing Rubin's January 5 proposal leads me to infer that Rubin purposefully avoided the procedural hurdles (such as independent advisors) that scuttled his merger proposal. Seaman's counsel conceded during oral argument that there is no evidence that the board formally made the following critical decisions.

First, the Special Committee simply stopped meeting. Defendants assert that the Special Committee functioned on a de facto basis, and "were given the leading role in guiding and advising Mr. Rosenberg and other executive management in their work." [28] The record indicates, however, that Ridings was the only "independent" director involved in the structure and negotiation of the Agreements. Management handled virtually every aspect of negotiating the Agreements with Levitz representatives and simply informed the board of developments. The Special Committee did nothing and made no recommendation.

In this regard, defendants argue that Rubin, Haney and Symington removed themselves from the negotiating process so as not to taint Management's efforts. The record refutes this assertion. Management learned of the proposed Agreements through Rubin, before it was presented to the independent directors. On February 29, 2000, while Alperin was out of the country and without inviting Peraldo's participation, Rubin held a private two-hour meeting with Management at Resurgence's office to discuss progress on the Agreements. Also, the Resurgence representatives attended and participated in the March 2 board meeting at which Management presented its views of the Agreements and the board determined how to proceed.

Second, neither Alex Brown nor any other independent financial advisor was retained to analyze the new proposals. Defendants assert that because the Agreements relate so inherently to operational matter they are beyond the scope of an independent advisor's expertise. While this might be true, it ignores the circumstances surrounding the decision not to retain such advice. Management repeatedly noted its discomfort with valuation related matters and expressed its interest in having Alex Brown's advice. Moreover, besides the easily quantified annual management fees, the benefits to Seaman of this transaction relate to cost savings and supposed synergies. Quantifying such benefits is precisely why people retain expert financial advisors. Without this advice, Management was limited in its ability to understand these supposed benefits of the transactions.

Finally, no effort was made to involve Shereff Friedman in the new round of

---

**28.** Seaman Ans. Br. at 14.

negotiations. Instead, Seaman's counsel, Jones, Day, Reavis & Pogue, *which also represents Resurgence on a regular basis,* was selected to advise Management with respect to the Agreements.

### 2. *Management's Concerns and Efforts to Negotiate the Agreements*

The handwritten and formal documentation of Management's analysis establishes that, at least initially, Management found it difficult to comprehend how the proposed Agreements could be fair to Seaman if the proposed merger was not. Indeed, McGeough, in his notes dated February 17, 2000 asked, "Why would [Levitz's] performance under a service agreement be significantly better than in a merger if same [management] team is directing process?" Despite their reservations, there is substantial evidence in the record showing Management's understanding that Rubin was determined to achieve a deal "no matter what." Thus, Management kept working until a deal was reached.

In late January, Management prepared a "reference sheet" that listed factors to consider in evaluating the Agreements. Defendants use this document to show how much progress Management made in improving the deal from Seaman's point of view.[29] The document also illustrates Management's initial aversion to the proposal. Among other problems, Management listed the disruption to Seaman's business, costs of integrating the businesses and noted that "[f]or approximately two years senior management will spend majority of their time on developing ser-

vicing business [i.e., services for Levitz] to the potential detriment of retail business."

Beside the negatives, Management immediately recognized the general benefit of the Challenged Transactions that defendants repeatedly stressed in their briefs and at oral argument: cost savings related to a unified advertising budget and integrated "back-office" operations. However, Management perceived "[s]ignificant cost savings for Levitz, difficult to quantify savings for Seamans."

Finally, Management's conclusion was two-fold: (1) "Reject as currently proposed: it makes no business or economic sense" and (2) "If Board wish us to pursue it, we want it on record we disagree, however will follow Board's direction—need Alex Brown!"

In early March, when the substance of the Agreements came closer to their final form, Resurgence purchased 100% of Senior Management's shares in Seaman. Further, Resurgence purchased additional shares from Management, so that in less than a year, Rosenberg, Halper and McGeough had liquidated 75% of their original Seaman holdings. Even assuming for present purposes that these transactions were proper stock sales by the management group, it is clear that by selling all or nearly all of their equity in Seaman, they limited their risk from the Agreements.[30] Presently, only Seaman and plaintiffs stand to lose if, in fact, the Agreements are unfair to Seaman.

---

29. I am convinced that Management did, in fact, make progress from the obviously inadequate starting point. I also note, however, that none of the defendants spend much effort arguing that the *result* of those negotiations is actually *fair* to Seaman; only that it provides benefits and is better than the initial proposal.

30. I also note that the record is replete with references to reminders by Rubin to Management that their compensation would increase significantly to account for their added responsibilities in running Levitz as well as Seaman. There is even some indication that Seaman management might be made directors of LHFI.

## I. Management Ultimately Provides a Tepid Endorsement of the Challenged Transactions

At the March 2, 2000 board meeting, Management discussed their progress on the Agreements and their remaining concerns with the full board. The board instructed Management to keep working on the proposals. Over time, Management clearly extracted protections and benefits for Seaman not included in the opening proposal. Finally, at the April 5, 2000 meeting, the board requested "management's position on entering into the [Agreements]. Mr. Rosenberg read a statement, a copy of which was ordered attached to these minutes, outlining the position of management." [31]

Management's position statement (the "Statement") begins by listing the general benefits to Seaman, including the following: ability to generate profits "from management fees, service fees and synergies without a large investment" and "Seaman[ ] does not have any of the capital risks of Levitz." The Statement then explains:

> When these servicing agreements were presented to the Board on January 5, 2000, we were directed by the Board to analyze the proposal. *This is a unique contractual arrangement and therefore, we did not have any yardstick to measure the proposal against. In addition, we did not have financial advisors to guide us.* However, we spent considerable time and effort developing our analysis, using the expertise of *some* of the board members and our outside

counsel at Jones Day. We presented our finding to the Board on March 2, 2000.

> Based upon our findings the Board directed us to continue to negotiate this agreement.... We have negotiated this agreement to the best of our ability, keeping the Board informed during the process. *We believe that ... we have negotiated significant improvements in these agreements from the initial proposals.* [32]

The Statement then lists the benefits that Management negotiated, as follows: (1) guaranteed payments for all five years; (2) enhanced Seaman termination rights; (3) Seaman can resolve most conflicts in its favor; (4) winding down costs are borne by Levitz; (5) Levitz pays the added employee related and certain other costs; and (6) Seaman holds a right of first offer if Levitz plans to sell its east coast stores. Finally, the Statement documents Management's ultimate conclusion:

> "We believe these Servicing Agreements *are significantly better than the terms of the Merger that Levitz proposed.* Therefore, we as management feel comfortable in recommending to the Board that the Company *could* enter into these agreements." [33]

Following the reading into the record of the Statement and some "further discussion," the board approved the Agreements. It appears to me that Management sought, *consistent with conclusion point 2 of the late January reference sheet for the Agreements,*[34] to be on record explaining the difficult circumstances surrounding their

---

31. Minutes of April 5, 2000 board meeting.

32. *Id.* (emphasis added).

33. *Id.* (emphasis added).

34. See *supra* at section III.H.2 (Conclusion point I of that document states "Reject as

currently proposed: it makes no business or economic sense" and point 2 states "If Board wish us to pursue it, *we want it on record we disagree,* however will follow Board's direction—need Alex Brown." (emphasis added)).

**T. ROWE PRICE RECOVERY FUND, L.P. v. RUBIN**    Del.  **549**
Cite as, Del.Ch., 770 A.2d 536 (2000)

assignment and their belief that they had extracted a transaction more beneficial to Seaman than the rejected merger proposal.

The real import of the Statement, in my view, however, is that Management did not opine that the Agreements actually represent a worthwhile venture for the company, much less one that was on fair terms. Similarly, while defendants focus on proving that Seaman will get *certain benefits* from the Challenged Transactions, there is little focus on whether the Agreements themselves are actually beneficial and worthwhile for the entity.[35]

### J. The Parties' Divergent Views of the Merits of the Agreements

Plaintiffs attack nearly every element of the Challenged Transactions. According to plaintiffs, Seaman should simply allow Levitz to fail and liquidate. In short, plaintiffs attack as foreign to their understanding of capitalism and the corporate law the very concept of dedicating time, skills and resources for the purpose of aiding a direct competitor and providing it with the tools needed to succeed. Put less dramatically, plaintiffs assert that Rubin's desire to salvage his Levitz investment is the sole driving force behind the Challenged Transactions. This point is hardly contradicted by defendants.

In support of their challenge to the concept underlying the Agreements, plaintiffs point out that at the end of five years, Seaman's principal competitor may reemerge as a viable threat, having enjoyed the benefit of learning and understanding how Management successfully operates retail furniture stores.[36] At the same time, Seaman may suffer because Management is distracted from considering Seaman-related issues while it focuses on revitalizing Levitz.

In challenging the substantive terms of the Agreements, plaintiffs identify several legal and practical issues that they contend were either never considered or, if considered, evidence the gross unfairness of the Challenged Transactions. Assuming these issues are as glaringly pertinent as plaintiffs contend, independent advisors would likely have raised these issues and allowed a special committee to properly address them.[37]

Plaintiffs' specific attacks on the terms of the Agreements include questions about Levitz's ability to satisfy its side of the bargain. They say that Levitz's disclosure statements are not reliable. Further, Seaman may have to divert its own cash flow for Levitz's benefit. Plaintiffs also assert that the Challenged Transactions involve *per se* price fixing, and therefore subject

---

**35.** In other words, defendant's arguments rests on the assumption, which I believe was shared by Management, Senior Management and the independent directors, that Seaman was inevitably going to enter some form of what ultimately became the Challenged Transactions. Only by accepting the propriety of this inevitable result can one properly focus solely on the extent of benefits extracted.

**36.** In that regard, it is striking that neither Management nor the board appear to have considered either the benefits of the Agreements to Levitz or the decline in Seaman's profits that can be expected from a more

successful Levitz. Indeed, "[t]he materials presented to Seaman's Board at its March 2000 meeting assume that the only difference between Seaman's EBITDA due to servicing the [Agreements] would be the servicing [and management fee] revenues, thereby ignoring any effect the [Agreements] would have on Seaman's sales and revenues." Fischel Aff. ¶ 15 n. 3.

**37.** Further, independent advisors may have estimated the value of these Agreements to Levitz, which, contend plaintiffs, dwarfs the value running to Seaman, so that Management could better understand its leverage.

Seaman and its stockholders to potential liability for *per se* violations of federal and state antitrust laws. Plaintiffs claim that the substantial risk that Seaman will become responsible for Levitz's liabilities to third parties, as well as its ERISA-related liabilities, should Levitz fail, completely outweighs the marginal benefits offered by the Challenged Transactions.

Finally, plaintiffs take cold comfort from two aspects of the Agreements that they do not believe will operate properly. Specifically, the Agreements, as finally structured, allow Management to resolve most conflicts in Seaman's favor. Plaintiffs assert that there is no assurance that Management, without the help of an independent process, will actually do so, especially in light of their perception that Rubin will constantly seek to exert control for his own benefit. Additionally, while the Agreements grant Seaman termination rights in the event Levitz does not perform its side of the Agreements or Seaman's financial figures deteriorate, plaintiffs assert that as long as Rubin is in control, there is no chance that any termination rights will be exercised to further Seaman's interests.

Defendants respond by listing benefits that Seaman will achieve from the Agreements and impeaching plaintiffs' various liability concerns. They submitted, in ad-

dition to Rosenberg's affidavit, an affidavit from Stephen F. Cooper, a Managing Partner of Zolfo Cooper, LLC, which is a firm specializing in consulting with respect to financially distressed companies.[38] Cooper states that in his opinion, "Seaman's management ably acquitted themselves by negotiating the agreements in a fashion that will likely provide Seaman with substantial economic benefit."[39]

Specifically, Cooper explains several benefits that Seaman will receive and challenges plaintiffs' liability concerns. First, Seaman is guaranteed minimum payments of $3 million for the first year and $3.5 million per year for the last four years.[40] Additionally, Rosenberg points out that in the last three years of the deal, Seaman may, if Levitz is successful, obtain an additional "incentive fee."[41]

Cooper identifies as a second benefit, "less open to precise dollar calculation ... the synergies Seaman ought to realize."[42] Cooper does not, however, define any such synergies.

Cooper further states that the Agreements "will allow Seaman to spread its warehouse costs and negotiate better advertising terms and freight rates. Its greater inventory purchasing power will allow it to drive better bargains...."[43] Finally, since "Seaman will be managing

---

**38.** While defendants submit this affidavit, they have moved to exclude the affidavit of Daniel R. Fischel, Dean of The University of Chicago Law School, on the grounds that he is not qualified to give an expert economic opinion and that his affidavit is too equivocal to constitute an admissible expert opinion. I will deny that motion.

**39.** Cooper Aff. ¶ 8. I focus here on Cooper's affidavit solely because it generally encapsulates the arguments set forth in Rosenberg's affidavit and in defendants' briefs.

**40.** Cooper states that "[t]aking into account the projected incremental cost for the agree-

ments of about $1 million annually, the minimum payments represent about 5–8% EBITDA growth." Cooper Aff. ¶ 9.

**41.** There is no discussion, however, of whether Management considered, before endorsing the Agreements or even as part of this litigation, whether those incentive fees are proportionate to or capable of compensating Seaman for the lost business attributable to additional sales in Levitz's stores.

**42.** Cooper Aff. ¶ 10.

**43.** Cooper Aff. ¶ 11.

Levitz in that region, it will be able to position the Levitz and Seaman merchandising programs so as to be complimentary."

Cooper also responds to plaintiffs' criticism of the Agreements. He states that "[t]here is simply no logical or historical reason to believe that the existence of added responsibilities for Senior Management will be a detriment to Seaman."[44] He also contends that plaintiffs' concerns about Levitz's financial condition are unfounded because plaintiffs forget "that Levitz cannot emerge from bankruptcy protection ... without first satisfying the bankruptcy judge that its business plan is viable and its capital structure is such as will allow it to survive and discharge obligations."[45]  Cooper's last pertinent comment is that the liability risks identified by plaintiffs are those risks generally encountered in the course of running a business.[46]

Finally, in further response to plaintiffs' antitrust concerns, which were explained in the opening and reply affidavit of Stephen D. Houck, an antitrust attorney with the law firm of Reboul, MacMurray, Hewitt, Maynard & Kristol, defendants submitted the affidavit of Stephen Calkins, an antitrust law professor at Wayne State University Law School. I need not resolve on this motion any issues of antitrust law. It suffices to note that the parties' respective affidavits, briefing and argument leaves me convinced that plaintiffs' concerns about liability are not without force.

Defendants may ultimately be correct in their view of the law. But the critical fact is that the Seaman board of directors was not advised of this potential legal risk when they approved the Agreements.

## III. LEGAL ANALYSIS

### A. Legal Standards

[1]  Preliminary injunctive relief will be granted only where the moving party demonstrates the following: (1) a reasonable probability of success on the merits; (2) irreparable harm if the injunction is not granted; and (3) a balance of equities in favor of granting the relief.[47]

The issue of probability of success on the merits depends critically on the standard of review. The defendants argue that, notwithstanding Resurgence's status as Seaman's majority stockholder and its admittedly conflicting interests, the decision of the Seaman board of directors to approve the Agreements is protected by the business judgment rule. This is so, they say, because those contracts are not a merger but a "business transaction." Alternatively, they argue that because Resurgence did not misuse its position of control in connection with the negotiation of the Agreements, the business judgment rule should apply. I disagree both as a matter of law and, although not material to my conclusion, as a matter of fact.

**44.**  *Id.* ¶ 14.

**45.**  *Id.* Naturally, if plaintiffs are correct that the whole purpose of the Agreements is to transfer value out of Seaman and into Levitz, then their concern about Levitz's *ability* to honor its obligations seems misguided. Also, Management negotiated to ensure that LHFI will guarantee Levitz's obligations under the Agreement.

**46.**  I agree that any business should concern itself with ERISA, antitrust, and third-party liability risks. Plaintiffs' argument, however, (aside from the supposed *per se* price fixing fear) is that Seaman should not be forced to concern itself with *Levitz's* business risks.

**47.**  *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 179 (1985); *SI Management L.P. v. Wininger,* 707 A.2d 37, 40 (1998).

[2]  As to the law,[48] the Delaware Supreme Court held in *Kahn v. Lynch Communication Systems, Inc.,*[49] that the entire fairness standard applied to the review of a transaction (in that case a merger) negotiated between a controlling stockholder and the controlled corporation, notwithstanding approval of the transaction by a special committee of disinterested directors of the controlled corporation. At most, the Court held that approval by a properly functioning committee of disinterested directors would shift the burden of proof on the issue of fairness to plaintiffs. One year later, in a post-trial opinion in *Kahn v. Tremont Corp.,*[50] Chancellor Allen explicitly refused to limit *Lynch* to merger cases.  He said:

> Defendants seek to limit *Lynch* to cases in which mergers give rise to the claim of unfairness, but offer no plausible rationale for a distinction between mergers and other corporate transactions and in principle I can perceive none.  Thus, I conclude that under *Lynch* the operation of such a committee can only shift to plaintiff the burden of proving that the transaction was unfair.[51]

The Supreme Court reaffirmed Chancellor Allen's conclusion in its decision in the same case, when it stated that "when a controlling shareholder stands on both sides of the transaction, the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard."[52]

[3]  Defendants do not mention Chancellor Allen's opinion in *Kahn v. Tremont* and attempt to distinguish the Supreme Court's opinion in that case on the basis that it does not expressly discuss the distinction they would draw between mergers and other business transactions.  This *absence* of analysis is either of no import whatsoever or, at best, indicates the Supreme Court's implicit endorsement of Chancellor Allen's *explicitly stated* inability to find such distinction.  In any event, both the Supreme Court and this court explicitly held that the entire fairness standard of review applies in the non-merger context to interested transaction involving controlling stockholders.  Thus, I have no difficulty concluding that the entire fairness standard applies here.[53]

[4, 5]  Moreover, based on the record before me, I am satisfied that defendants

---

**48.**  The factual record in the context of this preliminary injunction is uniquely suggestive of Rubin's improper influence of the course of events.  Thus, defendants' novel legal assertion that Resurgence's status as majority stockholder is not enough to invoke an entire fairness analysis of the Agreements is irrelevant.  Even if that were true, I conclude, at this stage of the proceedings, that Rubin and Resurgence actually exercised their control over Seaman in such a way as to require them to demonstrate the fairness of the Agreements.

**49.**  Del.Supr., 669 A.2d 79 (1995).

**50.**  Del.Ch., Civ.A. No. 12339, mem. op. at 18, Allen, C., (March 21, 1996), *rev'd on other grounds,* Del.Supr., 694 A.2d 422 (1997).

**51.**  *Id.*

**52.**  *Kahn v. Tremont,* 694 A.2d at 428.  See also *Ryan v. Tad's Enterprises, Inc.,* Del. Ch., 709 A.2d 682, 689 (1996), *aff'd* Del.Supr., 693 A.2d 1082(1997) (Order).

**53.**  I also note that the record on this motion easily satisfies whatever initial burden plaintiffs had of showing some basis for invoking the fairness obligation.  See *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 703 (1983).  The record shows a self-dealing transaction in which the majority stockholder, Resurgence, is receiving a special benefit and Seaman is suffering an apparent detriment. See *D.A. Drexler, L.S. Black, Jr. & A.G. Sparks, III, Delaware Corporation Law and Practice,* § 15.11 at 15–74 (1999).

will bear the burden of proving fairness at trial. They quite consciously chose not to employ any independent bargaining mechanism in negotiating the Agreements. They abandoned the Special Committee and its independent legal and financial advisors. Instead, Management "bargained" with Levitz and took legal advice from the same law firm that represents Resurgence. Predictably, this "negotiation," unlike the merger discussions that failed precisely because of these procedural safeguards, succeeded in arriving at a transaction satisfactory to Levitz and Resurgence. The Agreements were then presented to the full Seaman board of directors and approved. Nothing about this process would lead me to conclude that the burden of proof on the issue of fairness will be shifted at trial to plaintiffs.[54]

Of course, in the context of a motion for a preliminary injunction, the moving party must shoulder the burden of showing a reasonable probability of ultimate success on the merits. Thus, it is not enough for plaintiffs merely to convince me that the entire fairness standard applies and then

rest. Instead, they must carry the burden of showing such a lack of fairness in the Challenged Transaction as to establish a reasonable likelihood that the defendants will be unable to meet their burden of proving fairness at trial.[55]

**B. Probability of Success on the Merits**

[6]  Plaintiffs have shown a reasonable, and indeed a strong, probability of success on the merits of their claim.

[7, 8]  The test of entire fairness is an "exacting" one and, where it applies, the "challenged transaction must withstand rigorous judicial scrutiny."[56] Of course, there are two components to the concept of entire fairness: fair dealing and fair price.[57] Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[58] Fair price "relates to the economic and financial considerations of the proposed [transaction]

---

**54.** Defendants argue that Rosenberg, who is Seaman's CEO, is legally independent of Rubin or Resurgence and, thus, 4 out of 7 of the Seaman directors were "independent" of the majority stockholder. Although the record does suggest that Rosenberg and the other members of Management resisted certain of Rubin's threats and blandishments, there is nothing to suggest that Rosenberg was actually able to act independently of Rubin in connection with the approval of the Agreements. Indeed, the record suggests otherwise, and I cannot regard Rosenberg as legally independent. *See Rales v. Blasband,* Del.Supr., 634 A.2d 927, 937 (1993). Moreover, the existing record creates a substantial issue about Ridings's independence, a point requiring further inquiry at trial. Thus, only 2 of the 7 directors, Peraldo and Alperin, neither of whom knew of Ridings's contacts with Resurgence, are clearly "independent" for the purposes of my analysis. In the circumstances, the fact that the Agreements received unanimous board approval (including an initial approval

of the independent directors) does not shift the burden of proof on fairness.

**55.** *See, e.g., In re Trans World Airlines, Inc. Shareholders Litig.,* Del.Ch., Civ.A. No. 9844, mem. op. at 18–19, 1988 WL 111271, Allen, C. (Oct. 21, 1988) (party seeking injunctive relief, even if other side will bear burden of proof at trial, must establish to a certain "degree of confidence" that the merits warrant the relief sought); *Cascella v. GDv, Inc.,* Del. Ch., C.A. No. 5899, letter op. at 2–3, Brown, V.C. (June 21, 1979) (party seeking injunctive relief bears burden of showing a likelihood that "under the facts the defendants will be unable to establish intrinsic fairness").

**56.** *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1279 (1989).

**57.** *Weinberger,* 457 A.2d at 711.

**58.** *Id.*

. . . ." [59] In making a determination as to the entire fairness of a transaction, the Court does not focus on one component over the other, but examines all aspects of the issue as a whole.[60]

I have described both the procedural and price aspects of the Agreements at length earlier in this opinion and will not repeat all that has been said. Based on my preliminary factual findings, there is a substantial likelihood that defendants will be unable to satisfy any aspect of the fairness analysis and that, taken as a whole, the Agreements are likely to be judged unfair to Seaman. Briefly, the following observations support my conclusion.

1. *Timing.* The timing of the transaction is driven entirely by Resurgence's desire to rescue its investment in Levitz. Perhaps most fundamentally, there is nothing in the record to indicate that—left on its own—Seaman would *ever* seek out or enter into an arrangement of the sort contemplated by the Agreements. Certainly, the Agreements proposed by Rubin were *never* part of any Seaman business plan.

2. *Initiation.* Rubin initiated the idea of a business transaction between Seaman and Levitz and promoted it relentlessly. He disregarded the negative conclusions of P & M, which was then excluded from further involvement in the process. Resurgence purchased enough shares from Management to obtain an absolute majority and immediately removed Golden and Ruocco (who expressed skepticism about a. Levitz merger) from the board of directors. Rubin secured the appointment of Ridings to the board and to the Special Committee without full and complete dis-

closure of Ridings's relationship with Resurgence. When the merger discussions failed, Rubin effectively disbanded the Special Committee and discharged the Committee's independent legal and financial advisers. In the course of Management's "negotiation" of the Agreements with Levitz, Resurgence purchased additional shares from Management and Senior Management, evidently to mollify their concerns over the effect of the Agreements on the value of Seaman.

3. *Negotiation.* "Arm's length negotiation between independent bargaining parties is a 'well recognized touchstone of fair dealing.' Conversely, its absence is evidence of unfair dealing." [61] Defendants argue that there were real arm's length negotiations over the terms of the Agreements. Indeed, there is evidence in the record that Management made a substantial effort to secure better terms for Seaman than those first proposed by Resurgence and Levitz, and Management was successful in certain respects. However, there is nothing to suggest that the negotiation process replicated or even approximated that which would occur at arm's length. Instead, the record strongly suggests that Management accepted the fact that a deal would be done and simply strove to arrange better terms for Seaman. At the April 5 board meeting, after making additional sales of Seaman stock, Management reported only that the Agreements were a better deal than Resurgence's grossly unfair merger proposal and that the directors "could" approve them.

[9] 4. *Structure.* The "structure" of the Agreements is unremarkable except

**59.** *Id.*

**60.** *Id.*

**61.** *Kahn v. Dairy Mart Convenience Stores, Inc.,* Del.Ch., Civ.A., No. 12489, mem. op. at 19, 1996 WL 159628, Jacobs, V.C. (Mar. 29, 1996) (citation omitted).

T. ROWE PRICE RECOVERY FUND, L.P. v. RUBIN    Del. **555**
Cite as, Del.Ch., 770 A.2d 536 (2000)

for the obvious and troubling conclusion that they are designed and structured to restore the competitive position and power of Levitz in order to salvage Resurgence's investment in that company. Plaintiffs argue that this fact renders the Agreements contrary to the fundamental principal of Delaware corporate law that a controlling stockholder may not use corporate assets to advantage itself to the corporation's disadvantage.[62]

5. *Disclosure to Directors.* The incomplete disclosure to the directors, especially Alperin and Ruocco, about Ridings's relationships with Resurgence is troubling. They evidently relied on him and his expertise in approving the Agreements. If, as plaintiffs argue and parts of the record suggest, Ridings saw his role as one of promoting a deal with Levitz rather than advocating and protecting the interests of Seaman, his participation in the process *raises* rather than resolves issues of fairness.

6. *Approval by Directors.* Alperin's and Peraldo's approval of the transaction is some evidence of fairness. On the present record, however, I cannot give much weight to it for several reasons. First, as just discussed, Ridings's participation in their deliberation is problematic. Second, there is record evidence that they, like management, concluded that some deal with Levitz was inevitable and agreed to this one simply because it was better for Seaman than the grossly inadequate merger proposal. Third, the record does not support the conclusion that the directors' deliberations were fully informed. Plaintiffs have raised a series of legal and business issues, such as potential antitrust and ERISA liabilities and the viability of alternatives to the Agreements, which likely warranted consideration by the directors in their deliberations. At this stage of the proceeding, the record does not reflect that the board of directors considered or discussed these issues.[63]

7. *Price.* Of course, Seaman is due to receive some consideration for the management and other services it is promising to deliver. It will receive $17 million over the course of five years and potentially could receive additional "incentive" payments. In addition, there are other less tangible benefits flowing to Seaman of a synergistic nature, such as cost savings and volume discounts that it may realize.

On the other side of the ledger are a substantial diversion of the time and attention of Seaman's management, a diversion of capital resources and added costs. Also, there are various risks of potentially material liabilities flowing from the entanglement of Seaman into the affairs of its largest competitor as it emerges from a long and difficult bankruptcy. Finally, there must be some fundamental concern that increased revenues for Levitz will come at the expense of decreased revenues for Seaman.

It is difficult to evaluate the interplay of these various factors, in part because there was no expert analysis prepared for the board of directors in conjunction with its approval of the Agreements. In this regard, however, it is important to note that Senior Management insisted on selling 100% of their shares and Management sold more of their remaining shares in March

---

**62.** Citing *Sinclair Oil Corp. v. Levien,* Del. Supr., 280 A.2d 717, 720 (1971), and *Thorpe v. CERBCO, Inc.,* Del.Ch., Civ.A. No. 11713, mem. op. at 17, 1995 WL 478954, Allen, C. (Aug.9, 1995), *aff'd in part, rev'd in part,* Del. Supr., 676 A.2d 436 (1996).

**63.** The parties sharply disagree over the merits of these issues. I have no occasion to resolve them at this time, other than to note that the issues are significant and present some material risks to Seaman.

**556** Del.          **770 ATLANTIC REPORTER, 2d SERIES**

2000, just as the final terms of the deal were being arranged. This fact is suggestive that, despite defendants' after-the-fact efforts to prove the fairness of the Agreements, the management group perceived the fundamental unfairness of the proposal to Seaman.

My analysis of the fairness of the Agreements also requires me to look more broadly at the connection between the Agreements and the plan to reorganize Levitz. The defendants urge me to recognize, as an indication of fairness, that the plaintiffs will have the option to exchange their Seaman shares for common shares of the new holding company, LHFI, on the same terms as Resurgence. I give no credence to this argument because the terms of that exchange were fixed unilaterally by Resurgence and reflect the same 60/40 equity split in favor of Levitz that was rejected as grossly unfair by the Special Committee in December 1999. Insofar as the record of the failed merger negotiations shows, that split does not reflect a fair assessment of the relative values of the two companies. Rather, it is one that Resurgence chose to further its interest in reorganizing Levitz, thus, salvaging its large investment in that bankrupt company. Thus, I conclude that the relationship of the Agreements to the Levitz reorganization and the unfair valuation of Seaman implicit therein suggest unfairness.

**C. Irreparable Harm**

[10]  I am also persuaded that plaintiffs have shown the sort of imminently threatened irreparable harm that justifies the

extraordinary remedy of a preliminary injunction.

The imminence of the threat can be viewed at least two ways. First, although the Agreements are not yet fully operative, their existence is diverting the time and attention of Seaman's management from Seaman's business to the effort to rescue Levitz. Indeed, the Agreements themselves contemplate that the parties will use the time period before the Levitz plan of reorganization is approved (and the other conditions are met that precede the operation of the Agreements) to negotiate a detailed plan of implementation. Thus, an element of the harm I find to be irreparable is already occurring. Second, it seems likely that if I refuse the injunction, the Agreements will become effective before this matter can be tried and a final determination reached.[64] Once that happens, the full measure of the irreparable harm will occur. For these reasons, I am satisfied that the need for injunctive relief is not speculative or remote but real and sufficiently imminent in nature to require that I act.[65]

The harm threatened by the Agreements includes, among other things, that (i) Management's time and attention will be substantially diverted from Seaman's business, (ii) Seaman will become operationally and financially entangled with a business in unstable financial condition, (iii) Seaman's assets and management will be diverted to permit a stockholder (Resurgence) to compete directly with Seaman; (iv) Seaman will be exposed to material potential liabilities flowing either from its own illegal conduct (such as antitrust

---

**64.** At argument, the parties estimated the time needed to prepare for trial at between three and six months. Of course, a final decision after trial could well take weeks or months of additional time.

**65.** *See* Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 10–2(b)(3), 702 (1998) (hereinafter "Wolfe & Pittenger").

liability) or from its close association with a financially less secure Levitz.[66]

Defendants argue strenuously that each of these "harms" is purely economic and can be remedied in an action at law. They point out that it is possible in certain cases (generally those involving intellectual property infringement) to reasonably estimate lost profits or the diminution in enterprise value.

[11,12] It is likely that, despite unquestionable difficulties of proof, a court might estimate such damages in an action at law. Thus, plaintiffs might obtain some recovery, unless the court found the elements of damages sought to be so speculative as to be non-compensatory. Nevertheless, I do not agree that the possibility of some such monetary recovery should stay the issuance of an injunction. The harm here threatened is irreparable, in my judgment, because "in keeping with the broad discretion with which [this] court is vested in such matter '[i]t is not necessary that the injury be beyond the possibility of repair by money compensation' but only that it 'be of such a nature that no fair and reasonable redress may be had in a court of law and that to refuse the injunction would be a denial of justice.'"[67] As has been said, "[a]lternative legal redress must be clearly available and 'as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.'"[68]

Here, I have the power to prevent the occurrence of a threatened injury on a record strongly supporting plaintiffs' position on the merits. It would work an injustice on Seaman and plaintiffs to permit the Agreements to go forward with the hope that some claim for money damages (however imprecisely measured) might later be available. I find myself nearly in the position of Vice Chancellor Jacobs in *Sealy Mattress Co. of N.J. v. Sealy, Inc.,* in which he recognized that where money damages "may be highly difficult to calculate" preliminary injunctive relief is proper.[69] In this regard, he stated:

> "To say that this Court has the power to condemn the egregious conduct involved here (as it has preliminarily done), but yet must declare itself powerless to prevent the very harmful transaction that is the object and purpose of the conduct, affronts the very notion of equity and the fiduciary standards that have been articulated time and time again by the Courts of this State."[70]

Finally, I must observe that it will be considerably more difficult, if not impossible, to fashion a full and adequate equita-

---

**66.** Plaintiffs also point to a line of cases finding that the creation of a "listening line" between competitors constitutes a threat of irreparable harm. *See, e.g., Elco Corp. v. Microdot Inc.,* 360 F.Supp. 741, 754 (D.Del. 1973). Defendants respond that, under the cases cited, the injury is threatened to Levitz, not Seaman, that money damages are an adequate remedy and, in any case, Seaman is free to sell its trade secrets to Levitz. Seaman may learn much about the Levitz stores that it has agreed to operate and about Levitz's operations as a whole. It is still the case that Levitz will of necessity learn a lot about the way Seaman's management (which all parties agrees is highly effective) runs its business. It stands to reason that Levitz will be

able to use this information to help build its business and, ultimately, to compete with Seaman. This is a species of harm that courts have recognized is irreparable.

**67.** *Wolfe & Pittenger* § 10–2(b)(4) at 705 (quoting *State v. Delaware State Educ. Ass'n.,* Del.Ch., 326 A.2d 868, 875 (1974)).

**68.** *Id.* (quoting Thomas C. Spelling & James Hamilton Lewis, *A Treatise On The Law Governing Injunctions* § 44 at 94 (1926)).

**69.** Del.Ch., 532 A.2d 1324, 1341 (1987).

**70.** *Id.*

**558** Del.

ble remedy after trial on the merits. First, Seaman will have suffered the multifaceted negative effects on its business for some relatively substantial period of time. Moreover, at a hearing before the Bankruptcy Court, Levitz candidly acknowledged that the Agreements lie at the very heart of the Levitz plan of reorganization and that it was seeking to have those contracts put in place without the possibility of their later rescission. Even if this latter assertion is disregarded, it is certainly the case that once the Levitz plan of reorganization is approved and goes into effect many more persons will have a legitimate interest and expectation in the continued performance of the Agreements. Therefore, the remedy of rescission would be difficult to employ.

**D. Balance of the Equities**

[13]   I note first that Levitz, because it is a bankrupt, is not a party to this case. Defendants have seized on this fact to argue that the failure to join Levitz is grounds for denial of the injunction and dismissal of the action. I cannot agree. On June 14, 2000, Judge Walrath of the United States Bankruptcy Court for the District of Delaware issued an order in the Levitz bankruptcy case both denying a motion to enjoin plaintiffs from proceeding in this court and expressly granting them relief from the automatic stay provisions of the Bankruptcy Code, so they could pursue this action, including the injunctive relief now sought. Thus, the Bankruptcy Court is content to allow this action to proceed in Levitz's absence. I note also

that Levitz's interests in this matter have been forcefully represented by Resurgence.[71]

[14]   In my opinion, Seaman faces the threat of marginal, if any, harm by the issuance of the injunction. The Agreements present no uniquely beneficial opportunity to it. Thus, the present circumstance is unlike those cases in which this court has refused to enjoin a premium acquisition proposal where no other such proposal exists.[72] Indeed, if my view of the Agreements is correct, it is likely that Seaman will benefit substantially from an injunction against its performance of what appear to be unfair contract obligations.[73] Similarly, Management, each of whom are defendants in this action, are not threatened with any harm by the issuance of the injunction. Their interests in the Agreements are the same as Seaman's.

This leaves Levitz, Resurgence and Levitz's other creditors as the parties likely to feel the bite of an injunction. It must be frankly admitted that such an order is likely to affect them substantially. At a minimum, Resurgence and Levitz may find it necessary to restructure the proposed Levitz plan of reorganization. I note, however, defendants argue in their briefs that there is no evidence in the record that Levitz "must fail in the absence of the proposed contracts." I take this to mean that there are other possible solutions to the Levitz bankruptcy that do not depend on approval of the Agreements. Thus, I am unable to speculate as to the ultimate

---

**71.**   *See, e.g., Moran v. Household Int'l, Inc.,* Del.Ch., 490 A.2d 1059, 1073 (1985) ("It is not necessary to join a person whose interests are fully protected by the parties already present in the case."), *aff'd,* Del.Supr., 500 A.2d 1346 (1985).

**72.**   *See* Wolfe & Pittenger § 10–2(b)(5) at 720, n. 138 and cases cited therein.

**73.**   Further, even if I am mistaken about the merits of the Agreements, defendants in no event argued that the benefits to Seaman are so substantial that denying Seaman those benefits would cause any significant harm.

T. ROWE PRICE RECOVERY FUND, L.P. v. RUBIN    Del. **559**
Cite as, Del.Ch., 770 A.2d 536 (2000)

impact of an injunction on Resurgence, Levitz or its other creditors.

Moreover, since I think it likely that at trial I will find the Agreements to be unfair, I see no reason to allow Levitz's creditors other than Resurgence to become intertwined in a complex exchange offer and reorganization that depends on the Agreements, which, in the end, may be undone. The public interest therefore favors the issuance of an injunction.

Balanced against these harms is the substantial, imminent and irreparable harm that I conclude is likely to befall Seaman and the plaintiffs in the absence of a preliminary injunction. Thus, plaintiffs are entitled to the relief they now seek.

Of course, the granting of a preliminary injunction is a severe remedy, not to be handed out lightly. I recognize, as I must, the possibility that I may be issuing this form of relief improvidently. For that rea-

son, I will entertain an application from the defendants to set an expedited trial date. Similarly, in accordance with Rule 65(c) of the Rules of this court, I will require plaintiffs to post a cash or surety bond in the amount of $100,000.

## IV. CONCLUSION

For all of the foregoing reasons, a preliminary injunction shall issue enjoining and restraining the defendants from performing or taking any further action with respect to the performance of the Agreements. Plaintiffs shall present a form of order on notice.



**6**

judgment.[6]  The defendant in the second
lawsuit may properly assert the defense of
collateral estoppel to prevent the plaintiff
from litigating issues that the plaintiff previ-
ously litigated and lost, even though the de-
fendant himself was not a party to the first
proceeding.[7]

### Ineffective Assistance of Counsel
### Legal Malpractice

[4, 5]  The standards for proving ineffec-
tive assistance of counsel in a criminal pro-
ceeding are equivalent to the standards for
proving legal malpractice in a civil proceed-
ing.[8]  It therefore was appropriate in this
case for the Superior Court to have applied
the doctrine of collateral estoppel if the issue
of Malik's competency actually was litigated
and decided in Sanders' criminal proceed-
ings.[9]  In Sanders' case, his present allega-
tions, in all material respects, encompass the
allegations of ineffective assistance of counsel
that were raised and rejected by the Superi-
or Court in his postconviction proceedings.
It does not matter that Sanders raised only
some, but not all, of these issues when he
appealed to this Court from the Superior
Court's postconviction ruling.  The Superior
Court's postconviction ruling was a valid, fi-
nal judgment on the issues he now raises.
He raises no new material contentions.  Un-
der the circumstances, we agree with the
Superior Court's holding that Sanders' civil
lawsuit was barred by the doctrine of collat-
eral estoppel.

The judgment of the Superior Court is
therefore AFFIRMED.



**6.**  *Id.*

**7.**  *Parklane Hosiery v. Shore,* 439 U.S. 322, 328,
99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1979).

---

**TRUE NORTH COMMUNICATIONS
INC., a Delaware corporation,
Plaintiff,**

v.

**PUBLICIS S.A., a French corporation, and
Publicis Communication, a French cor-
poration, Defendants.**

**Civil Action No. 16039–NC.**

Court of Chancery of Delaware,
New Castle County.

Argued:  Dec. 22, 1997.

Decided:  Dec. 23, 1997.

Revised:  Jan. 15, 1998.

Communications company sought pre-
liminary injunction requiring its largest
shareholder to refrain from opposing compa-
ny's pending merger.  The Court of Chan-
cery, New Castle County, Chandler, Chancel-
lor, held that: (1) pooling agreement between
company and shareholder required share-
holder to refrain from opposing company's
pending merger, and (2) injunction was war-
ranted.

Motion granted.

**1. Contracts** ⟜**143(2)**

When interpreting contract provision,
court must first determine whether the con-
tractual language in question is ambiguous.

**2. Contracts** ⟜**143(1), 152, 154**
**  Evidence** ⟜**448**

If contract's terms are clear on their
face, the court interpreting the contract is
not permitted to examine parol evidence; in-
stead, the court must apply the meaning that
would be ascribed to the language by a rea-
sonable third party.

**3. Evidence** ⟜**448**

When interpreting contract provision, if
contract language is reasonably subject to

**8.**  *McCord v. Bailey,* D.C.Cir., 636 F.2d 606, 609
(1980), *cert. denied,* 451 U.S. 983, 101 S.Ct. 2314,
68 L.Ed.2d 839 (1981).

**9.**  *Id.*

more than one interpretation, the court will consider parol evidence in order to ascertain the parties' intentions.

**4. Corporations ⫸583**

Pooling agreement between communications company and its largest shareholder required shareholder to refrain from opposing company's pending merger, and was not a mere "further assurances" clause.

**5. Injunction ⫸138.12**

Stipulation in pooling agreement between communications company and its largest shareholder, that breach of provision requiring shareholder to support company's acquisitions could not be reasonably or adequately compensated in damages in an action at law, established irreparable harm from shareholder's breach of that provision, as required for preliminary injunction.

**6. Injunction ⫸138.42**

Shareholder's breach of pooling agreement by opposing communications company's pending merger would cause irreparable harm to company absent injunction, since shareholder's opposition threatened to destroy unique acquisition opportunity and damage caused by loss of such opportunity could not be quantified.

**7. Injunction ⫸138.42**

Equities favored issuance of injunction prohibiting communications company's largest shareholder from opposing company's pending merger; shareholder had agreed in pooling agreement to support company's acquisitions, and failure to issue injunction would lead to irreparable harm to company.

---

Kenneth J. Nachbar, Jon E. Abramczyk, Donna L. Culver, and Jessica Zeldin, of Morris, Nichols, Arsht & Tunnell, Wilmington; Robert A. Atkins, Martin London, Danya E. Perry, and Roberto Finzi, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, and Sidley & Austin, Chicago, IL, for plaintiff.

Robert K. Payson, and Arthur L. Dent, of Potter, Anderson & Corroon, Wilmington; Philip K. Howard, C. William Phillips, and Daniel M. Mandil, of Howard, Darby & Levin, New York City, for defendants.

**OPINION**

CHANDLER, Chancellor.

Plaintiff True North Communications, Inc. ("True North") seeks preliminary injunctive relief against defendants Publicis S.A. and Publicis Communication (collectively "Publicis"), requiring them to refrain from opposing True North's pending merger with Bozell, Jacobs, Kenyon & Eckhardt, Inc. Publicis is True North's largest shareholder, holding 18.4% of True North's outstanding shares, and it objects to the proposed Bozell merger. As a result, Publicis has commenced a tender offer of $28 per share for True North stock, conditioned on defeat of the Bozell merger proposal, and has solicited proxies from other investors to that end.

On December 16, 1997, I granted True North's motion for a temporary restraining order against Publicis' tender offer and proxy solicitation, finding that True North alleged a colorable claim on the merits and that Publicis' actions, unless enjoined, threatened irreparable injury to True North. A hearing on True North's motion for a preliminary injunction was held on December 22, with the parties providing briefs, an extensive documentary record, and three witnesses: Lloyd N. Cutler, outside counsel to True North's Special Committee; Maurice Levy, Chief Executive Officer and Director General of Publicis; and Thomas Kuhn, outside counsel for Publicis. Before analyzing the legal claims, it is important to describe, in some detail, the factual background to this controversy.

**I. BACKGROUND FACTS**

True North Communications, Inc., a Delaware corporation, is a communications company that operates marketing and advertising agencies in the United States, Canada, Europe, Latin America and Asia. True North has annual revenues of approximately $500 million.

Defendants Publicis S.A. and Publicis Communication are both French corpora-

tions. Publicis Communication owns and operates numerous advertising agencies principally in Europe.

In January 1989, Publicis and True North (then known as Foote, Cone & Belding) entered into a joint venture that united the two companies' operations and established a network of advertising agencies throughout Europe. As part of the joint venture, Publicis and True North purchased significant minority shareholdings in each other. True North currently owns 26.5% of Publicis' common stock, and Publicis owns 18.6% of True North's common stock.

The joint venture, known as Publicis●FCB, was in trouble almost from the beginning. The alliance quickly "descended into acrimony, into high-profile litigation and into mistrust." A recent article in *Business Week* described the parties' joint venture as "A Marriage Made in Hell." Earlier this year, the parties decided that a divorce—a dissolution of the joint venture—was the only way to end the discord and mistrust.

The terms of the joint venture's dissolution were set forth in a Memorandum of Agreement dated February 19, 1997. Pursuant to the Memorandum of Agreement, True North and Publicis agreed to create "two separate agency networks, one owned and controlled by Publicis and the other owned and controlled by True North," which "would have the ability to function globally and independently of one another." The parties retained ownership of each other's stock.

### A. *The Pooling Agreement*

An overriding objective of each party after the dissolution was to be able to engage in large acquisitions to build the separate, independent, worldwide agencies critical to their futures in the advertising industry. In order to effect this mutual objective, on May 19, 1997, True North and Publicis signed the Pooling Agreement, one of eight agreements annexed to the Memorandum of Agreement. These agreements were designed to disentangle the companies' business and to divide ownership of the advertising agencies operated by the joint venture.

Under the provisions of the Pooling Agreement, the parties agreed to provide assistance and support to ensure that future transactions could employ pooling of interests accounting. Specifically, pursuant to § 1.1 of the Pooling Agreement, Publicis agreed to (a) provide True North with a "pooling letter" needed to effect a pooling of interests transaction and to "(b) if reasonably requested, take such other action in support of the transaction (other than a commitment to vote for such transaction) as would be customary with respect to an acquisition or other similar business transaction in which True North may participate...." This was a reciprocal obligation.

The pooling letter assurance was essential to both parties, since they were both contemplating future acquisitions. As the parties describe it, with pooling of interests accounting, the combined company does not have to write-off or amortize the acquired company's good will, which accounts for a substantial part of the acquired advertising company's value. For all practical purposes, pooling transactions are the only way to accomplish major transactions in the advertising business, a fact which has not been disputed in this action, or at least not seriously.

For a company to qualify for pooling of interests accounting, all affiliates, generally defined as shareholders holding 10% or more of the company's stock, must consent and promise not to divest any stock for a specific period of time. The pooling letter Publicis agreed to provide to True North pursuant to the Pooling Agreement is a typical form of consent. The ability to withhold such consent is the ability to kill a pooling of interests transaction.

Publicis' obligation to provide True North with a pooling letter was not unconditional. Publicis had the right to withhold the pooling letter, unless:

(i) True North obtained a fairness opinion from a nationally recognized investment bank;

(ii) A majority of the non-management directors of True North voted to approve the terms and conditions of the contemplated transaction; and

(iii) True North obtained pooling letters (or other forms of consent) from all other non-*de minimis* affiliates of True North.

Further, under § 1.1.1, Publicis could withdraw its pooling letter if the contemplated transaction were not approved by majority vote of all outstanding shares of True North.

### B. *True North's Proposed Acquisition of Bozell*

Subsequent to the unwinding of the joint venture with Publicis, True North engaged in extensive negotiations to acquire Bozell, Jacobs, Kenyon & Eckhardt ("Bozell"), an international communications company with advertising and public relations agencies in 53 countries around the world. Bozell has annual revenues of approximately $450 million.

On July 30, 1997, True North's Board of Directors approved the acquisition of Bozell, subject to shareholder approval. The next day, True North announced that Bozell had agreed to a stock for stock merger.

The Merger Agreement, which will terminate by its own terms if the merger is not closed by December 31, 1997, requires the approval of both True North's and Bozell's shareholders. Moreover, Bozell may terminate the Merger Agreement if True North's shareholders do not vote on the merger by December 31, 1997.

On November 10, 1997, Publicis Chairman Maurice Levy sent a letter to True North stating Publicis' position that True North's proposed transaction with Bozell was contrary to the best interests of True North's shareholders. As an alternative to the Bozell transaction, Levy stated that Publicis was prepared to propose a merger with True North.

On November 17, one week after sending the letter to True North, Publicis disclosed publicly the text of the letter. The stock market reacted dramatically. On the day of the announcement, the price of a share of True North increased from $23 to over $26. Approximately 1,000,000 shares were traded—a volume more than twelve times True North's average daily trading volume.

Also on November 17, True North filed a complaint in the Court of Chancery, requesting that the Court order Publicis to provide True North with information necessary for True North to obtain Securities and Exchange Commission approval of the Bozell transaction. Publicis was also notified, at this time, of its obligation to "support a True North acquisition" under § 1.1(b) of the Pooling Agreement.

Publicis agreed to provide the requested information in response to True North's complaint. Thereafter, True North obtained SEC approval, set a November 18, 1997 record date for the shareholder vote on the Bozell proposal and scheduled a shareholders meeting for December 30.

Beginning on or about November 25, there was a flurry of activity that ultimately evolved into the litigation now before this Court. First, Publicis filed suit against True North and its directors in the United States District Court for the Northern District of Illinois on several grounds, including breach of fiduciary duty in proposing a merger with Bozell. Publicis' chief objective, however, was to block the merger between True North and Bozell. Second, on November 26, True North requested that Publicis honor its obligations under the Pooling Agreement by refraining from acting in opposition to the Bozell Merger.

On December 3, True North answered the complaint in the federal action and asserted counterclaims, alleging, among other things, that Publicis had breached its contractual duty to support the Bozell transaction. Also on December 3, True North sent a letter to Publicis requesting that Publicis "refrain from taking any actions against the proposed Bozell transaction (with the exception of voting your shares against the transaction)," pursuant to § 1.1(b) of the Pooling Agreement.

The next day, Levy sent another letter to the True North Board of Directors stating that Publicis intended to commence a hostile tender offer for 33% of True North's outstanding shares that, when combined with Publicis' existing holdings, would give it control of True North. The letter stated that the tender offer was expressly conditioned on

the termination of the Bozell Merger Agreement. On the same day, Publicis filed a preliminary proxy statement with the SEC for the purpose of soliciting True North shareholders to vote against the Bozell merger.

On December 5, True North filed a motion for a temporary restraining order in the United States District Court for the Northern District of Illinois, claiming that Publicis' actions to defeat the Bozell merger violated Publicis' contractual obligation to support True North's acquisitions under § 1.1(b) of the Pooling Agreement. At a hearing scheduled the same day, United States District Judge Gottschall concluded that the Pooling Agreement was ambiguous, and that extrinsic evidence would be necessary to interpret the agreement. Following an evidentiary hearing on December 8, the federal court ruled in favor of True North and entered a temporary restraining order prohibiting Publicis from going forward with its hostile tender offer and proxy solicitation. This order was re-characterized on December 10 as a preliminary injunction order so as to permit an immediate appeal.

Five days later, the United States Court of Appeals for the Seventh Circuit vacated that order, holding that under the forum selection clause, claims arising under § 1.1 of the Pooling Agreement should be determined by a Delaware court. In the evening hours of December 15, True North applied to this Court for a temporary restraining order. In the early morning hours of December 16, after hearing from both parties, this Court set an expedited schedule with a hearing date of December 22, and temporarily enjoined Publicis from continuing its hostile tender offer or proxy solicitation.

## II. LEGAL STANDARD

The standard applicable to True North's motion for preliminary injunctive relief is well settled under Delaware law. In order to obtain preliminary injunctive relief, True North must establish a reasonable probability of success on the merits, a reasonable likelihood that it will suffer irreparable harm absent the injunction, and that the harm to True North if relief is denied outweighs the harm to Publicis if the injunction is granted. *Revlon, Inc. v. MacAndrews & Forbes Holdings,* Del.Supr., 506 A.2d 173, 179 (1986).

Whether in the circumstances of this case True North is entitled to preliminary injunctive relief turns on the interpretation of the Pooling Agreement. If Publicis' hostile tender offer and proxy contest violate an enforceable obligation under the agreement, then Publicis' breach may entitle True North to the injunction it seeks.

[1, 2] Before turning to the arguments surrounding the agreement, however, it is important to describe the underlying legal principles applicable in the context of interpreting a contract provision. Under Delaware law, courts must first determine whether the contractual language in question is ambiguous. *Bell Atlantic Meridian Systems v. Octel Communications Corp.,* Del.Ch., C.A. No. 14348, Allen, C., 1995 WL 707916 (Nov. 28, 1995). If the contract's terms are clear on their face, the Court is not permitted to examine parol evidence. Instead, the Court must apply the meaning that would be ascribed to the language by a reasonable third party. *See City Investing Co. v. Continental Cas.,* Del.Supr., 624 A.2d 1191, 1198 (1993).

[3] If, however, the contract language in question is reasonably subject to more than one interpretation, the Court will consider parol evidence in order to ascertain the parties' intentions. *See Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (1997).

## III. ANALYSIS OF CLAIMS

The central issue in this controversy is the meaning of just 40 words—out of thousands of words—in an agreement between sophisticated parties, represented by very sophisticated lawyers. True North contends that Publicis' actions to defeat the merger with Bozell (and no one denies that Publicis' actions are intended to destroy the Bozell merger) violate Publicis' contractual obligation to support True North's acquisitions. That obligation, True North insists, is found

in § 1.1 of the Pooling Agreement, which provides in its entirety as follows:

1.1. *Obligation of Publicis and Communication to Deliver Pooling Letter.* So long as Communication or any of its affiliates owns at least 10% of the issued and outstanding shares of True North Stock (as hereinafter defined), within 30 days after receiving a written request from True North delivered before the third anniversary of this Agreement, Publicis and Communication shall (a) furnish True North, and shall cause any designee of Communication serving on the Board of Directors of True North to furnish True North, with a "pooling letter", in substantially the form attached hereto as Exhibit A, or upon the request of True North, in such other form as is conventional for a transaction accounted for as a pooling of interests under generally accepted accounting principles applied in the United States, and, (b) if reasonably requested, take such other action in support of the transaction (other than a commitment to vote for such transaction) as would be customary with respect to an acquisition or other similar business transaction in which True North may participate; *provided* that Publicis and Communication may withdraw such pooling letter if any of the following conditions is not met within 90 days after Publicis and Communication shall have furnished such pooling letter.

(i) True North has obtained a fairness opinion from a nationally recognized investment bank with regard to the contemplated transaction;

(ii) A majority of the non-management directors of True North has voted to approve the terms and conditions of the contemplated transaction; and

(iii) True North has obtained pooling letters (or similar action) by all other non-*de minimis* affiliates of True North.

1.1.1. Not later than 90 days after Publicis and Communication shall have furnished the pooling letter, True North shall call a meeting of the shareholders of True North, to be held within a further 60 days, to vote on the contemplated transaction. If a majority vote of the outstanding shares of True North in favor of the contemplated transaction is not obtained at such meeting (or at an adjournment thereof within such 60 day period), Publicis and Communication may withdraw their pooling letter.

According to True North, the 40 words in dispute in subpart (b)—"if reasonably requested, take such other action in support of the transaction (other than a commitment to vote for such transaction) as would be customary with respect to an acquisition or other similar business transaction in which True North may participate"—require Publicis to take only actions to *support*, not oppose or impede, the Bozell acquisition. True North argues vigorously that the clear language of § 1.1(b), not to mention its equally clear drafting history, demonstrates that True North and Publicis intended to impose upon each other broad reciprocal obligations to support large acquisitions, as part of an agreement to cooperate in establishing "two separate agency networks, one owned and controlled by Publicis and the other owned and controlled by True North." *See* Plaintiff's Trial Exhibit, Tab 20, Ex. 3, February 19, 1997 Memorandum of Agreement, ¶ 2(a).

In striking contrast to True North's interpretation, Publicis vehemently contends that § 1.1(b) is clearly a "further assurances" clause. That is, Publicis argues that all subpart (b) adds to § 1.1 is Publicis' general assurance that it will provide any additional technical or ministerial information necessary to assist True North in its efforts to obtain pooling accounting treatment. In other words, Publicis reads subpart (b) as a catch-all contract provision by which a party, after making a precise commitment to perform in some manner, makes a vague, more general commitment to take other actions that are incidental to, and necessary for, the performance of the core commitment. For Publicis, the language in § 1.1(b) is crystal clear, but with a wholly different meaning than that which is ascribed to it by True North. Publicis says the language of subpart (b) merely confirms its agreement to provide a pooling letter and to cooperate in True North's effort to obtain pooling of interests accounting.

In further support of this interpretation, Publicis points to the fact that this reading of subpart (b) is buttressed by other provisions in § 1.1. For example, Publicis notes that § 1.1 does not even apply unless an affiliate owns at least 10% of True North's outstanding shares. In addition, § 1.1 does not appear to apply to cash transactions, although True North's witness, Lloyd Cutler, testified during the preliminary injunction hearing that he believed § 1.1 might very well apply to cash transactions as well as stock transactions. Finally, Publicis points to the title of the agreement and the heading of § 1.1—"Obligation of Publicis and Communication to Deliver Pooling Letter"—as indications that subpart (b) was intended to address only obligations incidental to the core commitment of providing a pooling of interest letter. This is the reading of the operative language so strongly urged by Publicis through its witnesses, including its Chairman, Maurice Levy, and its negotiating counsel, Martin Lipton and Thomas Kuhn.

[4] I find the more compelling interpretative argument is on the side of True North. Publicis obligated itself to take action "in support of the transaction (other than a commitment to vote for such transaction)." The word "support" is not a vague term. Without listing every action that it might require a party to affirmatively undertake, it is a term ordinarily understood in the English language as incompatible with the launching of a hostile tender offer conditioned on abandonment or destruction of the very transaction the party is obligated in subpart (a) to assist by providing a pooling of interests letter. This was the straightforward reading advocated by True North's principal negotiating counsel, Lloyd Cutler, and I find it most persuasive.

Most tellingly, subpart (b)'s phrase "other than a commitment to vote for such transaction" has no coherent meaning if subpart (b) is read as a further assurances clause. By using words that commit Publicis to support a transaction, except that it is not committed to vote in favor of the transaction, the terms of subpart (b) address, in my opinion, a completely different subject than the concept that is addressed in subpart (a). Subpart (a)

is unmistakably designed to require Publicis to furnish True North with a pooling letter in a conventional form upon request. If subpart (b) were intended to provide "further assurance" that Publicis would provide information necessary to ensure a pooling of interests accounting treatment, it would have been very simple to have provided that Publicis "shall if reasonably requested provide such other information as is necessary to ensure that the transaction qualifies for pooling of interests accounting treatment." But that is not how subpart (b) is worded. To have the Court read subpart (b) as if it did read in this fashion would twist the ordinary meaning of common English words beyond recognition.

It also is noteworthy that the two conceptually distinct obligations set forth in subpart (a) and subpart (b) appeared in the February 19, 1997 Memorandum of Agreement almost *in haec verba*, with one important difference. In paragraph 24 of the Memorandum of Agreement, the two conceptually distinct obligations—furnishing True North with a pooling letter if requested *and* taking such other action if reasonably requested in support of a transaction in which True North might participate—were not set apart by subheadings (a) and (b). Draftsmen use subheadings deliberately, to signify by their use that concepts are separate and distinct. Cutler testified that was indeed the very reason the draftsmen of § 1.1 modified the language of paragraph 24 in the Memorandum of Agreement, to signify that the obligations in subparts (a) and (b) were separate and distinct contractual obligations.

Moreover, the clear terms of subpart (b) cannot be read as a mere "further assurances" provision because of the explicit carve out language inserted into subpart (b) at the insistence of Publicis' counsel. By requesting that explicit carve out, reserving the right to vote against the transaction, Publicis acknowledged that True North's unqualified right to reasonably request such other action in support of the transaction as would be customary with respect to an acquisition *included* the right to request that Publicis commit to vote for such a transaction. Even Publicis' counsel has acknowledged that the

carve out language, reserving Publicis' right to vote against the transaction, does not fit comfortably in the context of a "further assurances" clause. As a result, Publicis was forced to minimize the carve out language as "a mere shorthand" reference, recommended to make clear that by giving further assurances of Publicis' intention to provide pooling of interests accounting information, it did not thereby intend to waive any of its other rights as a True North stockholder.

Ultimately, I cannot accept Publicis' proffered explanation that the carve out language represents a shorthand form of protection for Publicis; nor can I accept the "further assurances" spin that Publicis attempts to place on the language of subpart (b) of § 1.1. First, if in fact the agreement only covers technical accounting issues, I am hard pressed to find a plausible explanation for why the contract commits Publicis to "support" transactions, rather than simply take steps necessary to ensure pooling of interests accounting. The latter phrase would have easily captured the meaning that Publicis now attempts to place on subpart (b).

Second, no explanation exists under Publicis' interpretation of § 1.1 as to why Publicis' voting rights were carved out. If Publicis were only expected under subpart (b) of § 1.1 to provide "ancillary" accounting information under the Pooling Agreement, why carve out the right to vote against the transaction? Publicis' explanation that the carve out is shorthand for a reservation of rights is equally implausible here. Publicis could easily have expressly reserved within the parenthetical the right to undertake a hostile takeover, solicit proxies or take other similar actions. This inexplicable mystery in the contract language is precisely why the district judge in the federal action found it "simply impossible" to accept Publicis' interpretation that subpart (b) is a "further assurances" provision. I too find it impossible to reconcile the carve out language with the current meaning that Publicis wants me to attach to subpart (b). The language simply will not bear the weight of this interpretation, an interpretation, so jarring to the common meaning and understanding of words that even Publicis' counsel admits they do

not "fit" comfortably within the interpretation Publicis advances.

Accordingly, I think a reasonable person should have had no expectation inconsistent with the plain and ordinary meaning of the 40 words in question. Those words, simply read, require Publicis to support (that is, not to take action designed to obstruct) a True North acquisition in the customary manner, except that Publicis has reserved the right ultimately to vote against a proposed acquisition. Viewed objectively by a reasonable person, I am of the opinion that the language of § 1.1(b) admits of only one reasonable meaning. Nevertheless, I recognize that the parties to this controversy have advanced completely inconsistent interpretations of the contract language in question.

Under Delaware law, when a provision of a contract is fairly susceptible to more than one interpretation, one may conclude that the provision is ambiguous. In that event, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions. *See Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (1997). Although I believe that the words in controversy cannot be read reasonably in the manner suggested by Publicis, I admitted all of the extrinsic evidence offered by the parties in order to ascertain the parties' intentions.

In the context of a preliminary injunction hearing, the parties ordinarily would present a paper record with respect to extrinsic evidence to be considered by the Court. In this case, however, the Court allowed the parties to provide not only affidavits and documents regarding the negotiating history of the disputed language, but also to present live testimony by witnesses directly involved in the contract negotiations. By and large, however, the extrinsic evidence offered by the parties is not in conflict and can be relied upon to arrive at a proper interpretation of the contractual terms in issue.

It is clear that a divorce or dissolution of the joint venture was in each party's economic self-interest. To that end, the parties agreed that each would go its own way and each would build a separate, independent global network. As Levy testified, the sepa-

ration agreement was intended to permit each party to "create and develop its own global venture." This intention and shared contractual objective is recited in the separation agreements themselves, which provide that "Publicis and True North agree to create two separate agency networks, one owned and controlled by Publicis and the other owned and controlled by True North." *See, e.g.,* Plaintiff's Trial Exhibit, Tab 20, Ex. 3, February 19, 1997 Memorandum of Agreement, ¶ 2(a). The testimony at the hearing also demonstrated that each party recognized that the parties would have to make acquisitions in order to develop these separate, global networks. Moreover, it became clear at the hearing that, at least within the advertising industry, "pooling of interests acquisitions" and "acquisitions" are synonymous. That is, because goodwill constitutes such a large part of the value of an advertising company, large acquisitions or transactions are virtually always undertaken by using the pooling of interests method of accounting.

In the discussions between True North and Publicis regarding the terms of their separation agreement and the process by which they would cooperate in going forward to create separate, independent networks, the focus of attention was on the ability of either party to interfere with that objective. As a result, on January 27, 1997, True North's Board of Directors adopted a resolution that agreed to the Memorandum of Agreement for the dissolution of the joint venture that was then under discussion, but with the qualification that the following protection be obtained:

> "Upon notification by True North Communications, Inc. of intent to participate in any acquisition, Publicis will not take any action to restrict True North Communications' ability to acquire agencies or companies using the pooling of interest accounting. (Reciprocal rights will be approved if required.)"

This Board resolution was transmitted to Levy, who was thus made aware of True North's concern. In addition, Levy later received and approved the minutes of that meeting. With True North's concern fully expressed, Publicis' counsel, Martin Lipton,

proposed a side letter to address it. For this side letter, Lipton suggested language that "Publicis and True North will cooperate in good faith in proposed acquisitions by the other to build their respective global networks." *See* Plaintiff's Trial Exhibit, Tab 10, Ex. 15, p. 2, ¶ 4 (letter dated January 31, 1997 from Lipton to Cutler .)

On February 6, 1997, after Publicis had offered to resolve the dispute over this issue by committing to "not unreasonably withhold a pooling letter if the transaction is not deemed by Publicis to be materially adverse to its investment," True North's Board met again and resolved to "obtain a clear commitment from Publicis to support future [True North] pooling transactions." *See* Plaintiff's Trial Exhibit, Tab 15, Ex. 11, p. 2. Levy also received and approved the minutes of this True North Board meeting.

Once again, although the concerns were communicated to Levy, usually via faxed copies of board minutes or via letters or phone calls from Stephen Vehslage (True North's lead negotiator on its Special Committee), the principal task of finding a solution to True North's concern was referred to Lipton and Cutler, the attorneys for Publicis and True North, respectively. On February 7, 1997, Lipton sent Cutler a revised side letter incorporating True North's request for a commitment from Publicis to provide a pooling letter and to "support" acquisitions. *See* Plaintiff's Trial Exhibit, Tab 31, Ex. 31. In this letter, Lipton proposed that if Publicis did not wish to support a particular pooling transaction proposed by True North, it alternatively could reserve the right to sell its True North shares back to True North. By February 19, however, Publicis had decided not to reserve the right to sell its stock in True North and agreed to provide a pooling letter as well as to support pooling acquisitions with one restriction. It requested an explicit carve out with respect to Publicis' obligation to support a True North acquisition, adding the words "other than a commitment to vote for the transaction."

Levy testified most emphatically that he never understood the agreement to require Publicis' commitment to support a True North acquisition. He believed, based on

statements by Vehslage, that True North was only concerned about pooling of interests accounting treatment. Importantly, however, Levy testified that he relied on his attorneys, Lipton in particular, to develop language that would resolve the controversy with True North.

On True North's side, Cutler testified unequivocally that the issue, from the perspective of True North, was far more than merely requiring Publicis to provide a pooling letter. Cutler testified that True North expressly bargained for a commitment from Publicis to support future acquisitions. Publicis responded, via Lipton, by suggesting the insertion of language that each party would "cooperate in good faith" in proposed acquisitions by the other. Nothing in the record indicates that the parties ever abandoned this mutual understanding. True North certainly did not waver in its determination to require a "firm commitment" from Publicis to support future pooling transactions.

Cutler testified that the negotiations on this point were "involved," and that True North agreed to the series of protections that Publicis demanded in return for Publicis' general obligation to support True North's acquisitions. As the agreement reflects, Publicis insisted that it have the right to withdraw its pooling letter (and thus destroy True North's proposed acquisition) if any of the following conditions were not satisfied: (1) True North failed to obtain a fairness opinion from a nationally—recognized investment bank with regard to the contemplated transaction; (2) True North failed to obtain a majority vote of the outside directors of True North approving the terms and conditions of the contemplated transaction; (3) True North failed to secure a majority vote of the outstanding shares of True North; or (4) True North failed to receive pooling letters (or similar forms of consent) from all other non-*de minimis* affiliates of True North.

Cutler also testified that Publicis insisted that the vote of True North's shareholders on any transaction be required to be a majority vote of all of the *outstanding* shares of True North stock. True North's negotiators preferred to require a majority of the shares being voted, provided there was a quorum,

but Lipton insisted on behalf of Publicis that the vote be of all *outstanding* shares. The effect of this provision is to require a supermajority vote, since Publicis holds almost 20% of True North's stock and approximately 10% of stockholders typically fail to vote in elections. Accordingly, True North is required to obtain approval of 51% of the remaining 70% of its outstanding stock.

All of the negotiating history surrounding the Pooling Agreement and the Memorandum of Agreement of which it is a part, confirm what, in my opinion, is clear from the face of the documents. True North bargained for and received a contractual commitment from Publicis to support True North acquisitions, with the limited exception that Publicis is entitled to vote its True North shares as it deems fit. Publicis' effort to limit the phrase, "support True North transactions," to mean "provide ancillary information necessary to effectuate a pooling of interests accounting treatment" is belied, in my view, by two factors: first, the clear language of § 1.1(b) and second, the fact that the Pooling Agreement is not limited to pooling of interests accounting issues. The Pooling Agreement includes, for example, provisions that relate to the right to vote shares, the right to require the directors of True North to obtain a fairness opinion, and the right to hold a shareholder vote on any proposed transaction. In addition, testimony regarding the negotiating history and a review of documents that flowed back and forth between the parties, clearly demonstrate that each party understood True North's concern about obtaining a "clear commitment" from Publicis to support future True North pooling of interests transactions. This concern no doubt grew out of the difficult relationship between these parties over the years, including the mistrust and acrimony that characterized the joint venture. True North's Board was unwilling to accept the general language of Publicis' promise "to cooperate in good faith" or Publicis' generalized commitment to provide a pooling letter if requested. Publicis understood True North's concern and responded to it.

Ultimately, I am persuaded that these negotiations between the parties produced

§ 1.1, which protects True North from the risk that Publicis either might try to withhold a pooling letter in order to thwart a pooling of interests transaction or might attempt to thwart a transaction by other means, such as a proxy solicitation or a hostile tender offer. I find that subparts (a) and (b) of § 1.1 were negotiated to protect True North's interests against these risks. In return, subsections (i), (ii), and (iii) of § 1.1 and § 1.1.1 were negotiated to protect Publicis from having to support a transaction by True North that might not be in Publicis' interest. Like Judge Gottschall of the Northern District of Illinois, I find True North's interpretation of this agreement more persuasive and overwhelmingly supported by the testimony and extrinsic evidence presented by the parties. Accordingly, I am satisfied that True North has demonstrated a reasonable probability of success on the merits of its claim that Publicis has breached its contractual agreement to support True North's transaction with Bozell by launching a hostile tender offer and soliciting proxies conditioned on defeat of the Bozell transaction. I turn now to the issues of irreparable harm and balance of the equities.

## IV. IRREPARABLE HARM

The second prong of the preliminary injunction test requires the party seeking the injunction to demonstrate that it will suffer irreparable harm if the injunction is not granted. *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1278 (1988). I find that True North has satisfied this burden in two ways. First, the contract executed by True North and Publicis—the Pooling Agreement—expressly provides that Publicis' breach of § 1.1 will constitute irreparable harm to True North, entitling True North to injunctive relief. Second, Publicis' actions threaten to destroy the proposed Bozell merger, a loss that cannot be quantified. This is the essence of irreparable harm.

[5] The irreparable harm element of the injunction standard is established by Publicis' own contractual stipulation in § 2.4.2 of the Pooling Agreement. There, Publicis acknowledged that "a breach [of § 1.1] would cause a loss to True North which could not be reasonably or adequately compensated in damages in an action at law, that remedies other than injunctive relief could not fully compensate True North for a breach of said covenants and that, accordingly, True North shall be entitled to injunctive relief to prevent any breach or continuing breaches of this Agreement arising out of a request under section 1.1." This Court has previously upheld similar contractual stipulations in otherwise enforceable contracts. *See, e.g., Vitalink Pharmacy Services, Inc. v. Grancare, Inc.,* Del.Ch., C.A. No. 15744, Jacobs, V.C., 1997 WL 458494 (Aug. 7, 1997), slip op. at 23–24. In *Vitalink,* this Court held that one such contractual stipulation "alone suffice[d] to establish the element of irreparable harm" and refused to entertain defendant's arguments opposing plaintiff's right to seek injunctive relief based on that provision. *Id.*

Publicis insists that it never intended to contractually stipulate that its failure to "support the transaction" would constitute irreparable harm to True North, because it did not think that was what § 1.1 required. I reject this argument, as it depends on agreeing with Publicis' contention that § 1.1(b) is really a "further assurances" clause rather than a commitment to support—including, *inter alia,* not opposing—acquisitions by True North (other than promising to vote in favor of such transactions). I have already found that argument untenable. Defendants cannot now say there is no irreparable harm to True North upon Publicis' breach of § 1.1, given that it expressly says so in the contract. *Id.* at 24 n. 46 (quoting *SLC Beverages, Inc. v. Burnup & Sims, Inc.,* Del.Ch., C.A. No. 8860, Hartnett, V.C., 1987 WL 16035 (Aug. 20, 1987), slip op. at 6). Having carefully negotiated this contract, both Publicis and True North are bound by its terms. And in this case, those terms stipulate that a breach of § 1.1 by Publicis entitles True North to seek injunctive relief.

[6] Even without the contract language conceding the irreparable nature of the injury to True North caused by Publicis' failure to support the proposed Bozell merger, it is nonetheless clear that True North will suffer irreparable harm if Publicis is not enjoined from pursuing its activities in opposition to

**E.I. DU PONT DE NEMOURS v. ADMIRAL INS.**    Del. **45**
Cite as, Del.Super., 711 A.2d 45 (1995)

the merger. Publicis' opposition efforts threaten to destroy the Bozell merger, which is a unique acquisition opportunity for True North. The damage to True North caused by the loss of such an opportunity cannot be quantified. Thus, damages in an action at law would not be a sufficient remedy, and injunctive relief is appropriate.

## V. BALANCE OF EQUITIES

[7] The third prong of the test for preliminary injunctive relief is the balance of equities. Under this prong, the plaintiff must demonstrate that the harm to the plaintiff if relief is denied outweighs the harm to the defendant if the injunction is granted. *Mills Acquisition Co.,* 559 A.2d at 1278–79. I am convinced that if I deny True North the preliminary injunction that it requests, True North would suffer a harm much greater than any harm Publicis could possibly suffer if I were to grant the injunction.

First, I find that because Publicis has no right to breach its contract with True North, Publicis cannot invoke general equity principles to save it from an injunction. Under the terms of the Pooling Agreement, Publicis contracted away its right to launch a hostile takeover of True North and also to solicit proxies in opposition to the Bozell merger. Accordingly, Publicis cannot now assert that it will be harmed due to the Court's enforcement of the rights and obligations for which it specifically bargained, and which were reduced to writing in the terms of the Pooling Agreement.

Second, Publicis invokes "equities" of the "shareholder right to receive information" and its own right to offer to buy True North shares. This is not an equity consideration in these circumstances, because I have already found that Publicis does not have the right to make a hostile tender offer under § 1.1(b) of the Pooling Agreement. On the contrary, under the Pooling Agreement, Publicis is contractually bound to support True North's acquisitions, not undermine them by launching a hostile tender offer *conditioned*

on the destruction of the very merger proposal it has covenanted to support. Additionally, I cannot ignore the fact that the market is now well advised of Publicis' opposition to this merger. Publicis made its November 10 letter to True North public, and one million True North shares immediately changed hands. Therefore, I find that no real threat to shareholder democracy exists; nor is a legal right of Publicis threatened, by granting the injunction requested by True North.

In contrast, the failure to issue an injunction clearly will lead to irreparable harm to True North. True North's bargained for contractual right to make acquisitions with the support of Publicis (and at the very least, without hostile overtures by Publicis), will certainly be lost, and its opportunity to merge with Bozell may be lost. Therefore, I find that the balance of equities tips heavily in favor of True North and against Publicis.

As True North has met its burden, I grant its motion for a preliminary injunction.[1]

IT IS SO ORDERED.



## E.I. DU PONT DE NEMOURS AND COMPANY, Plaintiff,

v.

## ADMIRAL INSURANCE COMPANY, et al., Defendants.

### No. 89C–AU–99.

Superior Court of Delaware,
New Castle County.

Submitted: Aug. 11, 1995.
Decided: Aug. 23, 1995.

Insured sought declaratory judgment that excess liability insurance policies cov-

---

1. After Publicis' unsuccessful appeal to the Delaware Supreme Court, True North's shareholders on December 30, 1997, voted to approve the proposed merger with Bozell, by which 0.51 shares of True North will be swapped for each Bozell share. *See The Wall Street Journal* A3 (Dec. 31, 1997).

Westlaw.

705 A.2d 244                                                          Page 1
705 A.2d 244, 1997 WL 812636 (Del.Supr.)
**(Cite as: 705 A.2d 244, 705 A.2d 244 (Table))**

**H**
Publicis S.A. v. True North Communications, Inc.
Del.Supr.,1997.
(The decision of the Court is referenced in the At-
lantic Reporter in a 'Table of Decisions Without
Published Opinions.')
            Supreme Court of Delaware.
PUBLICIS S.A., a French corporation, and Publicis
  Communication, a French corporation, Defendants
            Below, Appellants,
                    v.
  TRUE NORTH COMMUNICATIONS, INC., a
  Delaware corporation, Plaintiff Below, Appellee.
                **No. 545, 1997.**

               Dec. 29, 1997.

Courts Below: Court of Chancery of the State of
Delaware in and for New Castle County C.A. No.
16039

Before VEASEY, Chief Justice, WALSH and
HARTNETT, Justices.

                  *ORDER*

*1 This 29th day of December 1997, upon consid-
eration of the record, the briefs of the parties and
the telephonic oral argument held this date, it ap-
pears to the Court as follows:

(1) This appeal of the interlocutory order of the
Court of Chancery dated December 23, 1997 is
hereby accepted as meeting one or more of the cri-
teria of Supreme Court Rule 42.

(2) Both parties have filed motions to supplement
the record, which motions should be denied and the
material contained in the proffers should be disreg-
arded.

(3) To the extent the issues raised on appeal are fac-
tual, the record evidence supports the Chancellor's
factual findings.

(4) To the extent the errors alleged on appeal are at-
tributed to an abuse of discretion, the record does
not support those assertions.

(5) To the extent that the issues raised on appeal are
legal, they are controlled by settled Delaware law,
which was properly applied.

(6) The judgment of the Court of Chancery should
be affirmed on the basis of and for the reasons as-
signed by the Chancellor in his excellent and well-
reasoned opinion of December 23, 1997.

NOW, THEREFORE, IT IS ORDERED that the
motions to supplement the record are denied and
the order of the Court of Chancery be, and the same
hereby is,

AFFIRMED. The mandate shall issue immediately.

Del.Supr.,1997.
Publicis S.A. v. True North Communications, Inc.
705 A.2d 244, 1997 WL 812636 (Del.Supr.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.