1  IVOR SAMSON (SBN 052767)
   isamson@sonnenschein.com
2  MARY KAY LACEY (SBN 142812)
   mlacey@sonnenschein.com
3  HILLARY NOLL KALAY (SBN 233173)
   hkalay@sonnenschein.com
4  SONNENSCHEIN NATH & ROSENTHAL LLP
   525 Market Street, 26th Floor
5  San Francisco, CA 94105-2708
   Telephone: (415) 882-5000
6  Facsimile: (415) 882-0300

7  Attorneys for Defendant
   ANDREW CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EDDY DOMINGUEZ, NEWTON BUI, TAN NGUYEN, and LICINO VALINO,<br><br>Plaintiffs.<br><br>v.<br><br>ANDREW CORPORATION,<br><br>Defendant. | Case No. C 07-04679 CW<br><br>**ANDREW CORP.'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT IN FAVOR OF ARBITRATION**<br><br>Date: November 29, 2007<br>Time: 2:00 p.m.<br>Courtroom: 2, Fourth Floor<br>Honorable Claudia Wilken |

**ANDREW CORP.'S REPLY ISO MOTION TO DISMISS IN FAVOR OF ARBITRATION**

## I.   INTRODUCTION

Plaintiffs assert that Andrew has "missed the point of Plaintiffs claims in this action." (Opposition at p. 2.) On the contrary, the point seems pretty clear: to avoid arbitration by disingenuously fashioning a complaint to look like it meets the so-called "carve-out" provisions of the parties' Stock Purchase Agreement ("Agreement" or "SPA"). The problem Plaintiffs face, and the crux of the apparent disconnect between Plaintiffs and Andrew, is two-fold:

(1) Plaintiffs can only avoid mandatory arbitration under the SPA by seeking injunctive relief to enforce specific "terms and provisions" of the SPA. (*See* Section 10(n) of the SPA). However, Plaintiffs do not, and cannot, dispute that there are ***no*** terms or provisions of the SPA they seek to specifically enforce.

(2) Plaintiffs instead argue they can avoid arbitration by enforcing certain "head count" and "capital resources" obligations purportedly set forth in a document they now claim is wholly "separate and distinct from the SPA" (i.e., the Operating Agreement).

This raises the obvious question, nowhere answered by Plaintiffs: If injunctive relief is limited under Section 10(n) to enforcing specific terms of the SPA, but the only terms that Plaintiffs seek to enforce are under an agreement separate from the SPA (i.e., the Operating Agreement), what is the theory upon which their claim for injunctive relief rests? There is none.[1]

Instead, Plaintiffs' Complaint sets forth various contract and tort related causes of action, each of which is "related to" and "arises out of" the SPA, and each of which is amenable (if proved) to monetary damages (not injunctive relief). As a result, for each of the reasons analyzed in Andrew's Opening Brief, as well as those discussed below, Andrew respectfully requests that this Court honor the SPA's broadly worded mandatory arbitration provision and dismiss this action in its entirety in favor of arbitration under Section 10(o) of the SPA.

---

[1] This conclusion is further highlighted by the fact, as argued extensively in Andrew's Opposition to Plaintiffs' Motion to Compel Arbitration and further discussed *infra* at p.--, there is no signed Operating Agreement which obligates Andrew to provide certain "head count" and "operating resources" to Plaintiffs.

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-5000

## II. ARGUMENT

### A. Plaintiffs' Attempt To Amend Their Complaint To Avoid The Assertion Of Damage Claims "Arising Out Of" And "Related To" The SPA Does Not Change The Fundamental Nature Of This Dispute

#### 1. Plaintiffs' Breach Of Contract Claim "Arises Out Of" The SPA And Is Subject To Mandatory Arbitration.

Plaintiffs' operative Complaint alleges that the SPA has been breached in numerous ways and seeks monetary damages for those breaches. (Original Complaint, ¶¶ 31, 32.) Apparently recognizing that a monetary claim for breach of contract damages is inconsistent with a claim for injunctive relief, Plaintiffs seek to amend their Complaint. (Plaintiffs' Motion to Amend is currently pending and will be heard concurrently with the instant Motion to Dismiss in Favor of Arbitration). Specifically, while Plaintiffs assert that the earn-out provisions of Section 2(g) of the SPA have been breached, they no longer allege they will suffer monetary damages as a result of not being "paid" their earn-out under their breach of contract claim. Plaintiffs' Proposed Amended Complaint now asserts Andrew has breached the SPA by "failing to provide [Plaintiffs] with the necessary headcount and other resources to accomplish the goals necessary for plaintiffs to *have an opportunity to be eligible for the earn-out*"; and limits the relief sought to a request that the Court issue a ruling to require Andrew to comply with the terms and provisions of Section 2(g) of the SPA. (Proposed Complaint, ¶32.)) (emphasis added).

However, as set forth in Andrew's Opening Brief, Section 2(g) does not require Andrew to provide any "head count" or "capital" resources to Plaintiffs. Rather, in language that could not possibly be more clear, Section 2(g)(iv) gives Andrew *sole discretion* to determine the business resources that will be provided to Plaintiffs:

> The Parties acknowledge and agree that [Andrew] shall have full control and discretion with respect to the decisions related to [Andrew], including, without limitation, its operations, budgeting, marketing, and business scope (collectively the "Buyer Decisions") and no Buyer Decision nor its effect on the Target Business [i.e., Cell Site] shall result in any amendment or expectation of amendment by the parties with respect to any of the terms under this Section 2(g)(iv), and such acknowledgment and agreement represents a material inducement to the Buyer [Andrew] entering into this Agreement.

Notably, Plaintiffs' Opposition does not even attempt to dispute the fact that the SPA

gives Andrew "full control" over resources such as "head count" and "operating capital," nor does it refute the provision clarifying the parties' understanding that there will be no "amendment or expectation of amendment" with respect to Andrew's right to exercise sole discretion over the resources provided to Plaintiffs. These omissions are critical because, as both parties recognize, the only way to avoid mandatory arbitration for claims "arising out of" or "related to" the SPA is under the "carve out" provisions of Section 10(n); and that section narrowly applies only to claims for injunctive relief to enforce specific provisions of the SPA. (Opening Brief, p. 4, Opposition, p. 2.).

Thus, because there are no provisions of the SPA that Plaintiffs seek to specifically enforce, any claims "arising out of" a breach of Section 2(g) of the SPA cannot be included within the "carve out" provision of Section 10(n), and Plaintiffs' breach of contract claim must be dismissed in favor of arbitration.[2]

### 2. Any Alleged Specific Provisions Within The Operating Agreement Cannot Be Enforced Under The Carve Out Provisions Of The SPA

Plaintiffs' Opposition is equally silent as to how the Operating Agreement, which is the document that allegedly sets forth the "head count" and "operating resources" Andrew is obligated to make, applies to the injunctive relief claims set forth in Plaintiffs' Complaint. Under the allegations of the Complaint, it appeared that because the Operating Agreement was purportedly discussed and negotiated as part of the SPA, Plaintiffs were alleging it was

---

[2] Dismissal in favor of arbitration is also appropriate for Plaintiffs' additional "breach of contract" related claims for "Unjust Enrichment" and "Declaratory Relief." Although Plaintiffs assert that these claims are subject to the SPA's "carve out" provisions for injunctive relief (*see* Opposition at 2:13-17), Plaintiffs do not dispute the showing made in Andrew's Opening Brief that (1) a request for imposition of a constructive trust under an unjust enrichment claim does not constitute an "injunction" (*see* Opening Brief, pp. 13-14); and (2) a request for declaratory relief is not a proper remedy where, as here, the moving party is asserting monetary damages. (*See* Opening Brief, pp. 14-15). Further, even the Proposed Complaint contains paragraphs seeking monetary damages for the "the loss, or potential loss, of the of earn-out payments pursuant to the SPA." (*See, e.g.,* Proposed Complaint, ¶¶ 41, 48.) Thus, while Plaintiffs may not be seeking monetary damages for these two causes of action, the mere assertion of a prayer for "equitable" relief does not transform these causes of action into claims for injunctive relief within the "carve out" provision of the SPA.

somehow "related" to the SPA. Assuming that Plaintiffs believed the Operating Agreement was "related to" the "SPA," Andrew argued that a claim for injunctive relief under Section 10(n) was still not valid because the "carve out" provision of the SPA only applies to claims seeking to enforce specific terms of the SPA.

Now, however, Plaintiffs assert that the Operating Agreement is "separate and distinct from the SPA." (Opposition at p. 2.) But, that does not explain how Plaintiffs can "specifically enforce" any "head count" or "operating resource" obligations against Andrew since those terms are only allegedly found in the Operating Agreement. Put differently, if the Operating Agreement is separate from the SPA, and the injunctive relief provision of Section 10(n) is strictly limited to claims seeking to specifically enforce "terms and provisions" of the SPA (not terms and provisions of a document wholly "separate and distinct" from the SPA), under what theory do Plaintiffs believe they have a right to obtain an injunction requiring Andrew to provide certain "head count" and "operating resources" to Plaintiffs?

Plaintiffs failure to grapple with this conundrum cannot be blamed on Andrew. Andrew has not "missed the point." The point is to avoid arbitration at all costs, but the effort is unavailing.

### 3. Plaintiffs' Allegation That The Operating Agreement Is "Separate and Distinct" From The SPA Does Not Establish That It Is Not "Related" To The SPA

Plaintiffs' "new found" argument that the "Operating Agreement" is "separate and distinct" from the SPA also ignores the specific allegations set forth in the Complaint. Specifically, Plaintiffs allege that the "Operating Agreement" was not only discussed during negotiation of the SPA, but was a critical component of Plaintiffs' determination to enter into the SPA. (Original Complaint, ¶¶ 15, 16, 18, 34, 38, 41, 44, 47, 50, 55). In addition, according to Plaintiffs, the purpose of the Operating Agreement was to amend the provisions of the SPA (which provisions give Andrew sole discretion over providing business resources to Plaintiffs) by purportedly detailing certain "head count" and "capital resources" obligations assumed by Andrew. (See Opening Brief, pp. 11-14 and cases cited therein). Given this background, it simply defies logic and common sense for Plaintiffs to now argue that the Operating Agreement

4
**ANDREW CORP.'S REPLY ISO MOTION TO DISMISS IN FAVOR OF ARBITRATION**

(a key component of the SPA negotiation which purportedly supersede the sole discretion afforded Andrew under the SPA to provide business resources related to the "earn-out" provisions set forth in the SPA) is somehow not "related" to the SPA. The argument also ignores the integration clause of the SPA, which requires that any subsequent agreement purporting to amend the SPA (which is what Plaintiffs necessarily argue the Operating Agreement did in depriving Andrew of full discretion to provide "head count" and "operating resources') must be in writing and signed by the parties. (*See* Section 10(i)). Yet, no such signed agreement has been provided to the Court, and Andrew maintains that is because no such signed agreement exists. (*See* Declaration of Douglass Hall, filed in Support of Andrew's Opposition to Plaintiffs' Motion for Preliminary Injunction).

In sum, and when viewed in context, it is difficult to understand how the Operating Agreement could possibly be the "separate and distinct" document Plaintiffs now claim it to be. But, even if there is some lingering doubt as to the veracity of Plaintiffs' position, any such doubt must be resolved in favor of arbitration. Indeed, under the directly controlling authority cited in Andrew's Opening Brief, courts have long recognized that the strong policy favoring arbitration (particularly where the arbitration provision is broadly worded such as in the agreement at issue here), requires that all claims "arising out of or relating to" a contract will be subject to arbitration and that doubts will be resolved in favor of arbitration.[3] *See Homestake Lead Co. of Missouri v. Doe Run Resources Corp.*, 282 F. Supp. 2d 1131, 1138 (N.D. Cal. 2003); *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F. 3d 1205, 1209 (9th Cir. 1998) (relying on *Moses H. Cone Mem. Hosp. v. Mercury Constr.*, 460 U.S. 1, 24-25 (1983)); *Boston Telcomm. Group, Inc. v. Deloitte Touche Tohmatsu*, 278 F. Supp. 2d 1041, 1049 (N.D. Cal. 2003).

---

[3] As discussed in Andrew's Opening Brief, the mandatory arbitration provision of the SPA is both broad and unambiguous: it mandates that arbitration "shall be the sole and exclusive method for resolving any claim ("Claim") or dispute arising out of or relating to the rights and obligations acknowledged and agreed to in this Agreement, whether such Claim arose or the fact on which such Claim is based occurred prior to or after the execution and delivery of this Agreement." (*See* Section 10(o) of the SPA)

### 4. Plaintiffs' Allegation That Their Fraud, Negligent Misrepresentation And Intentional Interference With Economic Relations Claims Are Related To The Operating Agreement And Therefore Not Related To The SPA Is Similarly Misplaced

Plaintiffs' related argument that their Fraud, Negligence and Intentional Interference with Economic Relations claims likewise do not "relate" to the SPA is equally unpersuasive. Again, and as any fair reading of the Complaint makes clear, this dispute is premised on allegations that (1) Andrew is impeding Plaintiffs' ability to earn approximately $10 million in possible "earn-out" payments contemplated under the SPA; and (2) Andrew engaged in improper conduct during negotiation of the SPA, which induced Plaintiffs to enter into the SPA, causing additional monetary damage to Plaintiffs.[4]

Notwithstanding these assertions (which are advanced in both the Original and Proposed Complaints), Plaintiffs now argue that that their fraud, misrepresentation and intentional interference with prospective economic relations claims do not "relate" to the SPA. (Opposition, p. 4.) According to Plaintiffs, the causes of action for fraud and intentional interference relate to Andrew's failure to provide "head count" and "operating resources" under the purported terms of the Operating Agreement (not the SPA), and since the Operating Agreement is "separate" from the SPA, these claims likewise "do not arise out of the SPA." (*Id.*). This argument too is belied by the actual allegations of the Complaint, which expressly tie Andrew's purported "fraud," "misrepresentations" and misconduct in "interfering with prospective economic relations" directly to the SPA. For example, Plaintiffs' fraud claim states that "in justifiable reliance on, and as a proximate result of, Andrew's conduct and representations, Plaintiffs sold their stock in CSI, and entered into the SPA on the terms therein"-- thereby causing "damages" to be proved at trial, including "the loss of earn-out payments pursuant to the SPA." (*See* Second Cause of Action, Original Complaint, ¶¶ 37, 38, 39; Proposed Complaint, ¶¶ 39, 40, 41.) These same allegations are repeated in Plaintiffs'

---

[4] See Andrew's Opposition to Plaintiffs' Motion for Preliminary Injunction for a more complete discussion of the monetary damage claims alleged by Andrew.

"misrepresentation" and "interference with prospective economic relations" causes of action. (See Third Cause of Action for Negligent Misrepresentation, Original Complaint, ¶¶ 41-45, Proposed Complaint, ¶¶ 42, 43-48); Fourth Cause of Action for Intentional Interference With Prospective Economic Relations, Original Complaint, ¶ 50, Proposed Complaint, ¶53.)

In short, while Plaintiffs have every incentive to try to distance the allegations of their Complaint from the SPA to avoid mandatory arbitration, the fact is: Plaintiffs have to tied their claims to the SPA, as well as the negotiations surrounding the SPA, and it is difficult to imagine how they could possibly support their claims without relying on the SPA.[5] As a result, because the fraud, misrepresentation and intentional interference claims are tied to the SPA, just as the Operating Agreement is tied to the SPA, all of the claims asserted in Plaintiffs' Complaint "arise out of" and are "related to" the SPA, and are properly dismissed in favor of arbitration[6]

### B. Plaintiffs' Emotional Distress Claims

Finally, Plaintiffs' Proposed Complaint seeks to assert two new causes of action for intentional and negligent infliction of emotional harm. Andrew will file a separate brief in Opposition to Plaintiffs' Motion For Leave To Amend Its Complaint addressing these claims,

---

[5] To put a point on it, if Plaintiffs' truly believe they have "separate and distinct" claims arising from the Operating Agreement (but not the SPA), they should assert a breach of contract claim related to the Operating Agreement, and come forward with that Agreement. As the Court is aware, it is Andrew's position that there is no legally viable, signed contract obligating Andrew to provide certain "head count" and "operating resources" to Plaintiffs -- and that it is the SPA alone that controls the business resources related to any earn-out payments to which Plaintiffs may be entitled.

[6] The case law relied upon by Plaintiffs in their Opposition does not change this result, For example, the Ninth Circuit case relied upon by Plaintiffs, *Mediterranean Enterprises, Inc., v. Ssangyoung Constr. Co., Ltd.*, 708 F. 2d 1458 (9th Cir. 1983), analyzed narrower language than that presented here, finding that an arbitration agreement that covered claims "arising hereunder" to be more narrow than arbitration provisions which include claims "arising out of or relating to." *Id.* at 1464. Moreover, the court noted that "arising out of or relating to" has been labeled a "broad arbitration clause," and that the phrase "arising under" is limited to differences or disputes "arising out of" the agreement, notably omitting reference to disputes "relating to" agreements. *Id.* The court held that such an omission was significant in the Ninth Circuit and that the phrase "arising hereunder" is intended to cover a much narrower scope of disputes than those "arising out of or relating to." Because the arbitration provision of the SPA provides mandatory arbitration of all claims "arising out of" and "related to" the Agreement, *Mediterranean Enterprises* only further confirms that under controlling Ninth Circuit authority, this Court should dismiss Plaintiffs claims in favor of arbitration.

1  and explaining the basis upon which Andrew believes Plaintiffs' Motion to Amend is properly
2  denied. Further, to the extent Plaintiffs seek to bring new claims against Andrew that are
3  purportedly unrelated to the SPA, Andrew will seek an order requiring that such claims be
4  brought in a separate Complaint, following dismissal of the Original Complaint in its entirety in
5  favor of arbitration. *See e.g., Poweragent Inc., v. Electronic Data Systems Corp.*, 358 F.3d
6  1187, 1189 (9th Cir. 2004) (Amended Complaint brought for the purpose of avoiding arbitration
7  is disfavored).

### III. CONCLUSION

For the reasons set forth above, Plaintiffs' motion to dismiss in favor of arbitration should be granted.

Dated: November 15, 2007                    SONNENSCHEIN NATH & ROSENTHAL LLP


By    /s/ MARY KAY LACEY


MARY KAY LACEY
Attorneys for Defendant Andrew Corp.

2728276