IVOR SAMSON (SBN 052767)
isamson@sonnenschein.com
MARY KAY LACEY (SBN 142812)
mlacey@sonnenschein.com
HILLARY NOLL KALAY (SBN 233173)
hkalay@sonnenschein.com
SONNENSCHEIN NATH & ROSENTHAL LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
Telephone: (415) 882-5000
Facsimile: (415) 882-0300

Attorneys for Defendant
ANDREW CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EDDY DOMINGUEZ, NEWTON BUI, TAN NGYUEN and LICINO VALINO,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW CORPORATION,<br><br>Defendant. | No. C 07-04679 CW<br><br>DECLARATION OF MARY KAY LACEY IN SUPPORT OF ANDREW CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT<br><br>Date:   November 29, 2007<br>Time:  2:00 p.m.<br>Courtroom: 2, Fourth Floor<br>Honorable Claudia Wilken |

I, Mary Kay Lacey, declare as follows:

1.    I am a partner in the law firm of Sonnenschein Nath & Rosenthal LLP and am licensed to practice law in all state and federal courts in the State of California.  I am one of the attorneys of record for defendant Andrew Corporation in the above-captioned action.  During my representation of Andrew, I have obtained personal knowledge of the facts set forth below and, if called as a witness, could and would competently testify thereto.  I submit this declaration in support of Andrew's Opposition to Plaintiffs' Motion for Leave to Amend Complaint.

2.    I previously attached as Exhibit "A" a true and correct copy of the Stock Purchase Agreement entered into between Andrew Corporation, CellSite Industries, Inc., Eddy

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA  94105-2708
(415) 882-5000

1    Dominguez, as the Seller's Agent, and Sellers Eddy Dominguez, Newton Bui, Tan Nguyen and

2    Licino Valino, on April 24, 2006, in Support of Andrew's Motion to Dismiss in Favor of

3    Arbitration.

4        3.    Upon receiving plaintiffs' Proposed Amended Complaint, I asked my firm's word

5    processing department to run a "red-line" comparison of the Original and Proposed Complaints

6    so that I could more easily identify the proposed changes.  Attached hereto as Exhibit "A" is a

7    true and correct copy of the red-line document detailing the proposed changes between plaintiffs'

8    Original Complaint and Proposed Complaint.

9        I declare under penalty of perjury under the laws of the United States of America that the

10   foregoing is true and correct.  This declaration has been executed this 16th day of November,

11   2007 in San Francisco, California.

12

13

14                            /s/  MARY KAY LACEY
                              MARY KAY LACEY
15

16

17

18

19   27283286

20

21

22

23

24

25

26

27

28

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-2708
(415) 882-5000

-2-
ANDREW CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND

# EXHIBIT A

Plaintiffs Eddy Dominguez, Newton Bui, Tan Nguyen and Licinio Valino (collectively "Plaintiffs"), as and for their **Amended** Complaint in this action by their attorneys ~~Duane Morris,~~**Keller and Heckman** LLP, respectfully allege as follows:

PARTIES

1.    Eddy Dominguez is an individual who resides in California.

2.    Newton Bui is an individual who resides in California.

3.    Tan Nguyen is an individual who resides in California.

4.    Licinio Valino is an individual who resides in California.

5.    Upon information and belief, ~~d~~**D**efendant Andrew Corporation (NasdaqGS: ANDW) is a Delaware corporation, with its principal place of business in Illinois.

JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the amount in controversy exceeds the sum of $75,000, and there is complete diversity of citizenship among the parties to the action.

7.    This Court has personal jurisdiction over the Defendant because the Defendant conducts business within the Northern District.

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) (1) because the Defendant conducts business within the Northern District.  Venue is ~~further~~**also** proper, pursuant to 28 U.S.C. § 1391(a), because the wrongful acts and a substantial part of the claims alleged herein, arose in the Northern District.

INTRADISTRICT ASSIGNMENT~~;~~

9.    Pursuant to Northern District Local Rules 3-5(b), 3-2(c), and 3-2(d), this action is properly assigned to the San Francisco Division of the Northern District Court on the basis that a substantial part of the events or omissions which give rise to the claims herein occurred within the County of San Francisco.

GENERAL ALLEGATIONS

10.    Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation and averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

11.    Plaintiffs are former shareholders of a company named CellSite Industries, Inc. (hereinafter "CSI").

12.    In 2005, Plaintiffs were in discussion with Defendant Andrew Corporation ("Andrew") for Andrew to purchase all of the outstanding capital stock of CSI that Plaintiffs held.  On December 13, 2005, the Andrew business development team, traveled to San Francisco to conduct face to face negotiations with CSI's Board of Directors and Principal Stockholders to agree to terms for a letter of intent to acquire all of CSI's common stock.

13.    The San Francisco negotiations focused on three issues:  (1) total valuation of the deal; (2) what percentage of the purchase price would be paid upfront; and (3) what percentage of the purchase price would be deferred, subject to an "earn-out," whereby, if CSI met certain revenue and operating income targets on or before certain dates, Andrew would pay a specified portion of the deferred purchase price to Plaintiffs.  The result was a total purchase price of $21.5 million:  $6.5 million to be paid ~~upfront~~**up front**, a maximum $5 million earn-out for year one, a maximum $5 million earn-out for year two, and a maximum $4 million earn-out for year three.  In addition, a $1 million retention bonus was added to the purchase price, which was not subject to the earn-out contingencies, and instead would be paid over 3 years pro-rata to the Plaintiffs who continued their employment with CSI.

14.    The negotiated terms were incorporated into an initial Letter of Intent ("LOI") dated January 23, 2006.  The LOI contained an exclusivity clause that ran for a 60-day period for the benefit of Andrew.  Plaintiffs also signed a Joint Non-Disclosure Agreement ("NDA") on January 28, 2006.  The LOI period of exclusivity and the NDA were twice extended at Andrew's

- 2 -

request, and based on Andrew's representation that significant resources were being expended to complete a due diligence review. At that time, Andrew knew that Plaintiffs had received other independent and unsolicited offers.

15.    Plaintiffs and Andrew continued to negotiate the specific terms of a Stock Purchase Agreement, and final negotiations centered on five issues:  (a) calculation of the earn-out; (b) defining the criteria by which the earn-out goals would be measured; (c) Plaintiffs' ability to maintain some control of certain business decisions affecting growth of the business (which in turn would affect CSI's ability to meet the criteria necessary for Plaintiffs to earn the earn-out); (d) the forgiveness of certain loans Plaintiffs had made to CSI; and (e) the amount and formula for calculation of the net working capital.

16.    The plan was for the negotiation points related to accomplishing the earn-out criteria (listed in (b) and (c) in the foregoing paragraph) to be incorporated into a so-called Operating Agreement.  Andrew insisted that any Operating Agreement not be developed until after closing.  Accordingly, counsel for Andrew prepared an initial draft of the Stock Purchase Agreement ("SPA") that included the earn-out provision, but did not contain any protection for Plaintiffs.  When CSI attempted to insert language into the SPA that would incorporate the Operating Agreement, Andrew rejected all such language, on the grounds it was against "corporate policy."

17.    During the negotiation of the SPA, Andrew made certain misrepresentations, inducing Plaintiffs to forgo repayment of certain loans that Plaintiffs had made to CSI, in the amount of $813,400, and inducing Plaintiffs to forgo an additional $400,000 of funds left in net working capital beyond the "Threshold Net Working Capital" amount specified in the SPA. (Plaintiffs believed this amount would be used to help complete the transition and implement the terms of the SPA and the Operating Agreement).

- 3 -

18.    During an April 17, 2006 meeting in Chicago, Plaintiffs asked Andrew representatives whether Andrew was "in play" (merger discussions) to be acquired and whether there would be a change in control of Andrew.  Andrew representatives said "no," knowing that a "yes" would be a deal-breaker for Plaintiffs.  Andrew representatives also knew that the earn-out was a critical element of the SPA and that Plaintiffs needed some assurances to proceed with the SPA.  Andrew representatives told Plaintiffs that Andrew would put significant resources behind development of the Operating Agreement and would fully support CSI with adequate headcount and capital resources.  Andrew, however, still refused to officially incorporate the Operating Agreement into the SPA, again relying on undefined "corporate policy."  On April 24, 2006, CSI and Andrew executed the SPA.

19.    Unbeknownst to CSI, (at the time CSI and Andrew were negotiating the SPA and at the time of the Chicago meeting), Andrew was involved in active negotiations with ADC Telecommunications, Inc. (NasdaqGS:  ADCT) for the sale of Andrew to ADC Telecommunications, Inc. (ADC Telecom).  These negotiations culminated in Andrew and ADC Telecom signing an agreement on May 31, 2006 for the acquisition of Andrew, ~~less than~~**slightly over** a month after the SPA was executed by CSI and Andrew.

20.    During the April 17, 2006 Chicago meeting, Andrew's negotiating team did not truthfully answer Plaintiffs' questions regarding Andrew's future.  At this time, Andrew representatives knew or should have known that the earn-out was a substantial and important part of the SPA and the overall purchase price, and that Andrew's imminent sale could have a serious and detrimental affect on CSI's ability to fulfill the contingencies necessary for the earn-out.

21.    *The acquisition of Andrew by ADC Telecom was terminated in August 2006* **(partially** *as a result of an unsolicited bid by CommScope Inc., on or about August 9, 2006), lifting the freeze that had been put in place when the acquisition agreement was signed.  At this*

- 4 -

*time, Andrew assured Plaintiffs that CSI had Andrew's full support and that the promised resources would now be delivered. However, they were not; and negotiations continued with CommScope, Inc.*

**22.    The plan was for the negotiation points related to meeting the earn-out criteria to be incorporated into a so-called "Operating Agreement" (also known as the Operational Plan of Record). Andrew insisted that any Operating Agreement not be developed until after the closing.**

**The earn-out payments were based on a contingency of achieving defined revenue and operating income targets for the newly formed business unit comprised of former Cell Site Industries employees. Andrew Corporation named this business unit ACMC. Richard DeFelice was named director of ACMC and was the immediate supervisor of Plaintiffs and Plaintiff Dominguez's direct report. The purpose of this Operating Agreement was to outline the agreed-upon investment Andrew would make in ACMC in the form of headcount and capital equipment to ensure ACMC's ability to continue to grow the business.**

**23.**    The Operating Agreement was subsequently drafted by Andrew and Plaintiffs, but was never implemented. Andrew proceeded to place a series of obstacles and restraints (formal and informal) on the sales and operational staff of ~~CSI~~**ACMC**. Instead of the discussed Operating Agreement, a passive aggressive scheme was devised to cripple the ability of **ACMC (fka** CSI) to achieve its financial targets. For example, the **ACMC (fka** CSI) sales and operations were isolated and cutoff from promised resources upon which original financial targets for the earn-out had been set. In addition, the accounting protocols developed by CSI accountants as part of the Operating Agreement (to facilitate measurement of revenue and

operating income) were never adhered to by Andrew's accountants, though jointly developed with them.

~~22.    In addition, Andrew has refused to make certain scheduled payments of the retention bonus and other deferred payments associated with the acquisition of the David Stout Software.  The first two quarterly payments of the retention bonus were untimely paid, and the last three quarters of retention bonus payments are grossly overdue as of this date.  The deferred software payments became due and owing to the former shareholders on January 9, 2007.~~

~~23.    *The acquisition of Andrew by ADC Telecom was terminated in August 2006 (as a result of an unsolicited bid by CommScope Inc., on or about August 9, 2006), lifting the freeze that had been put in place when the acquisition agreement was signed.  At this time, Andrew assured Plaintiffs that CSI had Andrew's full support and that the promised resources would now be delivered.  However, they were not; and negotiations continued with CommScope, Inc;*~~

**24.    In year one, ACMC achieved its revenue and operating income targets, irrespective of the lack of investment from Andrew.  During year one, ACMC repeatedly asked for investment of headcount and capital per the Operational Plan of Record, but was denied time and time again with various excuses.  Even without the investment, ACMC met the yearly targets, while cautioning all along of impending financial consequences.**

**Because of the lack of investment in year one, Andrew has inhibited the ability of ACMC to achieve year two and year three earn-outs.**

~~23.~~**25.**  On August 27, 2007, Andrew announced yet again that it had reached an agreement to be acquired, this time by CommScope, Inc. (NYSE:  CTV).  This acquisition has been characterized as an all-cash deal that is highly leveraged, indicating the possibility that certain assets will be packaged and sold to help pay for the acquisition.  Indications of this are

- 6 -

evident from Andrew's consolidation of its business units from five divisions to two, to facilitate

a sale or spin-off of unwanted assets.~

24.**26.** In light of its pending acquisition, Andrew management has directed **ACMC (fka**

CSI)̲ management, operations and sales to focus all its efforts on maximizing 4th Quarter Fiscal

Year 2007 revenues (ended September 2007) (at the expense of future revenues), in an attempt to

reverse the worst quarter (FY Q3 2007, ended June 2007) in Andrew's history and ensure that

the CommScope, Inc., acquisition goes through.

25.**27.** Plaintiffs negotiated in good faith during the sale of their stock. Andrew,

however, failed to disclose its active and ongoing negotiations with ADC Telecom or its intent to

sell Andrew to the highest bidder. Plaintiffs had signed a comprehensive joint nondisclosure

agreement (NDA) binding the parties to secrecy with respect to all aspects of negotiations; and

Plaintiffs asked Andrew directly about change of control and the future of the company. The

fact that Andrew had intentions to be acquired, and was actively pursuing this course of action,

was a crucial and material piece of information not revealed to the Plaintiffs. Plaintiffs relied to

their detriment on Andrew's assertion; which significantly and negatively impacted Plaintiffs

negotiation for the sale of their stock.~ If Andrew had truthfully responded to Plaintiffs regarding

its intentions Plaintiffs may not have gone forward with the SPA, or may have insisted on

safeguards regarding the earn-out,. Andrew did not negotiate in good faith, and intentionally

withheld material information not wanting to create a disadvantage to itself or to its potential

buyer.

26.**28.** Andrew and Plaintiffs drafted the Operating Agreement for the purpose of

outlining operational support (head count and capital investment) levels adequate to allow

Plaintiffs to meet or exceed the earn-out threshold criteria, necessary to collect a substantial

portion of the total sale price. However, Andrew intentionally failed to fulfill its obligations

- 7 -

pursuant to the Operating Agreement, making it extremely difficult, if not impossible, for CSI to

meet the criteria necessary for Plaintiffs to be paid the earn-out.  The Plaintiffs, in spite of

Andrew's failure to perform achieved the first year earn-out targets.  However, Andrew's

continuing failure to perform under the operating agreement and Andrew management's

directives to sacrifice all future operating income and revenue targets for short term 4th Quarter

objectives will make it all but impossible to meet second year earn-out objectives.

       27.29.  Section 10(o) of the SPA provides, in part:

> Arbitration.  Except as expressly provided in this Agreement or
> with respect to disputes or claims for which injunctive relief is
> sought . . . , each Party hereto agrees that the arbitration procedure
> set forth in Exhibit D hereto shall be the sole and exclusive method
> for resolving any claim or dispute ("Claim") arising out of or
> relating to the rights and obligations acknowledged and agreed to
> in this Agreement, whether such Claim arose or the facts on which
> such Claim is based occurred prior to or after the execution and
> delivery of this Agreement.

However, Section 10(n) of the SPA provides:

> Specific Performance.  Each of the Parties acknowledges and
> agrees that the other Parties would be damaged irreparably in the
> event of any of the provisions of this Agreement are not performed
> in accordance with their specific terms or otherwise are breached.
> Accordingly, except as provided in Section 10(o) below, each of
> the Parties agrees that the other Parties shall be entitled to an
> injunction or injunctions to prevent breaches of the provisions of
> this Agreement and to enforce specifically this Agreement and the
> terms and provisions hereof in any court of the United States or
> any state thereof having jurisdiction over the Parties and the
> matter, in addition to any other remedy to which they may be
> entitled, at law or in equity.

FIRST CAUSE OF ACTION
### (Breach ofOf Contract Against Defendant)

       28.30.  Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation

and averment set forth in this Complaint with the same force and effect as if the same were more

fully set forth at length herein.

- 8 -

~~29.~~ **31.** Plaintiffs and Andrew entered into the SPA, whereby Andrew ~~promised to make~~**had** certain ~~payments~~**obligations**, including ~~certain retention and bonuses, as well as the~~**,** **but not limited to, making** earn-out payments~~,~~ in exchange for ~~P~~**p**laintiffs selling their stock in CSI.

~~30.    Plaintiffs have met, or have made every effort to meet, all of its obligations under the SPA.~~

~~31.    Andrew has made various breaches of the SPA, including 2(e) of the SPA by failing to deposit the funds into an escrow account.~~**32.    Andrew has breached the SPA at Section** 2(g) of the SPA by failing to provide CSI with the necessary headcount and other resources to accomplish the goals necessary for ~~Plaintiffs to be paid the earn-out, 2(h) of the SPA by failing to make the retention payments for the last three quarters, and 2(i) of the SPA by failing to make the payments to David Stout, all as required by the terms of the SPA~~**plaintiffs to have an opportunity to be eligible for the earn out**.

~~32.    As a result of Andrew's breaches, Plaintiffs suffered and continue to suffer damages in an amount to be proven at trial.~~

**33.    Section 10(n) of the SPA provides the parties an opportunity to petition the Court for an injunction to prevent breaches of the provisions of the SPA, in addition to any other remedy to which the parties may be entitled, at law or in equity. Andrew's breach of Section 2(g) falls directly under this provision.**

**34.    As a result of Andrew's breach of Section 2(g), plaintiffs have been irreparably harmed and are entitled to a ruling of this Court to require Andrew to comply with the terms and provisions of Section 2(g).**

SECOND CAUSE OF ACTION
        **(Fraud/Intentional Misrepresentation Against Defendant)**

- 9 -

~~33.~~**35.** Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation and averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

~~34.~~**36.** Andrew made the following false representations. During negotiation of the SPA, Andrew falsely stated that Andrew had no **current** plans to be acquired and that there would not be a change in ownership of Andrew. Andrew falsely told Plaintiffs that it would follow the Operating Agreement and would devote headcount and capital resources to CSI. Andrew falsely stated that it was in Plaintiffs' interest to forgo the loans they had made to CSI. Andrew falsely stated that the $400,000 of funds in net working capital would be used to help complete the transition and implement the terms of the ~~SPA and the~~ Operating Agreement.

~~35.~~**37.** At the time that Andrew made these statements, Andrew knew them to be false due to the fact that Andrew knew it was in discussions with ADC ~~Telecom~~**Telecommunications** to be acquired and intended to ultimately be acquired, knew it did not intend to follow the Operating Agreement and devote headcount and capital resources to CSI, knew that it was not in Plaintiffs' interest to forgo the loans they had made to CSI, and knew that the $400,000 of funds in net working capital would not be used to help complete the transition and implement the terms of the SPA and the Operating Agreement.

~~36.~~**38.** Andrew made all representations with the intention to induce Plaintiffs to rely and act on these representations in the manner hereinafter alleged.

~~37.~~**39.** In justifiable reliance on, and as a proximate result of, Andrew's conduct and representations, Plaintiffs sold their stock in CSI, and entered into the SPA on the terms therein.

~~38.~~**40.** Plaintiffs justifiably relied on Andrew's representations because it was negotiating with Andrew in good faith.

- 10 -

~~39.~~**41.** As a result of Andrew's actions, omissions, and representations, Plaintiffs suffered and continue to suffer damages in an amount to be proven at trial, including but not limited to the loss, or potential loss, of the earn-out payments pursuant to the SPA, loss of their $813,400 loans to CSI, loss of $400,000 in net working capital.

THIRD CAUSE OF ACTION
**(Negligent Misrepresentation Against Defendant)**

~~40.~~**42.** Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation and averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

~~41.~~**43.** Andrew made the following false representations. During negotiation of the SPA, Andrew falsely stated that Andrew had no **current** plans to be acquired and that there would not be a change in ownership of Andrew. Andrew falsely told Plaintiffs that it would follow the Operating Agreement and would devote headcount and capital resources to CSI. Andrew falsely stated that it was in Plaintiffs' interest to forgo the loans they had made to CSI. Andrew falsely stated that the $400,000 of funds in net working capital would be used to help complete the transition and implement the terms of the SPA and the Operating Agreement.

~~42.~~**44.** At the time that Andrew made these statements, it had no reasonable grounds for believing them to be true in that it should have known that Andrew was in discussions with ADC ~~Telecom~~**Telecommunications** to be acquired and intended to ultimately be acquired, that it did not intend to follow the Operating Agreement and devote headcount and capital resources to CSI, that it was not in Plaintiffs' interest to forgo the loans they had made to CSI, and that the $400,000 of funds in net working capital would not be used to help complete the transition and implement the terms of the SPA and the Operating Agreement.

~~43.~~**45.** Andrew made all representations with the intention to induce Plaintiffs to rely and act on these representations in the manner hereinafter alleged.

- 11 -

43.**46.** In justifiable reliance on, and as a proximate result of, Andrew's conduct and representations, Plaintiffs sold their stock in CSI, and entered into the SPA on the terms therein.

44.**47.** Plaintiffs justifiably relied on Andrew's representations because it was negotiating with Andrew in good faith.

45.**48.** As a result of Andrew's actions, omissions, and representations, Plaintiffs suffered and continue to suffer damages in an amount to be proven at trial, including but not limited to the loss, or potential loss, of the earn-out payments pursuant to the SPA, loss of their $813,400 loans to CSI, loss of $400,000 in net working capital.

FOURTH CAUSE OF ACTION
**(Intentional Interference with Prospective Economic Relations Against Defendant)**

46.**49.** Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation and averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

47.**50.** Plaintiffs and Andrew had an economic relationship whereby Andrew agreed to provide CSI with headcount and capital resources to meet certain criteria in order for Plaintiffs to be paid the earn-out.

48.**51.** Andrew knew that this was the agreement between Plaintiffs and Andrew.

49.**52.** Upon information and belief, Andrew intentionally frustrated and or disrupted this agreement by refusing to provide the headcount and capital resources.

50.**53.** Based on Andrew's false representations, Plaintiffs entered into the SPA.

51.**54.** Plaintiffs have suffered and will continue to suffer damages substantially and proximately caused by Andrew's intentional conduct.

FIFTH CAUSE OF ACTION
**(Negligent Interference with Prospective Economic Relations Against Defendant)**

2728195227281954\V-1

52.55. Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation and averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

52.56. Plaintiffs and Andrew had an economic relationship whereby Andrew agreed to provide CSI with headcount and capital resources to meet certain criteria in order for Plaintiffs to be paid the earn-out.

53.57. Andrew knew or should have known that this was the agreement between Plaintiffs and Andrew.

54.58. Upon information and belief, Andrew knew or should have known that it would disrupt this agreement by refusing to provide the headcount and capital resources.

55.59. Based on Andrew's false representations, Plaintiffs entered into the SPA.

56.60. Plaintiffs have suffered and will continue to suffer damages substantially and proximately caused by Andrew's intention conduct.

SIXTH CAUSE OF ACTION
(Breach of Implied Covenant of Good Faith and Fair Dealing)

57.    Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation and averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

58.    In every contract there is an implied covenant of good faith and fair dealing. As a result, Andrew had a duty to act in good faith and deal fairly with Plaintiffs in performing the terms of the SPA.

59.    As described more fully above, Andrew failed to act honestly and in good faith towards Plaintiffs in performing its obligations pursuant to the SPA.

- 13 -

60.    ~~Andrew has caused and will cause damage to Plaintiffs through its failure to act in good faith and deal fairly.  As a result, Plaintiffs have not received the benefits they expected when they entered into the SPA with Andrew.~~

61.    ~~Andrew's conducts as set forth above was willful, fraudulent, and done in a conscious disregard for Plaintiffs' rights.  Therefore, Plaintiffs are entitled to punitive damages in an amount subject to proof at trial.~~

61.    ~~Seventh cause of action~~

**(Unjust Enrichment/Fraudulent Transfer and
Imposition of Constructive Trust Against Defendant)**

~~62.~~**61.**  Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation and averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

~~63.~~**62.**  As a result of the relationship between Plaintiffs and Andrew and the facts stated above, Andrew has been unjustly enriched and a constructive trust should be established over the monies wrongfully obtained by Andrew from Plaintiffs.

~~64.~~**63.**  Plaintiffs have conferred a benefit on Andrew, and Andrew has knowledge of this benefit and has voluntarily accepted and retained the benefit conferred on it.

~~65.~~ **64.** Plaintiffs have no adequate remedy at law **and request relief under Section 10(n) of the SPA**.

~~66.~~**65.** By reason of the foregoing, Plaintiffs have been irreparably harmed and are entitled to the imposition of a constructive trust.

**EIGHTH**~~SEVENTH~~ CAUSE OF ACTION
**(Declaratory and Injunctive Relief Against Defendant)**

67.-**66.** Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation and averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

68.-**67.** Plaintiffs request that, pursuant to 28 U.S.C. §2201,**2201 and under Section 10(n) of the SPA,** this Court declare the respective rights and duties of the parties in this matter with regard to the SPA and Andrew's obligation to provide headcount and capital resources to CSI.

69.-**68.** For the reasons given above, a valid case and controversy exists sufficient for this Court to declare the rights and remedies of the parties in that there are and will continue to be acts by Andrew that are harming and will continue to harm Plaintiffs, including but not limited to Andrew's failure to provide CSI with necessary headcount and capital resources, that would in turn allow Plaintiffs to meet the criteria for the earn-out.

69.    There is an actual, ripe, and live controversy between Plaintiffs and Andrew regarding whether Andrew may continue to deny CSI needed headcount and capital resources.

70.    Accordingly, Plaintiffs request that this Court issue a declaratory judgment declaring that Andrew is breaching the SPA by failing to provide CSI with **needed** headcount and capital resources.

71.    Plaintiffs ask this Court to issue a declaration preliminarily and permanently enjoining Andrew from continuing to breach the SPA.

**EIGHTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**

**72.    Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation and averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.**

- 15 -

73. As of the execution of the SPA, Plaintiff Dominguez was an employee of Defendant. Andrew Corporation, through its agent DeFelice commenced a series of outrageous conduct, which began as derogatory statements relating to Plaintiff Dominguez's ethnicity. He is a Cuban American who came to the United States in 1980. These statements escalated into direct threats of physical violence toward Plaintiff Dominguez. The initial event occurred over the telephone in the Andrew offices. Plaintiff Dominguez was located in Milpitas, California, when DeFelice, who was in New Jersey, became irritated with Plaintiff Dominguez, and called Dominguez's wife, Rita Dominguez (also an employee of Andrew) and advised her that he hopes and wishes her husband gets hit "by a bus." This event was subsequently followed by an apology by DeFelice.

74. The second event again occurred over the telephone when DeFelice advised Dominguez that, "If I had a baseball bat, I'd bash your head in."

75. These events crescended into Andrew, through its agent DeFelice, engaging in a campaign to dissuade Plaintiff Dominguez, and indirectly the other Plaintiffs, from filing any lawsuit against Andrew for its failure to comply with the terms of the SPA and the Operating Agreement. DeFelice had several conversations with Dominguez advising him that Andrew will go to any length to not pay Dominguez and the other Plaintiffs what they are owed. Specifically, DeFelice apprised Dominguez that, "You don't understand, companies have killed people for less than this. Have your partners reconsider [it's not worth it]. If you are still alive you can start another business." While making these comments, DeFelice has invoked the names of senior personnel at Andrew and also apprised Plaintiff Dominguez of Andrew's actions in China to break up a protest at one of its manufacturing facilities. Andrew's conduct through its agent was intentional and malicious and done for the purpose of causing Plaintiff Dominguez to suffer humiliation,

- 16 -

mental anguish, and emotional distress. Andrew's conduct, through its agent, was an unveiled threat to persuade Plaintiff Dominguez and the other Plaintiffs from not proceeding with the instant lawsuit.

76.    As a proximate result of the acts alleged above, Plaintiff Dominguez suffered humiliation, mental anguish, and emotional distress, and has been injured as these threats have caused Plaintiff Dominguez to have insomnia, and they have distracted him from his duties at ACMC.  As such, Plaintiff Dominguez's ability to assist ACMC to achieve its earn-out numbers has also been compromised.  Plaintiff is informed and believes and thereon alleges that Plaintiff will thereby be prevented from attending to his occupation such that the ability to make the earn-outs in years two and three will result in a monetary loss.

77.    The acts of Andrew, through its agent, alleged above were willful, wanton, malicious, and oppressive and justify the awarding of exemplary and punitive damages.

NINTH CAUSE OF ACTION
(Negligent Infliction of Emotional Distress)

78.    Plaintiffs repeat, reallege, and incorporate by reference, each and every allegation and averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

79.    Defendant Andrew knew, or should have known, that its failure to exercise due care through its agent would cause Plaintiff Dominguez and its employee severe emotional distress.

80.    As a proximate result of Defendant Andrew's acts, through its agent, Richard DeFelice, DeFelice commenced a series of outrageous conduct, which began as derogatory statements relating to Plaintiff Dominguez's ethnicity.  He is a Cuban American who came to the United States in 1980.  These statements escalated into direct threats of

- 17 -

physical violence toward Plaintiff Dominguez. The initial event occurred over the telephone in the Andrew offices. Plaintiff Dominguez was located in Milpitas, California, when DeFelice, who was in New Jersey, became irritated with Plaintiff Dominguez, and called Dominguez's wife, Rita Dominguez (also an employee of Andrew) and advised her that he hopes and wishes her husband gets hit "by a bus." This event was subsequently followed by an apology by DeFelice.

81.    The second event again occurred over the telephone when DeFelice advised Dominguez that, "If I had a baseball bat, I'd bash your head in."

82.    These events crescended into Andrew, through its agent DeFelice, engaging in a campaign to dissuade Plaintiff Dominguez, and indirectly the other Plaintiffs, from filing any lawsuit against Andrew for its failure to comply with the terms of the SPA and the Operating Agreement. DeFelice had several conversations with Dominguez advising him that Andrew will go to any length to not pay Dominguez and the other Plaintiffs what they are owed. Specifically, DeFelice apprised Dominguez that, "You don't understand, companies have killed people for less than this. Have your partners reconsider [it's not worth it]. If you are still alive you can start another business." While making these comments, DeFelice has invoked the names of senior personnel at Andrew and also apprised Plaintiff Dominguez of Andrew's actions in China to break up a protest at one of its manufacturing facilities. Andrew's conduct through its agent was intentional and malicious and done for the purpose of causing emotional distress. Andrew's conduct, through its agent, as an unveiled threat to persuade Plaintiff Dominguez and the other Plaintiffs from not proceeding with the instant lawsuit.

- 18 -

**83.    As a further proximate result of Defendant Andrew's acts, through its agent, and the consequences proximately caused by them, as hereinabove alleged, Plaintiff Dominguez suffered severe emotional distress and mental suffering, all to his damage.**

PRAYER

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1.    On the First Cause of Action, ~~judgment against~~**an Order directing** Andrew ~~for an amount to be proven at trial, plus interest, costs, reasonable attorneys' fees, and other expenses incurred in collection of such damages~~**to comply with the terms and conditions of the SPA**.

2.    On the Second Cause of Action, judgment against Andrew for an amount to be proven at trial, plus interest, costs, reasonable attorneys' fees, and other expenses incurred in collection of such damages~~, as well as punitive damages~~.

3.    On the Third Cause of Action, judgment against Andrew for an amount to be proven at trial, plus interest, costs, reasonable attorneys' fees, and other expenses incurred in collection of such damages**, as well as punitive damages**.

4.    On the Fourth Cause of Action, judgment against Andrew for an amount to be proven at trial, plus interest, costs, reasonable attorneys' fees, and other expenses incurred in collection of such damages, as well as punitive damages.

5.    On the Fifth Cause of Action, ~~judgment against Andrew for an amount to be proven at trial, plus interest, costs, reasonable attorneys' fees, and other expenses incurred in collection of such damages, as well as punitive damages~~*the imposition of a constructive trust against Andrew*.

6.    On the Sixth Cause of Action, ~~judgment against Andrew for an amount to be proven at trial, plus interest, costs, reasonable attorneys' fees, and other expenses incurred in collection of such damages.~~

7. ~~On the Seventh Cause of Action, *the imposition of a constructive trust against Andrew.*~~8. ~~On the Eighth Cause of Action,~~ for a declaration that Andrew must comply with the SPA and an injunction enjoining Andrew from breaching the SPA,

**7.** **On the Seventh and Eighth Causes of Action, for general damages and punitive damages for severe emotional distress and mental suffering, according to proof;**

**8.** **For costs of suit herein incurred; and**

**9.** **For such other and further relief as the Court may deem proper**.

- 20 -